Date Filed: _1-18-00_

CASE # _____ Civ. 95-2460 PHX _____

CASE NAME _____ Washington _____

vs. _____ Stewart _____

## The Following document(s):

Dkt # _____    Transcript re:_____

_____

Dkt # _85_    Bulkie Document re:___Memo by Petition___

___re: Merit Claims_____

_____

Dkt # _____    Other re:_____

_____

## Has/Have been placed:

_____    In an Expando

_____    In the Sealed Room

_____    Other re:_____

Dkt # _85_

Fredric F. Kay
Federal Public Defender
Dale A. Baich (Ohio Bar No. 0025070)
Assistant Federal Public Defender
222 North Central Avenue, Suite 810
Phoenix, Arizona 85004
602.379.3670

John Trebon (State Bar No. 005375)
Trebon & Fine
308 N. Agassiz
Flagstaff, Arizona 86001
520.779.1713

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

THEODORE WASHINGTON,

Petitioner,

vs.

TERRY STEWART, et al.,

Respondents.

No.   CIV-95-2460-PHX-RGS

PETITIONER'S
MEMORANDUM REGARDING
MERIT CLAIMS

Petitioner Theodore Washington ("Washington"), pursuant to an order of the Court,[1] offers his memorandum addressing the merits of the claims as alleged in the First Amended Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254 by a Person in State Custody ("First Amended Petition") that are now pending before the Court.

## I. Introduction.

Theodore Washington is before this Court because the death penalty process in Arizona failed miserably. The system established in this state demands that a bifurcated trial be held on questions of guilt and sentencing; mandates that an appeal

[1]District Court Docket Entry No. ("Doc. No.") 64 at 35.

of the conviction and sentence be perfected; and permits collateral review to occur. In this case, however, the scheme broke down.

At least two jurors who convicted Washington do not believe that the death sentence was appropriate in this case.[2] However, their views were neither heard nor considered. Arizona is one of four death penalty states[3] that requires the trial judge alone to determine the existence of the factual issues that increase the maximum possible sentence. This practice has recently been called into question by the Supreme Court and that Court is again looking at the issue.[4]

Washington, like any other defendant seeking direct appellate review of his conviction and sentence, was entitled to independent review of his sentence by the state supreme court. While that review did take place, the Arizona Supreme Court did not adequately consider the evidence of an acquittal of a co-appellant. Part of the reason for this is that appellant counsel failed to present arguments related to these issues. The arguments on appeal would have resulted in a "dead-bang winner." On the same day Washington's conviction and sentence were upheld, his co-appellant James Mathers was acquitted by the state supreme court. The evidence against Washington was no stronger than the evidence against Mathers.

Finally, Arizona permits defendants in criminal cases to seek collateral review of a conviction or sentence. Washington sought such relief from the state courts,

---

[2]Affidavit of James A. Martin ("Martin Affidavit ") at ¶ 5; Affidavit of Linda Evans ("Evans Affidavit ") at ¶ 5; attached as Exhibits A and B to First Motion to Expand the Record Under Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts ("First Rule 7 Motion"). [Doc. No. -- ].

[3]Thirty-eight states, the federal government, and the United States military have statutes in place that allow for the imposition of a death sentence. *See* <http://www.essential.org/orgs/dpic/dpic1.htlm>

[4]*See* Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215 (1999); Apprendi v. New Jersey, 120 S.Ct. 525 (1999) (Mem.) (order granting certiorari).

however, review of one key issue did not occur. The state court judge declined to consider Washington's sufficiency of the evidence claim.

> In this court's view this may present a colorable claim for relief at some point in time, it seems most appropriate to allow counsel to make a record so it could be examined in the event that another court wishes to accept review.[5]

In other words, the state court judge passed the buck to "another court." That court is now this Court.

Washington, along with co-defendants Fred Robinson ("Robinson") and Jimmy Lee Mathers ("Mathers"), was convicted of first degree murder and other noncapital crimes, and sentenced to death after a trial at which the state presented evidence that Sterleen Hill was killed and her husband, Ralph Hill, Sr. badly injured during the invasion of their Yuma, Arizona home by two men. Even though there were two eye witnesses to the crime, neither identified Washington as being present. There was no physical evidence that placed Washington at or near the scene of the crime. At best, the evidence offered against Washington at trial showed that he was in Yuma, Arizona on the day of the crime.

The United States Constitution enshrines the privilege, through the writ of habeas corpus, to seek the aid of our courts whenever a person is held in jail or prison in violation of the Constitution. U.S. Const., Art. I, Section 9. Congress expressly provides that those wrongfully held in state custody may resort to the writ of habeas corpus to secure their release. 28 U.S.C. § 2254. At its core, the writ of habeas corpus is the primary -- and, in many cases, the only -- recourse to redress miscarriages of justice.

Reviewing a capital case is an exacting process, rife with technicalities and a distinctive mode of reasoning. It demands constant attention to the law of cumulation, which means a lot of little things add up. Following this case through

---

[5]State Court Trial Docket Entry ("Td.") at 192, 193.

the trial, the sentencing, the appeals, the collateral proceedings, and up to this point in the proceedings will necessitate this exercise in cumulation. However, what is at stake here is the tissue-thin difference between freedom and confinement, between life and death.

## II. Statement of the facts.

Washington had difficulty asserting himself both as a child and as an adult. His mother considered him weak and needing protection.[6] Growing up, Washington was bullied by the neighborhood children. In fact, Washington had a tendency to remain with people that he actually feared. His best friend as a child, Reggie Wait, fought with Washington regularly and, despite their friendship, Washington was scared of his friend.[7]

Washington's family believes that "Washington was not a leader; he was definitely a follower and had always been like that."[8] He is characterized as "tend[ing] to idealize people and . . .[being] impulsive in his reactions to people."[9] Throughout his life, Washington tended to "follow people who were on drugs. He was young and didn't care."[10] His associates often convinced him to act out.

---

[6]Declaration by Shirley Carson ("Carson Declaration") at ¶ 3, attached as Exhibit C to First Rule 7 Motion.

[7]Declaration by Sybil Littlejohn ("Littlejohn Declaration") at ¶ 9, attached as Exhibit D to First Rule 7 Motion.

[8]Littlejohn Declaration at ¶ 9; Declaration by Michelle Simpson ("Simpson Declaration") at ¶ 1, attached as Exhibit E to First Rule 7 Motion.

[9]Psychiatric Evaluation by Eva McCullars, M.D. Jun. 19, 1993 ("McCullars Evaluation") at 5. *See* Td. at 220.

[10]Littlejohn Declaration at ¶ 8.

Others described Washington as "gullible," "and easily led by others"[11] but they all agree that Washington was never violent.[12]  Because of his background, Washington tended to hide his feelings and allowed others to dominate him.

## A. The world Washington entered.

Theodore Washington was born on May 7, 1960[13] in Sacramento, California to Willie Mae Sampson Hines Skinner[14] ("Mrs. Skinner") and James Washington.[15] He was Mrs. Skinner's ninth child and her ninth pregnancy in a fifteen year period. Washington's half brothers and sisters were sired by eight different men.[16]

---

[11]Declaration by John Mondy ("Mondy Declaration") at ¶ 1, attached as Exhibit F to First Rule 7 Motion.

[12]Mondy Declaration at ¶ 1.

[13]Birth Certificate of Theodore Washington, attached as Exhibit G to First Rule 7 Motion.

[14]Willie Mae Skinner was born in Brookshire, Texas on May 30, 1919. Mrs. Skinner completed only the eighth grade. She grew up working on a cotton farm as a sharecropper. When she was in her twenties, Mrs. Skinner moved to Sacramento in search of work and began working in janitorial services. Declaration by Willie Mae Skinner ("Skinner Declaration") at ¶¶ 3, 4, attached as Exhibit H to First Rule 7 Motion.

[15]James Washington worked in a sawmill until he was murdered by his girlfriend on May 17, 1970. Death Certificate of Jim Washington, attached as Exhibit I to First Rule 7 Motion. James Washington appears to have been a quiet man but he frequently came by to see his son. The two were close and Washington was greatly distressed by the death of his father. Skinner Declaration at ¶¶ 4, 7, and 8.

[16]On February 9, 1945, Mrs. Skinner gave birth to her first child, Shirley Carson, out of wedlock. Shirley's father is Travis Stinson. After Shirley's birth, Mrs. Skinner married John Oliver Mondy and they had two children together, John Mondy, Jr. (January 19, 1946) and Patricia Lane Mondy (March 6, 1947). In 1949, Mrs. Skinner gave birth to her fourth child, Willie Champion, who has been described

At the time Washington was born, Mrs. Skinner was married to Ed Hines.[17] Over the years, Mrs. Skinner had many boyfriends and husbands, and these men routinely moved in and out of the family home.[18]

Mrs. Skinner's relationship with the men in her life was physically violent at times. Her daughter Shirley insisted that no one would call the police because "if anybody called the police it would've been the men calling them on Mama."[19] The only occasion when the police were called was following a fight between Mrs. Skinner and Washington's father, James.[20]

Washington was fifteen years younger than his oldest half sister, Shirley, who helped to raise him and the other children.[21] At his birth, Mrs. Skinner seriously considered abandoning Washington to other family members to raise. However, Shirley talked her mother into keeping Washington. Subsequently, Mrs. Skinner

_____

as "slow". His father, Dodie Lee Champion, was killed in a driving accident when he fell asleep at the wheel. A year later, in 1950, Mrs. Skinner gave birth to James Meyers, who was given away to another family. His father was James Otis Meyers. Leonard Beans, Mrs. Skinner's sixth child was born September 20, 1954. His father was Lennis Beans, who was an alcoholic. Leonard is mentally retarded and his birth was complicated and may have involved some trauma to the child. Leonard attends "workshops" for mentally retarded individuals where he works as a janitor. Michelle Anita Simpson was born to Mrs. Skinner and Carl Vernel Simpson on July 28, 1956. Mrs. Skinner's eighth child, Sybil Bracey, was fathered by Emmit Smith. Skinner Declaration at ¶ 3.

[17]Mrs. Skinner divorced Ed Hines in March of 1967, when Washington was almost seven years old. Later, she married David Skinner, but they no longer reside together. Skinner Declaration at ¶¶ 6, 9.

[18]Carson Declaration at ¶ 10.

[19]Carson Declaration at ¶ 11.

[20]Carson Declaration at ¶ 11; Littlejohn Declaration at ¶ 4.

[21]Carson Declaration at ¶ 9, 10.

became overly protective and indulgent of Washington due to her feelings of guilt. She further justified her behavior, as she explained to her children, as "something was wrong with Ted."[22] Shirley explained that, "Ted is very dependent on Mom. His role in the family was the baby; he didn't have to grow up."[23]

### B. Abuse.

Physical abuse was common in Washington's childhood home. His mother used to beat the children, including Washington, as a means of discipline.[24] She would "cuss at them and beat them over the head."[25] Washington reported that "the whippings raised welts. It was hard to move afterwards."[26] This abuse continued as much as twice a day from the age of five until Washington was twelve.[27]

Mrs. Skinner was a "dominant woman, a strong woman," who instilled a "respectful fear" in her children.[28] According to Shirley, she and her siblings "feared their mom like you fear Jesus and God."[29] Corporal punishment was common in the household. Shirley reported, "She'd get us. If you talked back, she slapped you or hit you . . . ." By today's standards, Mrs. Skinner's discipline would be called cruel

---

[22]Carson Declaration at ¶ 3.

[23]Carson Declaration at ¶ 2.

[24]McCullars Evaluation at 3.

[25]Littlejohn Declaration at ¶ 5.

[26]Neuropsychological Evaluation by Tod Roy, Ph.D. Apr. 16, 1993 ("First Roy Evaluation") at 8. *See* Td. at 210.

[27]First Roy Evaluation at 6.

[28]Carson Declaration at ¶ 5.

[29]Carson Declaration at ¶ 6.

or abusive.[30]  Sybil recalled, "when I was a child I would have bruises all over my body."[31]  She also recalled getting black eyes for minor transgressions.[32]  Even Washington's oldest brother reported that, although he used to box, Mrs. Skinner "hit harder than anyone."[33]  He recalled one incident when she knocked him out simply for being down the street watching a burning house.[34]

### C.  Learning disabilities.

Washington experienced significant learning difficulties in school and never achieved a reading level above the eighth grade or a math level above the seventh grade.[35]  He may have suffered from a learning disability but was not diagnosed as a child.[36]

Washington attended Ethel Phillips Elementary School and John F. Morse Elementary School in Sacramento, California.  Washington's 1965 school records noted a placement for special classes for "educable mentally retarded" children but no follow-up was recorded.[37]  During the second grade, Washington was directed to speech therapy classes for a speech impediment but his family moved before he received any help. His eldest sister, Shirley, did not recall ever noticing anything wrong but she reported, "Lots of things could happen in Mom's house and you just

---

[30]Carson Declaration at ¶ 6.

[31]Littlejohn Declaration at ¶ 5.

[32]Littlejohn Declaration at ¶ 5.

[33]Mondy Declaration at ¶ 2.

[34]Mondy Declaration at ¶ 2.

[35]First Roy Evaluation at 22.

[36]Neuropsychological Evaluation by Tod Roy, Ph.D. Aug. 23, 1993 ("Second Roy Evaluation") at 8. *See* Td. at 227.

[37]First Roy Evaluation at 9.

wouldn't know."[38]

Washington attended high school in Sacramento but he never graduated. At age fourteen, he was kicked out of one high school for fighting and then never completed Lincoln High, which was a vocational high school for troubled children.[39] While in school, Washington used marijuana and alcohol.[40] In 1977, Washington enrolled at Dorsey High School in Los Angeles, where he had gone to try and start school again. His grades ranged from C's and D's, and eventually D's and F's, before he dropped out.[41]

No adequate attention to his psychological difficulties was provided while he was a child. Reportedly, he was given Valium™ as a child to control his hyperactivity.[42] Washington revealed a history of mood swings but he indicated that he "didn't cry, just suffers, grieves."[43] At the age of fifteen, Washington was seen once by a psychologist who concluded that his troubles were related to the lack of a male figure in his life and the death of his father."[44] He received no other psychological treatment.[45]

---

[38]Carson Declaration at ¶ 7.

[39]McCullars Evaluation at 3.

[40]Carson Declaration at ¶ 8; Littlejohn Declaration at ¶ 6.

[41]First Roy Evaluation at 9.

[42]First Roy Evaluation at 21.

[43]McCullars Evaluation at 5.

[44]First Roy Evaluation at 21.

[45]Several of Washington's siblings have serious mental conditions. Willie Champion is "slow". He currently appears to have a problem with alcohol and he has never been able to hold down a steady job. Mrs. Skinner is his legal guardian. Willie supports himself with government assistance related to his mental disabilities.

Page 9

## D. Head injuries.

Starting from age two, Washington experienced a number of potentially serious head injuries. Between the ages of two and five, Washington hit his head falling out of bed at night. He did not receive medical attention.[46] Around age twelve, Washington was hit in the back of the head with a baseball bat, resulting in a brief loss of hearing.[47] In 1975, Washington was in a head-on collision between the bicycle he was riding and a car. After being thrown through the air, Washington landed on the windshield of the car. He suffered severe headaches and pain to the back of his head as a result and had to be taken for medical attention.[48] A year later, Washington was hit on the top of his head with a bumper jack, which resulted in a numbing pain to the upper half of his body.[49] Later at age eighteen, Washington was assaulted by several men while at a party. He was hit on the side of the head, kicked and punched repeatedly, until he passed out.[50] Washington's brother John saved him. Washington had so much blood on him that his clothes stuck to him. He was placed

---

Skinner Declaration at ¶ 3. Leonard Bean is mentally retarded and lives on government disability. First Roy Evaluation at 6. Skinner Declaration at ¶ 3. Sybil Littlejohn is dyslexic and has a learning disability. Because of her learning difficulties, Sybil was unable to graduate from high school. Throughout school, her reading abilities remained no higher than the first grade level. She has recently been working with a tutor and is now able to read at the fourth grade level. Littlejohn Declaration at ¶ 10.

[46]First Roy Evaluation at 13.

[47]First Roy Evaluation at 13.

[48]First Roy Evaluation at 14.

[49]First Roy Evaluation at 13.

[50]First Roy Evaluation at 14; Monday Declaration at ¶ 3.

in a bathtub to soak in order for the bloody clothes to be removed.[51]  In 1987, Washington was again beaten and hit on the head.  During this episode, Washington was hit on the temple with a gun.[52]

### E.  Other medical conditions.

At an unspecified point in his childhood, Washington suffered a high fever but its severity and duration are unknown.  He is diagnosed as having a history of hypoglycemia, but controls his illness with attention to his sugar intake.[53] Occasionally, as a result of the hypoglycemia, Washington suffered "episodes of confusion."[54]

### F.  Delinquency.

Washington had problems with the law during his childhood, beginning shortly after his father died, when he was eleven years old.  Washington had a traumatic reaction to the death of his father.[55] As an adolescent, Washington's encounters with the law were primarily a result of poor judgment and his susceptibility to peer pressure.  When his friends attempted to steal a woman's purse, Washington was arrested, although he was trying to help the woman.[56] Washington's friends then "pointed the finger" at him.[57] He was placed in juvenile detention for one month and required to do community service following that incident.  Between the ages of

---

[51]Mondy Declaration at ¶ 3.

[52]First Roy Evaluation at 14.

[53]McCullars Evaluation at 4 & 6.

[54]McCullars Evaluation at 7.

[55]First Roy Declaration at 8; Declaration by David Skinner ("David Skinner Declaration") at ¶ 2, attached as Exhibit J to First Rule 7 Motion.

[56]McCullars Evaluation at 3.

[57]McCullars Evaluation at 3.

fourteen and twenty, Washington engaged in numerous burglaries, usually to support his drug habit. In 1981, he was arrested and ultimately sentenced to six years in prison. He was released in 1985.[58]

### G. Substance abuse.

Washington was given his first taste of alcohol when he was two years old. His mother gave him alcohol to "knock [him] out as an infant."[59] By the age of eight, Washington was drinking and passing out from alcohol provided by his mother's boyfriend. Within four years, Washington was drinking heavily.[60] He was an alcoholic by age fourteen.[61] He started using barbiturates and uppers during this period,[62] but preferred the uppers because "they keep [him] up and alive."[63] Washington experimented with LSD and PCP as an adolescent, as well.[64]

In 1981, Washington was hospitalized following an adverse reaction to LSD and alcohol. Supposedly, Washington did not know that the alcohol was laced.[65] Along with alcohol, marijuana and other street drugs, his sister reported that Washington was smoking embalming fluid to get high.[66] Washington's drug use led to a brief psychiatric hospitalization, but Washington did not fully recover even after

---

[58]McCullars Evaluation at 3.

[59]First Roy Evaluation at 15.

[60]McCullars Evaluation at 5.

[61]First Roy Evaluation at 15.

[62]McCullars Evaluation at 5.

[63]First Roy Evaluation at 15.

[64]McCullars Evaluation at 5.

[65]First Roy Evaluation at 16; Littlejohn Declaration at ¶ 7.

[66]Littlejohn Declaration at ¶ 6.

his stay in the hospital. For awhile, he was "still looking crazy, . . . his eyes were all big. . . and he was talking evil."[67]

Around March of 1986, Washington began using crack cocaine and, very quickly, his use was costing him between $200 and $300 daily. Under the influence of the drugs, Washington began losing weight rapidly. His weight dropped from 172 to 130 pounds at one point. He reported that, despite his best efforts, he was unable to stop using. Washington began selling crack to support his habit.[68] By 1987, Washington was free basing cocaine.[69]

## H. Fatherhood.

Washington met Penny Ivette Johnson in 1980 and married her two years later. Penny is significantly older than Washington.[70] They had one child together, Jermone Theodore Washington. There were allegations that Penny had abused their son.[71] Washington and Penny later divorced, and Washington maintained custody of his son. Jermone now lives with Washington's mother, Mrs. Skinner.[72]

## I. Washington moves to Banning.

In 1986, Washington moved from Sacramento to Banning, California. During this time, he worked as a second foreman at Ceramic Tiles Company in Corona, California which was about an eighty mile round trip commute. After two and a half months, he quit this job because of the distance. Washington's son, Jermone, was

---

[67]Littlejohn Declaration at ¶ 7.

[68]McCullars Evaluation at 4.

[69]McCullars Evaluation at 4.

[70]Skinner Declaration at ¶ 10.

[71]Simpson Declaration at ¶ 6.

[72]Skinner Declaration at ¶ 10.

living with him at the time and Washington wanted to "spend time with his family."[73]

In Banning, Washington first met Fred Robinson. He was introduced by his half-sister, Senthia. The men shared an interest in motorcycles and blues music. Although Fred Robinson did not use alcohol or drugs, Washington was using marijuana regularly. Fred later introduced Washington to James Mathers, who was heavily involved with drugs.

Susan Hill was Robinson's common-law wife. The relationship between Robinson and Hill was described as "a long, stormy relationship" in which Robinson physically and verbally abused Hill.[74] During instances when Robinson was physically or verbally abusive toward Susan Hill and Washington was present, Washington routinely put himself between Robinson and Hill and acted as Susan Hill's protector.[75]

Robinson and Hill separated numerous times during their relationship. On those occasions when Susan Hill left Robinson, he traveled to wherever Hill was and, through violent confrontations and threats of murder, persuaded Hill to return with him. On at least one of those occasions, James Mathers traveled with Robinson to

[73]First Roy Evaluation at 20.

[74]State v. Robinson, 165 Ariz. 51, 54, 796 P.2d 853, 856 (1990). Washington's case was consolidated on appeal with Robinson's and Mathers' cases. The Arizona Supreme Court issued a consolidated opinion in Washington's and Robinson's cases, and a separate opinion in Mathers' case. State v. Mathers, 165 Ariz. 64, 796 P.2d 866 (1990). Any reference to Washington's case on direct appeal will be to the official citation -- State v. Robinson, supra.

[75]Declaration by Susan Hill ("Hill Declaration") at ¶ 6, attached as Exhibit K to First Rule 7 Motion.

force Hill to return.[76] Washington was never present during any of these events. [77]

In March, 1987, Hill again left Robinson. She traveled to Yuma, Arizona where she stayed with her parents for a brief period before returning to California to live with other relatives.

### J. The crime.

On June 8, 1987, Robinson and Mathers loaded a shotgun, a rifle and pistols into Robinson's car. They told one of Robinson's sons, Andre, that "they were going to Arizona to take care of some business."[78] Washington was not present when the weapons were loaded into the car or when these statements were made by Robinson and Mathers.[79] At some later point, Robinson and Mathers drove to Washington's house and Washington joined Robinson and Mathers in the car. The three, who resided in Banning California, then drove to Yuma, Arizona.[80]

In the evening of that same day, Le Sean Hill, son of Ralph and Sterleen Hill, answered a knock at the front door of their residence. When Le Sean opened the door, a man said that his name was "James"[81] and that he owed Le Sean's father some money. The man at the door then tried to grab Le Sean's arm. Le Sean pushed the man away and ran out the back door, yelling to his parents as he passed their room. Le Sean was subsequently unable to identify the man at the door. Indeed, Le Sean

---

[76]State v. Robinson, 165 Ariz. at 54, 55, 57, 796 ).2d at 856, 857, 859.

[77]Susan Hill Declaration at ¶ 6; Transcript of Trial Proceedings ("TR") Dec. 8, 1987 at 121, 122.

[78]TR Dec. 4, 1987 at 123-29; Dec. 8, 1987 at 6,17.

[79]TR Dec. 4, 1987 at 123-29; Dec. 8, 1987 at 31.

[80]State v. Mathers, 165 Ariz. at 69, 796 P.2d at 871; State v. Robinson, 165 Ariz. at 55, 796 P.2d at 857.

[81]Mathers' first name was Jimmy. He was known as "Jimmy Lee" and "J.B."

was unable to discern even the race of the person at the door. Le Sean testified that "James" "sounded black" but that he "could have been white."[82]

Ralph and Sterleen Hill jumped out of bed and ran into the dining room. There, the Hills were confronted by two men. One of the men yelled, "[w]e're narcotics agents. We want the dope and the money."[83] The Hills were taken to their bedroom and forced to lie face down on the bedroom floor. One man stood over them with a gun. The other man searched the Hill dresser drawers. Mr. Hill heard someone say, "[w]e better get the kid."[84] The Hills were tied up. Mr. Hill testified that he was then knocked unconscious.[85] Both of the Hills were shot in the back. Mrs. Hill died. Mr. Hill survived.

Mr. Hill did not identify Washington as one of the men in the house. Mr. Hill was shown a photograph of Washington and he did not identify Washington.[86] Washington was also placed in a line-up and Mr. Hill was unable to identify Washington by sight or voice as one of the men in the Hill residence on the night of the crime.[87]

Within moments of the shootings, Robinson was arrested while driving away from the Hill home.[88] When Robinson was stopped by the police, a red bandana, which contained hair similar to that of Mathers, was found in his car on the driver's

---

[82]TR Dec. 2, 1987 at 31, 55.

[83]TR Dec. 12, 1987 at 123.

[84]TR Dec. 12, 1987 at 126.

[85]TR Dec. 10, 1987 at 128, 129.

[86]TR Dec. 8, 1987 at 212.

[87]TR Dec. 8, 1987 at 216.

[88]TR Dec. 3, 1987 at 70.

side dashboard.[89]

Mathers was taken into custody, after being stopped in Coachella, California by members of the Hill family traveling to Yuma, on June 9, 1987.[90] Mathers told the Hill family that he was returning from Yuma.[91]

Washington made three telephone calls from Yuma on the day of the crime.[92] He was arrested in Banning, California on June 10, 1987.

### K. The trial.

Robert Clarke of Yuma, Arizona was appointed to represent Washington at trial.[93] Repeatedly, Washington moved to sever his case from Robinson's case and Mathers' case.[94] He argued:

- The state provided information through discovery that the co-defendants made statements to incriminate Washington but that Washington made no statement except to deny his participation in the crime.[95] The motion to sever was made pursuant to Bruton v. United States, 391 U.S. 123 (1968).[96]

---

[89]TR Dec. 3, 1987 at 195; State v. Robinson, 165 Ariz at 55, 796 P.2d at 854.

[90]TR Dec. 8, 1987 at 207.

[91]TR Dec. 8, 1987 at 110.

[92]State v. Robinson, 165 Ariz. at 56, 796 P.2d at 858.

[93]Td. at 28.

[94]Td. at 40; TR Sept. 17, 1987 at 31. Throughout the trial, Washington continued to move for a severance of his case from Mathers' case and Robinson's case. See TR Nov. 9, 1987 at 44.

[95]In response to that motion, the state expressly professed that "post arrest statements made by the defendants will not be used in the case in chief." TR Sept. 17, 1987 at 28. However, see Part II (L) and (M) infra.

[96]Td. at 40.

- The state intended on using evidence of prior bad acts by Robinson and Mathers.[97] Introduction of this evidence would be prejudicial to Washington.

The trial court denied Washington's motions to sever.[98]

The state offered no physical evidence to place Washington in or near the Hill residence, nor was there physical evidence connecting Washington to any of the property removed from the Hill home. No eyewitness testimony placed Washington in or near the Hill residence.

At the joint trial, the state argued that Robinson drove Mathers and Washington to the Hill residence. According to the state, Robinson waited in the car while Mathers and Washington went inside the Hill home. The state argued that Mathers shot the Hills while Washington attempted to find drugs in the house.[99] All three were found guilty on all counts.[100]

Susan Hill, the daughter of the victims and Fred Robinson's former wife, does not believe Washington was part of the plan or took part in the killing and assault.

> Although Teddy may have been with Fred and Mr. Mathers when they left Banning, California on June 8, 1987, and Teddy may have been in Yuma, Arizona on June 9, 1987, I do not believe that Teddy Washington was involved in the murder of my step-mother and the shooting of my father. I do not believe Teddy would hurt my family.
>
> . . . If Teddy would have been made aware that this was Fred's plan, or if he knew that Fred was traveling to my parents' home on June 8, 1987, he would have left Fred and Mr. Mathers.[101]

Although the jury found Washington guilty, two of the jurors believe

[97]TR Sept. 17, 1987 at 34-39; TR Nov. 9, 1987 at 38; Td. 74.

[98]TR Sept. 17, 1987 at 44-45; TR Nov. 9, 1987 at 38.

[99]TR Dec. 11, 1987 at 37, 39, 67, 68.

[100]TR Dec. 15, 1987 at 45-49.

[101]Hill Declaration at ¶¶ 9, 10; *see also* Carson Declaration at ¶ 13.

Washington was guilty only by association.

> [T]he older colored defendant was a control freak. He was the instigator, the one who planned it. The white guy was the shooter. Teddy was a follower who was in the wrong place at the wrong time. Teddy was the least involved of the three men and he was the least guilty.[102]

■  ■  ■

> We all believed Jimmy Mathers was the shooter. Teddy was guilty by association and was the least guilty of the three.[103]

Following the verdict, Washington moved for a judgment of acquittal and for a new trial.

> The evidence against my client, to characterize it as weak is certainly an overstatement. There is simply no evidence to connect my client with the scene of the crime, and aside from the fact that he was seen leaving the Banning area on the day of the homicide in the company of Fred Robinson and Mr. Mathers, and also of course the evidence disclosed that he was at least in the Yuma area sometime around 2 a.m. on June the 9th, there simply was no other evidence to indicate that this defendant committed the crime as alleged by the state.

> For those reasons, judge, I believe that the court should have directed a verdict of acquittal at the close of the state's evidence and certainly following the close of the case. I don't believe that there was anything else presented that would indicate that the defendant was guilty. The motion for new trial, judge, is based upon again the insufficiency of the evidence as I previously set forth before to the court. In addition, I believe that the verdict clearly was a product of simply guilt by association inasmuch as there was little if any evidence to connect this defendant with the crime. I think it's rather clear that what the jury probably did was they considered the evidence against Fred Robinson, which was rather substantial, found him guilty, and then because of the prior bad acts, judge, as a result of 2 rulings which allowed prosecution to impeach in essence his witnesses, the witnesses being Truman Robinson and Joe Dixon, with respect to their statements as to whether or not this defendant was wearing a red headband, and I think especially in connection with the prior bad act of which my client had absolutely nothing to

---

[102]Evans Affidavit at ¶ 4.

[103]Martin Affidavit at ¶ 3.

do with, I believe that the jury simply lumped all the defendants together and found them guilty.

I believe that is the reason that Teddy Washington was found guilty of this crime, and not from an independent evaluation of the evidence as it exists solely against Teddy Washington. For those reasons, judge, and as a result of your ruling in connection with the prior bad acts, your refusal to order a separate trial for Teddy Washington, I would request that he be granted a new trial.[104]

The court overruled Washington's motions.[105]

### L. The sentencing hearing.

After Robinson, Mathers, and Washington were convicted, the trial court held a joint sentencing hearing pursuant to Ariz. Rev. Stat.. §13-703. Washington again moved for an acquittal and a new trial.[106]

Neither Robinson nor Mathers presented mitigating evidence. Washington, however, presented undisputed mitigating evidence that he was a friendly, nonviolent person, a dependable worker, and a good father. The undisputed testimony also established that Washington was gullible and easily led. In addition, counsel argued that Washington was, if anything, a minor participant.[107] Washington also offered the testimony of Dr. Spritz, the attending physician to Mr. Hill, who testified that he could not say either way whether Mr. Hill was struck by a blunt object or rendered unconscious before being shot.[108] Finally, Washington offered the testimony of Steve Thomas. Thomas testified that Washington stated that he went to Yuma for a party.

---

[104]TR Dec. 23, 1987 at 5-7.

[105]TR Dec. 23, 1987 at 13.

[106]TR Jan. 8, 1988 at 32.

[107]TR Jan. 13, 1988 at 170-76.

[108]TR. Jan. 8, 1988 at 115-117.

> After they got to Yuma, he said that him and Fred got into an argument because it wasn't a party that they were going to. It was something else. And after the heated argument he gets out of the car. And after he got out of the car he was trying to get back to California, because I think him and Freddy had argued about some things. I don't know what it was.

In addition, Thomas testified that Washington stated that Robinson never told Washington what he intended to do once he got to Yuma.[109]

The state however, shifted its position concerning the admissibility of the post-arrest statements allegedly made by Washington and Robinson. Over Washington's objection, the state was permitted to introduce the post-arrest statements by Washington and Robinson into evidence.[110]  Specifically, the state offered the testimony of Major Ogden who interviewed Washington on June 11, 1987.

- [Robinson, Mathers and Washington] had left Banning. They got in the car to come to Arizona to party. . . . They left to go to the freeway coming to Yuma, [Washington] woke up.[111]

- He stated that he had gotten (sic) in an argument with Robinson.  Robinson told him they were supposed to see a coke dealer in Yuma and take him off.[112]

- This argument took place -- it took place at Carl's

---

[109]TR. Jan. 8, 1988 at 97-98.

[110]The state attempted to distinguish the "trial phase" from the "sentencing phase" of the capital proceeding by using the colloquialism "case in chief" -- a term which has no meaning in a capital case -- to mean the trial phase of the case. TR Jan. 8, 1987 at 57-58. This position is at odds with the supreme court's holding that "[a]n aggravation-mitigation hearing regarding the death sentence involves the same safeguards as a trial." State v. Robinson, 165 Ariz. at 59, 796 P.2d at 861. If Washington was afforded the protection against the admission of the statements at the trial phase of the proceedings, surely that same protection applies to the sentencing phase as well.

[111]TR Jan. 8, 1988 at 64.

[112]TR Jan. 8, 1988 at 59.

Jr., I believe here in Yuma. . . . At that point, he said he did get out of the car.[113]

Washington objected to the admission of the statements and the testimony by Major Ogden.

> At the beginning of this case we of course have a stipulation of the prosecutor that he will not use the statements of any of the 3 defendants. I don't believe that stipulation was limited for any purpose, judge. I think he now seeks to get around that by saying I made that stipulation on the basis of some sort of Bruton problem and it doesn't apply. If you take a look at the stipulation wherein he indicated he was not going to use the statements it doesn't say anything about it being limited for purposes of a Bruton problem or anything. It simply says he did not intend to use the statements at the trial. I suggest, your honor, that he is still bound by that stipulation, and as a result, this statement as it relates to Teddy Washington and the statements of the other 2 defendants are not admissible.[114]

The state later argued:

> *As testified by Major Ogden today, concerning the statement by Theodore Washington,* that Theodore Washington knew when he -- at least when he got to Yuma that there was going to be a robbery of a drug dealer, and that this robbery could have and may have and certainly was probable it would have resulted in a shooting or killing of these drug dealers, evidenced by the fact of the statement that if things get rough, shoot them, take them out, *were statements that Theodore Washington made.*[115]

The trial court, however, in response to a question as to what it would consider for purposes of sentencing, stated: "I have determined, gentlemen, and I will announce it here that *I do not intend to use the statements of the June 11 conversation or thereafter.*"[116]  The court later reiterated "[a]s I told you before, *I do not feel the*

---

[113]TR Jan. 8, 1988 at 60.

[114]TR Jan. 8, 1988 at 56-57.

[115]TR Jan. 8, 1988 at 149-150. (emphasis supplied).

[116]TR Jan. 8, 1988 at 149. (emphasis supplied).

Page 22

*need to consider the June ll interview of Mr. Washington.* I will take any possible stigma out of that from Mr. Clarke and Mr. Rouff."[117]

### M. The sentence.

Despite these representations and reassurances by the trial court, the statements made by Washington and recounted by Major Ogden were used against Washington and considered by the court in its decision to impose death.[118]

Irrespective of the fact that there was no physical evidence or eyewitness testimony that placed Washington at or near the Hill home, the trial court found that Washington "committed the offense in the expectation of the receipt of something of monetary value."[119] The court also found that "the defendant committed the offense in an especially heinous, cruel or depraved manner" because "[t]here is no reasonable doubt that the offense was committed in a cruel manner."[120]

In making this finding, the court relied on the June 11th statement by Washington and retold by Major Ogden. The court specifically found that Washington "was advised that the real purpose of this trip was to 'take out' a drug dealer and get his dope and money."[121] The only way the court could have reached this conclusion was to rely on the testimony by Major Ogden. The Court then found an absence of mitigating factors and sentenced Washington to death.[122] [123]

---

[117]TR Jan. 8, 1988 at 197. (emphasis supplied).

[118]TR Jan. 13, 1988 at 26.

[119]TR Jan. 13, 1988 at 26.

[120]TR Jan. 13, 1988 at 27.

[121]TR Jan. 13, 1988 at 26.

[122]TR Jan. 13, 1988 at 29.

[123]It should be noted that two of the jurors did not believe that a sentence of death is appropriate in this case. Although the jurors found Washington guilty, two

Page 23

At bottom, both the trial court and the state went back on their word to Washington that the post-arrest statements would not be offered into evidence and would not be considered by the court.

### N.  The direct appeal.

On appeal, the Arizona Supreme Court issued a consolidated opinion on the appeals of Robinson and Washington, the two black co-defendants.  The court affirmed the convictions and sentences.[124]

In a separate opinion on the same day, the supreme court vacated the convictions and sentences of Mathers, the white co-defendant, based upon insufficient evidence.  The supreme court held that the evidence offered against Mathers, "[a]t best, . . . supports an inference that Mathers went to Yuma with Robinson and Washington, reached Yuma, was present in Yuma, and returned from Yuma to California.  It does not, however, establish that Mathers went to the Hill home, was at the Hill home, was in the Hill home, or participated in the murder and

of the jurors believe Washington was guilty only by association.

> [T]he older colored defendant was a control freak.  He was the instigator, the one who planned it.  The white guy was the shooter.  Teddy was a follower who was in the wrong place at the wrong time.  Teddy was the least involved of the three men and he was the least guilty.  Evans Affidavit at ¶¶ 4, 5.
>
> ■   ■   ■
>
> We all believed Jimmy Mathers was the shooter.  Teddy was guilty by association and was the least guilty of the three.  Martin Affidavit at ¶¶ 3, 5.

In addition, Susan Hill, the victim's daughter, does not believe the death penalty is appropriate for Washington.  Hill Declaration at ¶ 12.

[124]State v. Robinson, 165 Ariz. 51, 796 P.2d 853; *cert den. sub nom.* Robinson v. Arizona, 498 U.S. 1110 (1991).

other crimes."[125] The court entered a judgment of acquittal on all counts in Mathers' case.

Although the evidence against Washington was no stronger than the evidence against Mathers -- and counsel for Washington vigorously argued at trial that the evidence against Washington was not sufficient to sustain a conviction and that a judgment of acquittal should have been entered -- inexplicably counsel on appeal, who was trial counsel, failed to present and argue this issue to the Arizona Supreme Court. Appellate counsel failed to present the state supreme court with an issue that was a "dead-bang winner."

## O. State collateral proceedings.

### a. Proceedings in the superior court.

The state of Arizona has in place a post-conviction process, defined in Ariz. R. Crim. P. Rule 32. Proceedings under Rule 32 are designed to provide convicted prisoners with an adequate opportunity to obtain relief from improper or unjust convictions under the state constitution or statutes, or the federal Constitution.

Washington filed a petition in the superior court seeking post-conviction relief.[126] Counsel was appointed and Washington subsequently amended the Rule 32 petition.[127] Afterwards, the superior court issued a ruling. The court disposed of all of Washington's claims except one: competency of counsel.[128] The court then scheduled and conducted an evidentiary hearing as to that claim.[129]

In disposing of the remaining claims, the superior court was obviously troubled

---

[125]State v. Mathers, 165 Ariz. at 69, 796 P.2d at 871.

[126]Td. at 169.

[127]Td. at 182.

[128]Td. at 192.

[129]Td. at 192, 194.

by the fact that Mathers had been acquitted by the Arizona Supreme Court on direct review while Washington's conviction was upheld and he remained under sentence of death. The court found:

> Quite truthfully, this court has a great deal of difficulty finding a basis to hold this defendant culpable which does not apply, at least equally or in a greater manner, to James Mathers. If Mathers, who was present at all times before the entry into the Hill residence, was not guilty of conspiring to rob and kill, no greater evidence seems to place this defendant at the scene.

■   ■   ■

> James Mathers' conviction was reversed as a mitigating factor. It is true that this court, at sentencing, viewed Mathers as the triggerman. It is also true that he is now free while the two defendants who probably did not, physically, kill anyone are on death row. This does not mean that this court can "forgive" them or reexamine their sentences which have been affirmed by the supreme court.

> The record is silent, insofar as this court can tell, as to the supreme court considering the reversal of Mathers' case with regard to Petitioner's case. This court has a difficult task in finding any evidence linking Washington to the crime.

> The findings in State v. Mathers, 165 Ariz. 64, at 68-70, which might apply to Washington, were:

> 1. ". . . the evidence would support a finding that Mathers said they were going to Arizona (not Yuma) to take care of business . . ."

> No evidence suggests that Washington said anything about the trip or its purpose.

> 2. ". . . that Mathers was seen helping load a duffel bag and some guns into Robinson's car . . ."

> No evidence suggests that Washington assisted Mathers in doing the loading. In fact the record suggests it was Robinson who assisted.

> 3. " . . . that Mathers was seen in the [Robinson's] car apparently leaving Banning with Robinson and Washington."

> 4. "At best the evidence supports an inference that Mathers went to Yuma with Robinson and Washington, and returned from Yuma to California. It does not, however, establish that Mathers went to the Hill's home,

Page 26

> was at the Hill's home, was in the Hill's home, or participated in the murder and other crimes."
>
> These two areas of evidence show first, clearly, that all three of the defendants rode together from Banning to Yuma and the record supports the fact that only Mathers, apparently, was able to return to California.
>
> But what other evidence was there of the activities of this petitioner which separates him from Mathers? From the facts found in State v. Robinson, 165 Ariz. 51, at 54-56, we know that only Robinson was seen leaving the area in his auto; that Robinson was stopped and had the red bandana (with hairs which did not match Washington) and Mathers' duffel bag.
>
> We know that Washington was in Yuma as he called Ms. Bryant from here. He told the officers what Robinson said about the purpose of the trip, but never said he was at or in the house.[130] No one else placed him in the house either. The only reference was to an unidentified, black male who had a mustache.
>
> However, the supreme court has accepted as true that the evidence showed that Washington entered the Hill residence while armed with a .38 caliber pistol and, though present with knowledge of the possibility or probability of killing, did nothing to stop the same. This court must accept that as true and does.
>
> To this court's view this may present a colorable claim for relief at some point in time, it seems most appropriate to allow counsel to make a record so it could be examined in the event that another court wishes to accept review.[131]

Clearly, Judge Bradshaw felt that evidence was exculpatory as to Washington and might, in the language of Rule 32.1(d) "... require that the conviction or sentence be vacated ..." However, Judge Bradshaw did not do what Rule 32 required of him. The superior court held a limited evidentiary hearing solely on the claim of ineffective assistance of counsel. Ultimately, the court then denied Washington's

---

[130]It was not proper for the court to consider statements by Washington. *See* Part II (L) and (M) *supra*.

[131]Td. at 192, pp. 3-5.

Page 27

petition seeking post-conviction relief.[132]

### b. Collateral proceedings in the state supreme court.

Washington sought review of the superior court's summary dismissal of the post-conviction petition in the Arizona Supreme Court. The state supreme court, without opinion, denied review. State v. Washington, No. CR-94-0410-PC (Sup. Ct. Apr. 25, 1995.)

### P. Federal review.

Washington then filed a Petition for Writ of Habeas Corpus and Application for Appointment of Counsel in the United States District Court for the District of Arizona. [Doc. No. 2.] Pursuant to 28 U.S.C. § 2254 and subsequent orders issued by this Court, Washington's First Amended Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254 by a Person in State Custody is properly before this Court. After issuing a stay of execution and setting a schedule for the filing of various pleadings, the Court ruled on the procedural status of Washington's constitutional claims. Memorandum and Order, Aug. 9, 1999. [Doc. No. 64.] The Court also denied Washington's first request for leave to amend his habeas corpus petition. [Doc. No. 56.] In addition, the Court denied Washington's motion for stay and abeyance pending exhaustion of constitutional claims in the Arizona courts. Order, Oct. 13, 1999. [Doc. No. 72.] Pending is Washington's second request for leave to amend the petition to include the claim outlined at Part III(H). See, Memorandum and Order, Aug. 9, 1999 at 25, n.9; Second Set of Amendments, Aug. 24, 1999. [Doc. No. 67.]

Washington will now address the merits of the pending constitutional claims.

### III. Response to specific claims.

### A.

In his third claim for relief, Washington alleges his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution

---

[132]Td. at 244, 245.

were violated as a result of the refusal by the trial court to sever Washington's case from the cases against the co-defendants.

### 1. Relevant facts.

At trial, the state presented evidence that Fred Robinson had twice before hunted down his common-law wife, Susan Hill, and returned her to their home.[133] Washington did not accompany Robinson on either of those trips.[134] Washington objected to the admission of this evidence as irrelevant and highly prejudicial.[135] In addition, the state introduced evidence that the murder weapon, which was seen in Fred Robinson's bedroom prior to the murder, was stolen.[136] Washington also objected to the admission of testimony and evidence that the shotgun was stolen.[137]

Washington repeatedly moved for a severance of his case from Fred Robinson's case.[138] The trial court overruled Washington's objection and denied his motion for severance.[139] The evidence related to Fred Robinson's tracking down of his wife and "persuading" her to return, as well as the stolen shotgun, may have been relevant in the state's case against Robinson and Mathers, but it was irrelevant and prejudicial to Washington. For this reason, among others, Washington's case should have been severed from the case against Mathers and Robinson.

---

[133]On at least one of those occasions, petitioner's co-defendant, Jimmy Mathers, accompanied Robinson. TR Dec. 8, 1997 at 90.

[134]Hill Declaration at ¶ 6.

[135]TR Nov. 9, 1987 at 22-27; Dec. 4, 1987 at 3-6.

[136]TR Nov. 18, 1987; TR Dec. 9, 1987 at 87; and State's Exhibit 13A.

[137]TR Nov. 18, 1987; TR Dec. 9, 1987 at 88.

[138]TR Sept. 17, 1987 at 35; Nov. 9, 1987 at 38.

[139]TR Sept. 17, 1987 at 48; Nov. 9, 1987 at 44.

## a. Prior kidnappings by Robinson and Mathers.

The state introduced the following evidence at trial:

Fred Robinson met Susan Hill in 1972 through a motorcycle club. Eventually Susan became Robinson's common-law wife. The couple parented three children, Andre, Truman, and Misha. They had lived together in a stormy relationship punctuated by periodic separations. Robinson verbally and physically abused Susan.

In February 1984, Susan left Robinson to go and live with her sister in Pacoima, California. Robinson confronted Susan in Pacoima and eventually forced her to return with him to his Banning, California residence. He told Susan that if she did not return with him, he would take her out to the desert and dispose of her where no one would ever find her.

In June 1986, Susan was staying with another sister in North Hollywood, California. Two men forced their way into the house and tied Susan's sister's and niece's hands together, all the while exhibiting small handguns. Susan hid in a closet. Soon she heard Robinson talking and then heard her sister ask her to come out. When Susan stepped from the closet, Robinson began to unbuckle a knife from his belt. Susan begged him not to take out the knife. Robinson told Susan that he had travelled (sic) to North Hollywood intending to kill her and her sister but had changed his mind because of the niece's presence. Susan then returned to Banning with Robinson.

In November 1986, without Robinson's knowledge, Susan went to Philadelphia, Pennsylvania, to live with her aunt and uncle. When Susan mailed her children Christmas presents with a Philadelphia return address, Robinson discovered her whereabouts. In January 1987, Robinson went to Philadelphia to retrieve Susan. Jimmy Lee Mathers accompanied him on the trip. Robinson used a ruse to lure Susan to a train station. He then grabbed her and took her to California. Before Susan left Philadelphia, she told her aunt and uncle that something would happen to them if Susan did not return to Banning with Robinson.

Upon returning to California, Susan stayed with Robinson for approximately three weeks. In February 1987, Susan persuaded Robinson to permit her to go to her father's house in Yuma, Arizona, for one week. Her father, Ralph Hill, Sr., and stepmother, Sterleen Hill, lived in Yuma with their teenage son, LeSean. The Hills were well acquainted with Robinson. Susan lived at the Hill home nearly three weeks, during which time Robinson telephoned at least twice. Sterleen Hill told Susan to inform Robinson that Sterleen had obtained a peace bond against him and that Robinson should not enter upon their

property. In a letter, Susan informed Robinson of her stepmother's statement.

Susan then went to Pacoima, California, to stay with her grandmother, then to Pasadena, California, to live with a sister. She did not notify Robinson that she had moved out of the Hill home.[140]

The evidence at issue demonstrated that Fred Robinson had hunted Susan Hill on a number of occasions, and was willing to use violence to force her to come back to him. By implication, the people who accompanied Robinson on these sojourns -- people like Jimmy Mathers – were likewise willing to use violence to accomplish their goal.[141] This evidence, introduced over Washington's objection, was not relevant to any alleged conduct by Washington, yet this evidence was extremely prejudicial. He suffered the unfair implication of linkage with those past acts of violence and the unfair inference of a predisposition to commit similar acts on the occasion in question.

### b. The shotgun in Robinson's home.

Similarly, the admission of the report concerning the stolen shotgun, unfairly link Washington to the shotgun. The defendants argued that the trial court erred in admitting hearsay evidence that the shotgun used in the slaying had been reported missing. The state asserts that it introduced this evidence in order to place the shotgun in Banning.

Over defense objection, the state had a law enforcement officer relate the

---

[140]State v. Robinson, 165 Ariz. at 57, 796 P.2d at 859.

[141]Susan Hill Declaration, at ¶¶ 4-6. On the other hand, Susan Hill, who was familiar with Washington knew him to be a "kind, polite and respectful man," who on many occasions protected her from Robinson's abuse and cruelty. Id. at ¶ 8. Susan Hill does not believe Robinson was involved in the murder of her step-mother or the assault of her father, and that if he did become aware that Robinson and Mathers were planning to engage in the conduct that resulted, that he would have left their company and not participate in such activity. Id. at ¶ 9, 10.

contents of the report on the missing shotgun. That on January 20, 1987, a Banning resident reported that his .12-gauge pump shotgun, Savage Model No. 69RXL, Serial No. E437931, was missing. The weapon was then seen in Robinson's bedroom by his sons Andre and Truman.[142] The trial court permitted this evidence to be introduced because it was a routine report, made prior to the crime, and did not implicate the defendants.[143]

Robinson's sons only saw Mathers and Robinson load the weapons into Robinson's car.[144] There was no evidence introduced that Washington knew that Robinson possessed this weapon or that Washington was present when it was loaded into Robinson's car. In addition, the state was unable to make any connection between Washington and the murder weapon. His fingerprints were not on the weapon.[145]

## 2. Argument.

This is not a case in which the prior bad acts evidence may be deemed harmless. The state did not possess any physical evidence or eyewitness testimony against Washington. The introduction of evidence admissible only against Robinson and Mathers, but not Washington -- at a trial where the court had refused to sever the cases -- tipped the balance in favor of the state.

### a. State court decision.

The Arizona Supreme Court upheld the refusal by the trial court to sever Washington's trial from that of Robinson and Mathers. First, the supreme court stated "since the evidence was clearly admissible against Robinson, the absence of

[142]TR Dec. 4, 1987 at 127, 198-99.

[143]State v. Robinson, 165 Ariz. at 54-55, 57, 796 P.2d at 856-57, 859.

[144]TR Dec. 4, 1987 at 123-29.

[145]TR Dec. 3, 1987 at 107-111.

[Washington] diminishes the prejudicial impact [of the evidence] as to him."[146] Second, the court noted that "the trial court gave a limiting instruction when this evidence was presented."[147]  However, the supreme court analyzing this evidence in the Mathers case found that testimony regarding the abduction of Susan Hill in Philadelphia by Robinson could not be used against Mathers absent any evidence of his complicity in that event.[148]

### b. Severance was required.

If substantial other crimes evidence is admissible against one defendant but inadmissible against a co-defendant, and if that evidence is such that it would tend to incriminate both the defendant against whom it is admissible and the one against whom it is inadmissible, then the latter is entitled to severance.

The state court's reasoning that Washington's non-involvement in Robinson's prior misconduct makes the evidence less prejudicial to Washington, is fundamentally mistaken.  It is precisely *because* Washington was *not* with Robinson on those prior occasions that this evidence is so damaging to Washington.  The state supreme court in Mathers refused to consider the Susan Hill abduction testimony as evidence against Mathers.[149]  If this evidence had nothing to do with Mathers,[150] then it had nothing to do with Washington.

The trial court's cautionary instruction to the jury cannot cure the harm of admitting the evidence of Robinson's and Mathers' prior conduct to Washington's case.  There are some contexts in which the risk that the jury will not, or cannot,

---

[146]State v. Robinson, 165 Ariz. at 55-56, 796 P.2d at 857-58.

[147]State v. Robinson, 165 Ariz. at 55-56, 796 P.2d at 857-58.

[148]State v. Mathers, 165 Ariz. at 68, 796 P.2d at 870.

[149]State v. Mathers, 165 Ariz. at 68, 796 P.2d at 870.

[150]State v. Mathers, 165 Ariz. at 69, 796 P.2d at 871.

Page 33

follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. The supreme court recognized this when it specifically rejected the state's argument on appeal, finding "[w]e failed to see how Robinson's abduction of Susan . . . can be used against Mathers.[151]

### c. The state court's decision is unreasonable.

Two or more defendants may be tried jointly to promote judicial economy and efficiency and "to serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." Richardson v. Marsh, 481 U.S. 200, 210 (1987). However, the Supreme Court clearly has admonished that the benefits of joint trials are permitted only as long as "these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial." Bruton v United States, 391 U.S. 123, 131 (1968).

A joint trial may prejudice one of the accused. If it appears that a defendant or the government is prejudiced by a joinder of defendants for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. The Supreme Court noted the inevitable fact that when co-defendants are tried together and "they have markedly different degrees of culpability, this risk of prejudice is heightened." Zafiro v. United States, 506 U.S. 534, 539 (1993).

In Zafiro, the Supreme Court expounded further advising that the courts "should be mindful of the serious risks of prejudice and overreaching that are characteristic of joint trials." 506 U.S. at 545. Specifically, in Zafiro, the Supreme Court held that a lower court should grant a severance if there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at

---

[151]State v. Mathers, 165 Ariz. at 68, 796 P.2d at 870.

Page 34

539. This is precisely the situation in Washington's case.

Washington was denied his right to a fair trial, and specifically, to not have the jury hear highly prejudicial materials that would have been indisputably inadmissible in a severed trial. In Bruton, the Supreme Court reversed a lower court holding precisely because the trial court failed to sever the trials of two co-defendants where the jury was allowed to hear "evidence that is probative of a defendant's guilt but technically admissible only against a co-defendant." See 391 U.S. at 131. The error in Washington's case far exceeds that of the Bruton case in that the evidence presented to the jury was not even technically probative of Washington's guilt but was solely prejudicial.

### d. The limiting instruction did not cure the harm.

The Arizona Supreme Court admitted that the evidence of Robinson's and Mathers' prior acts were potentially damaging to Washington, but, relying upon State v. Canedo, 125 Ariz. 197, 200, 608 P.2d 774, 777 (1980), concluded that "the trial court gave a limiting instruction when this evidence was presented. This adequately protected Washington."[152]

Limiting instructions are not sufficient to assure that the jury will consider the evidence against one defendant and then disregard it in deliberations on the co-defendant. The Supreme Court recognized the ineffectiveness of this form of remedy:

The fact of the matter is that too often such admonition

---

[152]State v. Robinson, 165 Ariz. at 57, 796 P.2d at 859. Canedo deals with the admissibility of the prior bad acts of the defendant, himself,  not those of a co-defendant. Canedo is limited to "the right of a criminal defendant to instructions regarding the limited use to be made of prior convictions." 123 Ariz. at 200, 608 P.2d at 777. Perhaps this type of harm might be cured with instructions to the jury, but the level of risk and harm is much greater in the case of a joint trial where the rights to a fair trial for one of the defendants is greatly jeopardized by highly prejudicial and inadmissible evidence. [T]he fact finder will in no way ascertain the unique function of the testimony and will in all likelihood utilize the convictions as substantive evidence of guilt." Id.

> against misuse is intrinsically ineffective in that the effect of such a nonadmissible declaration cannot be wiped from the brains of the jurors. The admonition therefore becomes a futile collocation of words and fails of its purpose as a legal protection to defendants against whom such a declaration should not tell.

Delli Paoli v. United States, 352 U.S. 232, 247 (1957). "The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction." Krulewitch v. United States, 336 U.S. 440, 453 (1949) (Jackson, J., concurring).

In Bruton, the Court specifically concluded the effectiveness of limiting instructions when dealing with the presentation of evidence against a co-defendant in a joint trial. The Supreme Court held that limiting instructions to the jury were insufficient because "the jury is expected to perform the overwhelming task of considering it in determining the guilt or innocence of the [defendant] and then of ignoring it in determining the guilt or innocence of any co-defendants . . . A jury cannot segregate evidence into separate intellectual boxes." 391 U.S. at 131. Although limiting instructions might cure some lesser conflicts, the degree of risk and harm in this case emphasize that there is "much more at stake than administrative convenience." Zafiro 506 U.S. at 545.

Washington's conviction and sentence speak to the seriousness of the harm done at the trial level. In a capital case, the stakes involved are such that the trial court must not violate any of the defendant's rights to a fair trial. The law in this matter is unequivocal. A trial of two defendants must be severed when the prejudice to one defendant is great and "a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539.

Although the Supreme Court allows the lower courts some discretion in creating remedies, the Court has clearly held, "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the

consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." Bruton, 391 U.S. at 135. Limiting instructions to the jury to ignore the highly prejudicial and inadmissible evidence against Washington while retaining it in their deliberations on Robinson and Mathers violated the Supreme Court holding in Bruton v. United States and provided no protection of Washington's rights to a fair trial.

■    ■    ■

Where the evidence is much stronger against one defendant than against the other, and the specter is raised that the less incriminated defendant may be found guilty by association, severance is required.[153]    Here, because Washington unwittingly traveled with two persons who had previously used force and violence to effect Susan Hill's return, the jury may well have inferred that he was similarly inclined and used that inference to fill in the holes in the state's case against him.

Washington's rights as guaranteed by the Due Process Clause of the Fifth Amendment to the United States Constitution; the Right to Counsel Clause of the Sixth Amendment to the United States Constitution; the Eighth Amendment protections against cruel and unusual punishment; and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, were violated as a result of the failure to sever his case from that of the co-defendants at trial and from the prejudicial admission of hearsay.

**B.**

Washington alleges, in his fourth claim for relief, that his right to a fair trial was violated when the court refused to allow counsel to challenge, through cross-examination, the witnesses offered by the state. This failure violated Washington's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

---

[153]Here, two jurors believed Washington was guilty by association. *See* Martin Affidavit at ¶ 3; Evans Affidavit at ¶ 4.

Page 37

Constitution.

## 1. Relevant facts.

Washington never even had the opportunity to confront one of the witnesses against him as the court, over objection, limited counsel's cross-examination.[154] At Washington's trial, defense counsel attempted to cross-examine Barbara Bryant, Washington's girlfriend, concerning inconsistent statements she had made.[155]

The state called as a witness Barbara Bryant, the girlfriend of Theodore Washington, and elicited testimony that Washington telephoned the witness several times from a pay telephone located in Yuma, Arizona, on June 9, 1987. During questioning by the state the following exchange took place:

Q. Let me backstep a few questions. When you got these calls in the middle of the night, did you ever ask him where he was?

A. I asked him once and he said, "Arizona".

Q. Arizona?

A. Uh - Huh.

Q. Did you ask him what he was doing in Arizona?

A. He said he was stranded.[156]

Thereafter, counsel for Washington cross-examined the witness concerning these calls. The witness was asked specifically what Washington said when he called her the first time during the early morning hours of June 9, 1987.[157] The state objected based upon hearsay and the court sustained the objection because the

---

[154]TR Dec. 3, 1987 at 144-45. In addition Washington moved for a mistrial. *Id.*

[155]TR Dec. 3, 1987 at 136-37.

[156]TR Dec. 2, 1987 at 122-123.

[157]TR Dec. 2, 1987 at 137.

question had already been asked and answered.[158] The trial court then explained that the question had been asked and answered by the state and the court would presume the witness' answers would be the same and prevented counsel from continuing with that line of questioning.[159]

Lengthy arguments then followed wherein counsel for Washington argued that the state could not "open the door" to the conversation and then limit cross-examination as to that conversation. Following the discussion, the trial court asked the state if it continued its objection. The state retracted somewhat and said that he believed counsel's point was well taken and that cross-examination on the conversation of the first telephone call, the one in which Washington stated he was stranded, would be proper.[160] Nevertheless, the trial court thereafter sustained the entire objection and left the issue for someone else to decide.[161]

### 2. Argument.

A witness can be cross-examined on any relevant matter.[162] The trial court's ruling cuts right to the heart of the purpose of cross-examination. If a witness cannot be asked specifically about those areas explored by the state, then why cross-examine at all. Washington should have had the right to cross-examine the witness concerning Washington's statements to her, especially since the state opened the door.

In all criminal prosecutions the accused has a right, guaranteed by the Sixth

---

[158]TR Dec. 2, 1987 at 137-138.

[159]TR Dec. 2, 1987 at 138.

[160]TR Dec. 2, 1987 at 143.

[161]TR Dec. 2, 1987 at 144. The following day Robinson, joined by Washington, filed a motion for mistrial on the grounds that he had been denied his right of cross-examination. TR Dec. 3, 1987 at pp. 16-19. The trial court overruled the motion and the trial continued.

[162]Ariz. R. Evid. 611(b).

and Fourteenth Amendments to the United States Constitution, "to be confronted with the witnesses against him." U.S. Const., Amdt. 6; Pointer v. Texas, 380 U.S. 400 (1965) (applying Sixth Amendment to the States). Central to the Confrontation Clause is the right to "ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." Maryland v. Craig, 497 U.S. 836, 845, (1990). The accused has a right to force a witness "'to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth.'" California v. Green, 399 U.S. 149, 158 (1970) (footnote and citation omitted). The Supreme Court has repeatedly rejected suggestions that the Confrontation Clause should be narrowly construed.

Here, Washington should have been permitted to cross-examine Barbara Bryant regarding the statements made by Washington in the telephone conversations. The state opened the door by asking the question of the witness on direct examination. Allowing cross-examination on this point would have ensured the reliability of the evidence against Washington, or alternatively would have demonstrated that the already weak, circumstantial case presented by the state was even thinner.

■ ■ ■

The refusal to permit cross-examination not only violated Washington's right to confrontation under the Sixth Amendment, but his rights to due process and a reliable sentencing hearing under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

## C.

Insufficient evidence existed to sustain Washington's convictions and sentences. In light of the judgment of acquittal entered by the Supreme Court of Arizona in State v. Mathers, Washington alleges in his fifth claim for relief that his conviction and sentence violate the Fifth, Sixth, Eighth and Fourteenth Amendments

to the United States Constitution.

## 1. Relevant facts regarding Washington.

Insufficient evidence existed to sustain Washington's convictions and/or sentence of death. The following evidence, as well as the prior bad acts of Mathers and Robinson described at Part III(A) *supra*, was offered against Washington and found **SUFFICIENT** to uphold his conviction.[163]

### a. Washington in a car in California.

On June 8, 1987, Robinson and Mathers left the residence in Banning, California traveling toward Washington's house. Washington, Robinson, and Mathers were last seen around 6:00 p.m. embarking on their trip in Robinson's tan Chevette.[164]

### b. Outside the Hill home.

### i. One man knocks on the door.

Later that day in Yuma, Arizona just before midnight, LeSean Hill opened the door of his parents house. A man with a deep voice identified himself as James and told LeSean that he had some money for Ralph Hill. When LeSean opened the door to accept the money, the man attempted to grab LeSean. LeSean pulled away, ran through the house past his parents' bedroom, and escaped through another door.[165]

### ii. Washington is not identified as the man.

Le Sean was unable to identify the man at the door. In fact, Le Sean could not identify Washington, Robinson or Mathers as being the person at the door. Indeed, Le Sean was unable to discern even the race of the person at the door. Le Sean testified that "James" "sounded black" but that he "could have been white."[166]

---

[163]*See* State v. Mathers, 165 Ariz. at 71, 796 P.2d at 873.

[164]TR Dec. 4, 1987 at 133-137.

[165]State v. Robinson, 165 Ariz. at 55-56, 796 P.2d at 857-58.

[166]TR Dec. 2, 1987 at 31, 55.

### c. Inside the Hill home.

### i. Events in the home.

Ralph and Sterleen Hill emerged from the bedroom as a result of the commotion and heard voices shout, "We're narcotics agents. We want the dope and the money." Ralph Hill could see shadows of two people but could not identify their voices. The two intruders forced Ralph and Sterleen to return to the bedroom and lie face down on the floor. Someone kept saying, "We know you got the money and the dope." During this time a black man with a red bandana and a moustache "screwed" a handgun into Ralph's ear, then ransacked the drawers and closet. A second person stood over Ralph and Sterleen. Someone said, "We better get the kid."[167]

### ii. Who was in the home?

Washington was not identified by Ralph Hill as being in the home. Mr. Hill said a "black man" was in the home. Washington is African-American. Fred Robinson is African-American too. Fred Robinson had facial hair.[168] When Robinson was stopped by the police moments after the Hills were shot, a red bandana was found in his car on the driver's side dashboard.[169] Mathers' hair was found in the red bandana.[170]

### d. Washington in Yuma.

At approximately 2:00 a.m. on June 9, 1987, Washington placed a telephone call to his girlfriend, Barbara Bryant. He gave her a Yuma telephone number at which he could be reached. Later, Washington called a second time and gave her a second Yuma telephone number. Bryant phoned Washington a total of three times at Yuma telephone numbers. During one of these conversations, Washington told her that he was stranded in Arizona. One phone number at which Bryant contacted Washington was assigned to the Yuma bus station.

---

[167]State v. Robinson, 165 Ariz. at 55-56, 796 P.2d at 857-58.

[168]See Defendants' Trial Exhibit W-E. Robinson is located in position number 2.

[169]TR Dec. 3, 1987 at 195; State v. Robinson, 165 Ariz at 55, 796 P.2d at 854.

[170]TR Nov. 30, 1987 at 19.

Washington returned to Banning by bus.[171]

Washington was in Yuma, Arizona on the day of the crime.

### 2. Relevant facts regarding Mathers.

The following evidence, as well as the prior bad acts of Mathers and Robinson described at Part III(A) *supra,* was offered against Mathers and found **INSUFFICIENT** to sustain his conviction.[172]

#### a. Mathers in a car in California.

[T]he state presented evidence that appellant Mathers, and co-defendants Robinson and Washington left Banning, California, and drove to Yuma, Arizona, on the afternoon of June 8, 1987. Appellant Mathers told Andre Robinson before they left that they were going to Arizona to take care of some business. Obviously the "business" appellant Mathers referred to required the use of weapons, as a shotgun, two pistols, and ammunition were loaded into the car. Brief for State at 21.

We agree the evidence would support a finding that Mathers said they were going to "Arizona [not Yuma] to take care of business," that Mathers was seen helping load a duffle bag and some guns into Robinson's car, and that Mathers was seen in the car apparently leaving Banning with Robinson and Washington. We find no evidence to support the state's assertion that "obviously" the "business" referred to required the use of weapons.[173]

#### b. Outside the Hill home.

#### i. One man knocks on the door.

Later that day in Yuma, Arizona just before midnight, LeSean Hill opened the door of his parents house. A man with a deep voice identified himself as James and told LeSean that he had some money for Ralph Hill. When LeSean opened the door to accept the money, the man attempted to grab LeSean. LeSean pulled away, ran through the house past his parents' bedroom, and

---

[171]State v. Robinson, 165 Ariz. at 55-56, 796 P.2d at 857-58.

[172]*See* State v. Mathers, 165 Ariz. at 71, 796 P.2d at 873.

[173]State v. Mathers, 165 Ariz. at 68, 796 P.2d at 869.

escaped through another door.[174]

### ii. Who knocked on the door?

Le Sean was unable to identify the man at the door. In fact, Le Sean could not identify Washington, Robinson or Mathers as being the person at the door. Indeed, Le Sean was unable to discern even the race of the person at the door. Le Sean testified that "James" "sounded black" but that he "could have been white."[175]  Mathers was not identified as being outside the Hill home.  However, Mathers' first name was "James," and although he was white, he was often described as "acting black."[176]

### c. Inside the Hill home.

### i. Events in the home?

Ralph and Sterleen Hill emerged from the bedroom as a result of the commotion and heard voices shout, "We're narcotics agents.  We want the dope and the money."  Ralph Hill could see shadows of two people but could not identify their voices.  The two intruders forced Ralph and Sterleen to return to the bedroom and lie face down on the floor.  Someone kept saying, "We know you got the money and the dope."  During this time a black man with a red bandana and a moustache "screwed" a handgun into Ralph's ear, then ransacked the drawers and closet.  A second person stood over Ralph and Sterleen.  Someone said, "We better get the kid."[177]

### ii. Who was in the home?

Mr. Hill said a "black man" was in the home.  The African-American man had a pistol, wore a red bandana and had a moustache.

Fred Robinson is African-American. Fred Robinson had facial hair.[178]  When Robinson was stopped by the police moments after the Hills were shot, a red bandana

---

[174]State v. Robinson, 165 Ariz. at 55-56, 796 P.2d at 857-58.

[175]TR Dec. 2, 1987 at 31, 55.

[176]Declaration by Dana Huseth ("Huseth Declaration") at ¶ 3, attached as Exhibit L to First Rule 7 Motion.

[177]State v. Robinson, 165 Ariz. at 55-56, 796 P.2d at 857-58.

[178]See Defendants' Trial Exhibit W-E. Robinson is located in position number 2.

was found in his car on the driver's side dashboard.[179] Mathers' hair was found in the red bandana.[180]

### d. Mathers in Yuma.

Mathers was arrested in . . . Yuma after he agreed to accompany two officers there. Susan and two carloads of Hill family members and friends confronted Mathers near Coachella the day following the murder. After Mathers had been questioned by the group, he fled to a nearby store. The evidence is conflicting about whether one of the group pulled a gun on Mathers. There is evidence to support the state's assertion that Mathers "admitted" that he had been in Arizona, and stated that Robinson was in Yuma. At best, this evidence supports an inference that Mathers went to Yuma with Robinson and Washington, reached Yuma, was present in Yuma, and returned from Yuma to California. *It does not, however, establish that Mathers went to the Hills' home, was at the Hills' home, was in the Hills' home, or participated in the murder and other crimes.*[181]

Mathers was in Yuma, Arizona on the day of the crime.

### 3. Washington versus Mathers.

Another way to look at the evidence against Washington and the evidence against Mathers is to read the two direct appeal decisions side-by-side.

---

[179]TR Dec. 3, 1987 at 195; State v. Robinson, 165 Ariz at 55, 796 P.2d at 854.

[180]TR Nov. 30, 1987 at 19.

[181]State v. Mathers, 165 Ariz. at 68-69, 796 P.2d at 869-70 (emphasis supplied).

## Washington

. . . Robinson and Mathers left the residence [in Banning] travelling (sic) toward Washington's house. Washington, Robinson, and Mathers were last seen around 6:00 p.m. embarking on their trip in Robinson's tan Chevette.

. . . About 11:45 p.m., someone knocked on the door. When LeSean opened the door, a man with a deep voice identified himself as James and told LeSean that he had some money for Ralph Hill. When LeSean opened the door to accept the money, the man attempted to grab LeSean. LeSean pulled away, ran through the house past his parents' bedroom, and escaped through another door. Ralph and Sterleen Hill emerged from the bedroom as a result of the commotion and heard voices shout, "We're narcotics agents. We want the dope and the money." Ralph Hill could see shadows of two people but could not identify their voices. The two intruders forced Ralph and Sterleen to return to the bedroom and lie face down on the floor. Someone kept saying, "We know you got the money and the dope." During this time a black man with a red bandana and a moustache "screwed" a handgun into Ralph's ear, then ransacked the drawers and closet. A second person stood over Ralph and Sterleen. Someone said, "We better get the kid."

\* \* \*

At approximately 2:00 a.m. on June 9, 1987, Washington placed a telephone call to his girlfriend, Barbara Bryant. He gave her a Yuma telephone number at which he could be reached. Later, Washington called a second time and gave her a second Yuma telephone number. Bryant phoned Washington a total of three times at Yuma telephone numbers. During one of these conversations, Washington told her that he was stranded in Arizona. One phone number at which Bryant contacted Washington was assigned to the Yuma bus station. Washington returned to Banning by bus.

State v. Robinson, 165 Ariz. at 55-56, 796 P.2d at 857-58.

## Mathers

We agree the evidence would support a finding that Mathers said they were going to "Arizona [not Yuma] to take care of business," that Mathers was seen helping load a duffle bag and some guns into Robinson's car, and that Mathers was seen in the car apparently leaving Banning with Robinson and Washington. . . .

\* \* \*

. . . Mathers was not arrested in Coachella but was, instead, arrested in Yuma after he agreed to accompany two officers there. Susan and two carloads of Hill family members and friends confronted Mathers near Coachella the day following the murder. After Mathers had been questioned by the group, he fled to a nearby store. The evidence is conflicting about whether one of the group pulled a gun on Mathers. There is evidence to support the state's assertion that Mathers "admitted" that he had been in Arizona, and stated that Robinson was in Yuma. At best, this evidence supports an inference that Mathers went to Yuma with Robinson and Washington, reached Yuma, was present in Yuma, and returned from Yuma to California. *It does not, however, establish that Mathers went to the Hills' home, was at the Hills' home, was in the Hills' home, or participated in the murder and other crimes.*

State v. Mathers, 165 Ariz. at 68-69, 796 P.2d at 869-70 (emphasis supplied).

The supreme court concluded Washington was in Yuma on the night in question and that was sufficient to uphold his conviction. The supreme court also concluded that Mathers was in Yuma on the night in question but this evidence was insufficient to sustain his conviction.

**4. The trial judge questioned the sufficiency of the evidence.**

The state of Arizona has in place a post-conviction process, defined in Ariz. R. Crim. P. 32. Proceedings under Rule 32 are designed to provide convicted prisoners with an adequate opportunity to obtain relief from improper or unjust convictions under the state constitution or statutes, or the federal Constitution. Rule 32 proceedings collapsed five former avenues of post-conviction relief into one, which is initiated before the original trial judge as part of the original criminal proceeding.[182]

In disposing the claims, the superior court was obviously troubled by the fact that Mathers had been acquitted by the Arizona Supreme Court on direct review while Washington's conviction was upheld and he remained under sentence of death. The court found:

> Quite truthfully, this court has a great deal of difficulty finding a basis to hold this defendant culpable which does not apply, at least equally or in a greater manner, to James Mathers. If Mathers, who was present at all times before the entry into the Hill residence, was not guilty of conspiring to rob and kill, no greater evidence seems to place this defendant at the scene.

---

[182]Rule 32.1 enumerates the grounds upon which relief may be granted. Among those grounds is Rule 32.1(e) which allows relief on the basis of newly-discovered material facts. If newly-discovered material facts exist, Rule 32.1(e)(1) mandates that the court consider the probability that such facts would have changed the verdict or sentence. The court is directed by Rule 32.6 to hold a hearing after it determines that the petitioner has raised an issue of material fact or law which would entitle him to relief. Finally, Rule 32.8 says that a petitioner "shall be entitled to a hearing to determine issues of material fact, with the right to be present and to subpoena witnesses in his behalf."

■ ■ ■

James Mathers' conviction was reversed as a mitigating factor. It is true that this court, at sentencing, viewed Mathers as the triggerman. It is also true that he is now free while the two defendants who probably did not, physically, kill anyone are on death row. This does not mean that this court can "forgive" them or reexamine their sentences which have been affirmed by the supreme court.

The record is silent, insofar as this court can tell, as to the supreme court considering the reversal of Mathers' case with regard to Petitioner's case. This court has a difficult task in finding any evidence linking Washington to the crime.

The findings in State v. Mathers, 165 Ariz. 64, at 68-70, which might apply to Washington, were:

1. ". . . the evidence would support a finding that Mathers said they were going to Arizona (not Yuma) to take care of business . . ."

No evidence suggests that Washington said anything about the trip or its purpose.

2. ". . . that Mathers was seen helping load a duffel bag and some guns into Robinson's car . . ."

No evidence suggests that Washington assisted Mathers in doing the loading. In fact the record suggests it was Robinson who assisted.

3. " . . . that Mathers was seen in the [Robinson's] car apparently leaving Banning with Robinson and Washington."

4. "At best the evidence supports an inference that Mathers went to Yuma with Robinson and Washington, and returned from Yuma to California. It does not, however, establish that Mathers went to the Hill's home, was at the Hill's home, was in the Hill's home, or participated in the murder and other crimes."

These two areas of evidence show first, clearly, that all three of the defendants rode together from Banning to Yuma and the record supports the fact that only Mathers, apparently, was able to return to California.

But what other evidence was there of the activities of this petitioner which separates him from Mathers? From the facts found in State v. Robinson, 165 Ariz. 51, at 54-56, we know that only Robinson was seen leaving the area in his auto; that Robinson was stopped and had the red bandana (with hairs which did not match Washington) and

Page 48

Mathers' duffel bag.

We know that Washington was in Yuma as he called Ms. Bryant from here. He told the officers what Robinson said about the purpose of the trip, but never said he was at or in the house.[183] No one else placed him in the house either. The only reference was to an unidentified, black male who had a mustache.

However, the supreme court has accepted as true that the evidence showed that Washington entered the Hill residence while armed with a .38 caliber pistol and, though present with knowledge of the possibility or probability of killing, did nothing to stop the same. This court must accept that as true and does.

To this court's view this may present a colorable claim for relief at some point in time, it seems most appropriate to allow counsel to make a record so it could be examined in the event that another court wishes to accept review.[184]

Clearly, the court felt that in light of the acquittal of Mathers, the evidence was not sufficient to sustain Washington's conviction. However, the court felt constrained by the ruling by the Arizona Supreme Court in Washington's appeal in declining to hold an evidentiary hearing on this claim or to give it full consideration on the merits, the trial court instead stated: "[t]o this court's view [the sufficiency of the evidence issue and Mathers' acquittal] may present a colorable claim for relief at some point in time, it seems most appropriate to allow counsel to make a record so it could be examined in the event that another court wishes to accept review."[185]

## 5. Argument.

The findings by the state supreme court that exculpate Mathers also exculpate Washington.

Sentencing guidelines have long been used in state and federal court to increase

---

[183]It was not proper for the court to consider statements by Washington. *See* Part II (L ) and (M) *supra*.

[184]Td. at 192, pp. 3-5.

[185]Td. at 192, 193.

Page 49

the degree of uniformity of sentencing for those who commit similar crimes and display similar degrees of culpability. In capital sentencing, establishing the degree of culpability serves an even greater role because of the severity of the punishment. Therefore, the culpability of co-defendants in relation to the defendant has is taken into account in several ways.

### a.

Appellate review plays an essential role in eliminating the systemic arbitrariness and capriciousness which infected death penalty schemes invalidated by Furman v. Georgia, 408 U.S. 238 (1972). The teaching of Furman was that a state may not leave the decision of whether a defendant lives or dies to unfettered discretion because such a scheme inevitably results in death sentences that are "wantonly and . . . freakishly imposed" and "are cruel and unusual in the same way that being struck by lightening is cruel and unusual." Id. at 309-310. (Stewart, J., concurring).

In response to Furman, many states added proportionality reviews to their capital statutes. These statutes insured that sentencers will be "given guidance regarding the factors about the crime and the defendant that the state, representing organized society, deems particularly relevant to the sentencing decision." Gregg, 428 U.S. at 192 (plurality opinion of Stewart, Powell, and Stevens, JJ.). The Gregg Court in particular underscored the useful function of proportionality review and characterized it as assuring that "'no death sentence is affirmed unless in similar cases throughout the State the death penalty has been imposed generally. . . .'" Gregg, 428 U.S. at 205 quoting Moore v. State, 233 Ga. 861, 864, 213 S.E.2d 829, 832 (1975).

### b.

The sentencing scheme in federal death penalty cases "allows consideration of evidence of a co-defendant's sentence at the punishment phase of the trial" when the two defendants are equally culpable. See Cordova v. Johnson, 993 F.Supp. 473, 503 (1998). In addition, "when there is substantial disparity in sentences imposed upon

different individuals engaging in the same criminal activity, the preservation of the appearance of judicial integrity and impartiality requires that the sentencing judge record an explanation." *See* United States v. Capriola, 537 F.2d 319, 321 (9th Cir.1976).

Although these considerations are generally made at the original sentencing, or during proportionality review on appeal, the same issues have emerged in the present court. In order to uphold the "appearance of judicial integrity and impartiality" that these cases refer to, the court must conclude that Washington and his co-defendant, who was acquitted, must be viewed in the same light.

■   ■   ■

A review of this case from trial, to appeal and through state collateral proceedings demonstrates that there is no evidence to suggest that Washington was transported to or that he was at the Hill home. There is no physical evidence to place him in the home, and despite the fact that there were two eyewitnesses who viewed a photo array and live line-up, Washington was not identified as being one of the invaders. Finally, there was no link between Washington and the abandoned property found near the scene. All that the state could show was that Washington was in Yuma, Arizona on the day of the crime. It is fundamentally unfair for one defendant in a criminal matter to walk free while another suffers the penalty of death when the evidence against each is equal. The application of the facts by the state supreme court as to Washington was unreasonable.

Washington's rights as guaranteed by the Due Process Clause of the Fifth Amendment to the United States Constitution; the Right to Counsel Clause of the Sixth Amendment to the United States Constitution; the Eighth Amendment protections against cruel and unusual punishment; and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, were violated as a result of a conviction against the manifest weight of the evidence and/or based upon insufficient evidence.

**D.**

In the eighth claim for relief, Washington alleges the pecuniary gain aggravating factor under Ariz. Rev. Stat. § 13-703 (F)(5) and the "heinous, cruel or depraved" aggravating factor under Ariz. Rev. Stat. § 13-703(F)(6), as applied, violated his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Arizona broadly defines first degree murder to include any killing with premeditation and a multitude of types of felony murder. The Arizona death penalty scheme, as written and applied in this case, fails to genuinely narrow the class of persons eligible for the death penalty. The aggravating circumstances involved in this case do not narrow the scope of capital offenses.

### 1. Relevant facts.

There were two aggravating circumstances according to the state. First, the state alleged the murder was committed for pecuniary gain under Ariz. Rev. Stat. § 13-703 (F)(5).[186] Next, according to the state, the murder was committed in an extremely heinous, cruel or depraved manner as defined by Ariz. Rev. Stat. § 13-703 (F)(6).[187] Under the theory the state presented at trial and at the sentencing hearing, co-defendant Mathers shot the Hills while Washington was rummaging through the house looking for drugs and money. The trial court adopted the state's theory.[188]

---

[186]Ariz. Rev. Stat. § 13-703 (F)(5) provides: "[t]he defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value."

[187]Ariz. Rev. Stat. § 13-703 (F)(6) provides: "The defendant committed the offense in an especially heinous, cruel or depraved manner."

[188]In this case, Washington was sentenced to death by a judge without the benefit of a jury deciding whether he was guilty, beyond a reasonable doubt, of certain aggravating factors. The trial judge alone made further factual findings as to additional elements -- statutory aggravating factors -- which were used to determine

whether Washington could be sentenced to death. Under Arizona's capital sentencing scheme, the trial judge alone makes the determination whether sufficient aggravating factors exist to warrant sentencing the defendant to death after he is found guilty of first-degree murder by a jury. *See* Ariz. Rev. Stat. § 13-703(B).

A dramatic development has occurred. In Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215 (1999), the Supreme Court issued an opinion calling into question the very constitutionality of Arizona's death sentencing laws.

In Jones, the Supreme Court erected a new framework on the foundation set in the constitution that the jury decides facts. The Supreme Court expressly stated that "any fact . . . that increases the maximum penalty for a crime must be . . . , submitted to a jury, and proven beyond a reasonable doubt." Jones, 119 S.Ct. at 1224 n.6; *see also id.* at 1228-29 (Stevens, J., concurring) ("I am convinced that it is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed[]"); *id.* at 1229 ("it is unconstitutional to remove from the jury the assessment of facts that alter the . . . prescribed range of penalties to which a criminal defendant is exposed[]") (Scalia, J., concurring); *id.* at 1238 ("If it is constitutionally impermissible to allow a judge's finding to increase the maximum punishment for carjacking by 10 years, it is not clear why a judge's finding may increase the maximum punishment for murder from imprisonment to death.") (Kennedy, J., The Chief Justice, O'Connor and Breyer, JJ., join dissenting).

Under the framework established by the Supreme Court in Jones, Walton v. Arizona, 497 U.S. 639 (1990), which approved Ariz. Rev. Stat. 13-703(B), is no longer "clearly established Supreme Court law."

Recently, the Supreme Court granted certiorari to the New Jersey Supreme Court. *See* Apprendi v. New Jersey, 120 S.Ct. 525 (1999) (Mem.). The question before the Supreme Court is:

> [i]s New Jersey's hate crime law, . . . unconstitutional insofar as it provides for extended term of imprisonment increasing maximum possible penalty by ten years, on basis of proof by preponderance of evidence rather than proof beyond a reasonable doubt, and denies defendant rights to notice by indictment and trial by jury?

*See* 66 Crim. Law Rept. 2093.

The issue of whether Washington had a constitutional right to have a jury determine the existence of factual issues that increase the maximum sentence possible and to take part in the sentencing decision -- is squarely before the Supreme Court in

Page 53

Specifically, as to Washington, the trial court found:

> There is no reasonable doubt that this defendant was either on his way from Banning, California as testified to by Mr. Thomas, or was in Yuma at the Carl's, Jr., when he was advised that the real purpose of this trip was to "take out" a drug dealer and get his dope and money. There is no reasonable doubt this defendant entered the Hill residence armed with a weapon. There is no reasonable doubt that, after the defendant bound the Hills, this defendant searched for items of value, and items of value were taken from the residence, some of which were recovered a distance from the Hill residence.

■ ■ ■

> There is no reasonable doubt that the offense was committed in a cruel manner, as the victims was bound hand and foot and placed face down on their bedroom floor, and not a threat to any of the defendants or their identities. There is no reasonable doubt that the offense was committed at the direction of another defendant but this defendant was present at the victim's bedroom at the time of the murder and in a position to stop the murder but did nothing to avert the disaster.

■ ■ ■

> There is no reasonable doubt that this defendant was responsible for the conduct of another person or persons and was a person who was a major factor in bringing about this crime.

■ ■ ■

> There is no reasonable doubt that the victim, who was immobile, bound hand and foot and laying face down, had to endure not only the fear of entry and search for several minutes, after being bound by armed men, but also endured for a time the terror of hearing her husband shot, hearing the gun being pumped and awaiting her turn to be shot also. Whether this terror lasted a matter of seconds, or whether it lasted a minute or more, the victim undoubtedly suffered enormous physical and mental torment while being fully conscious prior to her death.

■ ■ ■

> The court finds beyond a reasonable doubt that

_____

Apprendi. Judicial economy and prudence suggest that the Court hold this matter in abeyance until the Walton/Jones issue is resolved by the Supreme Court in Apprendi.

> Sterleen Hill was fully conscious prior to her death as evidenced by the lack of marks on her face, jaw, skull or scalp which would indicate a blow of sufficient force to render her unconscious. The court specifically notes that Dr. Shirer found no external or internal evidence consistent with there having been a blow to the victim's head. While the doctor stated it was conceivable that such a blow could be received and show nothing, he would expect to see some evidence of blow even though the necessity was not 100 percent.
>
> There is no reasonable doubt that the murder was a senseless crime. There was no way that the victim could have identified anyone. She was utterly helpless and in no manner a threat to the defendant. The evidence is that the defendant evinced a total and reckless disregard for human life, and that the defendant planned to execute the victim during an armed robbery.[189]

The findings by the trial court as to Washington, were based upon post-arrest statements made by Washington. The Arizona Supreme Court found that the trial court committed error by considering Washington's statements.[190] However, with the so called cat-being-out-of-the-bag, the state supreme court found sufficient evidence to uphold the finding of aggravating circumstances.

Without discussing Washington's lack of participation in the murder, citing to testimony that placed him in the home, or tying him to any of the items removed from the Hill household, the Arizona Supreme Court affirmed Washington's death sentence based on these two aggravating circumstances.

### a. Pecuniary gain.

To uphold the trial court's finding as to the pecuniary gain aggravating circumstance, the Arizona Supreme Court made the following finding:

> Robinson provided the murder weapon and transported Washington to the home of his common-law wife's parents. There is no evidence that Washington knew the Hills or where they lived but for the guidance of Robinson. Once at the Hill home, Washington demanded drugs and/or money from the Hills. ... [T]he evidence supports the trial

---

[189]TR Jan. 13, 1988 at 26-28.

[190]State v. Robinson, 165 Ariz. at 59-60, 796 P.2d at 861-62.

> court's finding that Robinson procured the slaying through promises to Washington of pecuniary gain, that is, the presence in the Hill home of drugs and/or money.
>
> *    *    *
>
> ... Washington searched closets and drawers for valuables. A few items were stolen from the house, although most were later discovered abandoned in the neighborhood. Accordingly, the trial court's finding that Washington had a financial motive for participating in the murder is supported by the evidence.[191]

There is no evidence to suggest that Washington was transported to or that he was at the Hill home. There is no physical evidence to place him in the home, and despite the fact that there were two eyewitnesses who viewed a photo array and live line-up, Washington was not identified as being one of the invaders. Finally, there was no link between Washington and the abandoned property found near the scene. All that the state could prove was that Washington was in Yuma, Arizona on the day of the crime.

### b. Heinous cruel or depraved conduct.

In order to affirm the trial court's finding as to the heinous, cruel or depraved aggravating circumstance, the Arizona Supreme Court made the following finding:

> The evidence indicated that Sterleen Hill was startled by the sudden intrusion of two armed individuals in her home. She and her husband were bound and forced to lie face down on their bedroom floor while demands were made upon them to produce drugs and money. Being bound would have caused Sterleen great distress. ... The court could infer that Sterleen was uncertain as to her ultimate fate. ... Because there was no evidence that she was rendered unconscious by a physical blow prior to being executed, she, like Ralph Hill, probably heard one of the intruders state that they should "get" the Hills' teenage son. Ralph Hill testified that he was then suddenly rendered unconscious. The evidence supports the inference that his loss of consciousness resulted from being shot in the back with a .12-gauge shotgun. Sterleen Hill would have witnessed this. Being aware that Ralph had been shot, and undoubtedly realizing that she was next, supports a finding of mental suffering by Sterleen. ... Although the shots

---

[191]State v. Robinson, 165 Ariz. at 60, 796 P.2d at 862.

Page 56

were fired in close proximity in time, because the shotgun was a pump shotgun, at least a short period of time must have elapsed between the time that Ralph Hill was wounded and Sterleen Hill was executed.[192]

Missing from this finding is any mention of Washington's name. There is a reference to "two armed individuals" as well as an assault and a shooting, but the responsible individuals are not identified. Again, there is no evidence to suggest that Washington was even in or near the Hill home. There is no physical evidence to place him in the home, and despite the fact that there were two eyewitnesses who viewed a photo array and live line-up, Washington was not identified as being one of the invaders. Once again, all that the state could show was that Washington was in Yuma, Arizona on the day of the crime.

## 2. Argument.

Preliminary to a finding of either the (F)(5) or (F)(6) aggravating circumstance, the state must prove beyond a reasonable doubt that "*the defendant committed the offense.*"[193] In this case, the court recognized "(t)he terms 'heinous' and 'depraved' focus on the *killer's* state of mind and attitude at the time of the offense."[194] In this case, the (F)(5) and (F)(6) aggravating circumstances upon which Washington's death sentence was imposed were not based on anything Washington did. There was no evidence, much less proof beyond a reasonable doubt, that Washington killed for pecuniary gain or that he intended or reasonably foresaw that the victim would suffer or anticipate her fate.

---

[192]State v. Robinson, 165 Ariz. at 61, 796 P.2d at 863.

[193]The term "offense" refers to the murder, not an underlying offense. State v. Carriger, 143 Ariz. 142, 161, 692 P.2d 991, 1010 (1984), *cert. denied*, 471 U.S. 1111 (1985) ("the state must prove additional facts to prove the aggravating circumstance of pecuniary gain once it has proved the robbery . . . [p]roving a taking in a robbery does not necessarily prove the motivation for a murder").

[194]State v. Robinson, 165 Ariz. at 60, 796 P.2d at 862 (emphasis added).

### a. Pecuniary gain.

The Arizona Supreme Court finding of the aggravating circumstance of pecuniary gain is an unreasonable determination of the facts and contrary to the law. The Arizona Supreme Court concluded that, "Washington had a financial motive for participating in the murder is supported by the evidence" and that "Washington was motivated by greed."[195]

In order to establish pecuniary gain as an aggravating circumstance, the state must show "the defendant's goal of pecuniary gain caused the murder and the murder was in furtherance of his goal." LaGrand v. Stewart, 133 F.3d 1253, 1260 (9th Cir. 1998). A motive for robbery alone does not suffice as the aggravating circumstance. The definitive finding is that the murder occurred in furtherance of the robbery. "To prove robbery, the state must show a taking of property from the victim; to prove pecuniary gain, the state must show the actor's motivation [for the murder] was the expectation of pecuniary gain. Proving a taking does not necessarily prove the motivation for a murder." Woratzeck v. Stewart, 97 F.3d 329, 335 (9th Cir. 1996).

To qualify as an aggravating circumstance, the state must show that the murder was related to the robbery and that the robbery would have failed but for the murder. For example, in LaGrand, the Ninth Circuit concluded that the murder resulted from the efforts of the defendant to coerce the victim to open a safe. The victim's refusal to cooperate thwarted the robbery and led to the murder. LaGrand, 133 F.3d at 1259. Similarly, in Smith v. Stewart, the court found "Smith's purpose in killing his victim was to quickly get money from the cash register at the convenience store." Smith v. Stewart, 140 F.3d 1263, 1271 (9th Cir. 1998). The state must not "rel[y] on the same facts to prove an element of robbery and the aggravating circumstance." State v. Carriger, 143 Ariz. 142, 161, 692 P.2d 991, 1010 (1984). The court in Washington's case did exactly that.

---

[195]State v. Robinson, 165 Ariz. at 60, 796 P.2d at 862.

The facts of the Washington case do not support this aggravating factor. Under the state's theory of the case, "Washington was motivated by greed," while "Robinson . . . was motivated by revenge." The killing of Sterleen Hill was independent of Washington's purported efforts to rob the Hills. The killing of Mrs. Hill in no way furthered Washington's goals. Aside from the fact that there is no evidence linking Washington to any of the items removed from the dwelling, there was no evidence presented at trial suggesting that Washington's purported goal of robbery was furthered by the killing. Sterleen Hill was killed for a reason independent of the robbery and without Washington's prior assent or knowledge.

In order to meet the Supreme Court admonition that the imposition of the death penalty not be "arbitrary and capricious," Gregg v. Georgia, 428 U.S. 153, 187 (1994), the aggravating circumstances in Arizona must be tailored so that "[not] everyone convicted of robbery felony-murder is automatically death eligible." Woratzeck, 97 F.3d at 334. The failure to prove that Washington participated in the murder in order to further his pecuniary goal violates the Supreme Court prohibition against "arbitrary and capricious" imposition of the death penalty without meaningful restrictions.

### b. Heinous, cruel or depraved.

The Supreme Court upheld Arizona's "especially heinous, cruel or depraved" aggravating factor in capital sentencing after finding "its construction meets constitutional requirements." Walton v. Arizona, 497 U.S. 639, 654 (1990). The Court reached its decision after evaluating the meaning and subsequent limitations that this particular construction would delineate. The statutes must "provide some guidance to the sentencer" and are intended to be applied as written. *Id.*

The Arizona Supreme Court recognized that "the terms 'heinous' and 'depraved' focus on the *killer's* state of mind and attitude at the time of the

Page 59

offense."[196]    The Supreme Court interpreted these terms to mean "the perpetrator relishes the murder, evidencing debasement or perversion or shows an indifference to the suffering of the victim and evidences a sense of pleasure in the killing." Walton, 497 U.S. at 649 (internal citations omitted). Clearly, the Arizona statute explicitly refers to the state of mind of the killer, not to that of a co-defendant. The Supreme Court also reiterated that this aggravating factor may only be applied to the "perpetrator" of the killing.

The evidence at trial never suggested that Washington was the actual killer. In fact, the states theory of the case was that Mathers was the killer.[197] At least two of the jurors believed this[198] and so did the trial judge.[199] The Supreme Court finding that this aggravating factor applies to Washington is a clear misinterpretation of the law.   Expanding the meaning of this aggravating factor to apply it arbitrarily to individuals other than the killer would violate the Supreme Court holding in Walton that "sought to give substance to the operative terms." Walton, 497 U.S. at 654.

In a similar vein, the Court in Walton determined that the meaning of cruelty which would pass constitutional muster is specifically "when the perpetrator inflicts mental anguish or physical abuse before the victim's death." Walton, 497 U.S. at 654. Again, this definition only applies to the "perpetrator" and not to co-defendants. Any expansion of the definition of "cruel" to included persons other than the actual killer fails to meaningfully narrow the class of persons to whom the death penalty can be applied. Godfrey v. Georgia, 466 U.S. 420 (1980).

---

[196]State v. Robinson, 165 Ariz. at 60, 796 P.2d at 862.

[197]TR Dec. 11, 1987 at 67, 68.

[198]Affidavit by juror, Linda Evans at ¶ 4; Affidavit by juror, James A. Martin at ¶ 3.

[199]Td. 192, pp. 3-5.

■　■　■

Washington's death sentence therefore was arbitrarily and capriciously imposed, in the same sense as that of the defendant in Furman v. Georgia, 408 U.S. 238 (1972). Sentencing Washington to death based on facts not in evidence violated Washington's rights as guaranteed by the Due Process Clause of the Fifth Amendment to the United States Constitution; the Right to Counsel Clause of the Sixth Amendment to the United States Constitution; the Eighth Amendment protections against cruel and unusual punishment; and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution.

### E.

Washington alleges in the tenth claim for relief that the imposition of the sentence violated his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution when the state failed to prove Washington's intent to commit murder. The Enmund/Tison finding cannot be sustained.

In affirming the trial court's Enmund/Tison finding as to Washington,[200] the Arizona Supreme Court stated that "Washington was at least present" when the Hills were tied up and "was at least present" when Mrs. Hill was murdered.[201] But there was no evidence to support this conclusion. All that the state offered at trial was that Washington was in Yuma on the day the crime occurred. Again, there is no evidence to suggest that Washington was even at or near the Hill home. There is no physical evidence to place him in the home, and despite the fact that there were two eyewitnesses who viewed a photo array and live line-up, Washington was not

---

[200]As to Washington, the court found "the defendant killed, or expected or intended that the victim would be killed and that the commission of a felony offense was occurring at the time of the murder." TR Jan. 13, 1988 at 28.

[201]State v. Robinson, 165 Ariz. at 62, 796 P.2d at 864.

Page 61

identified as being one of the invaders.

Assuming *arguendo* that "Washington was at least present," at the Hill home, this was not enough to sustain the Enmund/Tison finding. The state was required to prove that Washington *intended* Mrs. Hill's death or *was a major participant and showed reckless indifference to human life.* Washington's presence in and of itself does not establish the culpability requirements of Enmund. Nor does it establish the culpability in Tison. Because the record below fails to establish the minimum culpability needed, Washington's death sentence must be set aside.

## 1. Enmund.

The supreme court in Enmund v. Florida, 458 U.S. 782 (1982), held that the Eighth Amendment of the Constitution does not permit the imposition of the death penalty on one "who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Id.* at 797. Furthermore, the Supreme Court held that the "focus must be on [the defendant's] culpability, not on that of those who committed the robbery and shot the victims." *Id.* at 798.

In Enmund, the defendant "initiated and planned the armed robbery" but was in the car during the killings. *Id.* at 804. The Florida Supreme Court affirmed the murder conviction and the capital sentence on the basis of felony-murder, after having found that Enmund was present and aiding and abetting the commission of the crime. The United States Supreme Court reversed, after finding insufficient proof of Enmund's culpability in the killings to warrant the death penalty.

The Eighth Amendment is directed against punishments which are "greatly disproportionate to the offense charged." Weems v. United States, 217 U.S. 349, 371 (1910). Robbery, alone, is insufficient to justify capital punishment and fails to rise to the level of a crime "so grievous an affront to humanity that the only adequate response may be the penalty of death." Gregg v. Georgia, 428 U.S. 153, 184 (1976). The Court in Enmund concluded, "[T]he death penalty . . . is an excessive penalty for the robber who, as such, does not take human life." 458 U.S. at 797.

Page 62

As to whether capital punishment is justified when a killing occurs in the course of a robbery, the Enmund Court clearly held that the focus must be on the *intent* of each of the participants. "It is fundamental that causing harm intentionally must be punished more severely than causing the same harm unintentionally." 458 U.S. at 798. Under Enmund, the trial court must focus its attention on the defendant's individual culpability and not on that of the co-defendants who were the actual killers. The defendant's "criminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt." 458 U.S. at 801. The Court held that attributing to the defendant the culpability of his co-defendants is unconstitutional under the Eighth Amendment and would not be upheld upon review.

Under Enmund, culpability is measured by the defendant's intent as to each criminal act. "[T]he defendant's intention -- and therefore his moral guilt -- [is] critical to the degree of this criminal culpability . . . what [the defendant's] intentions, expectations, and actions were." 458 U.S. at 800. Without proof that the defendant was culpable of the murder, and not just the robbery, a capital sentence is unconstitutional. The holding of Enmund is clear, "[The defendant] did not kill or intend to kill and thus his culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to [the defendant] the culpability of those who killed . . . This was impermissible under the Eighth Amendment." *Id.* at 798.

### 2. Tison.

In Tison v. Arizona, 481 U.S. 137 (1987), the Supreme Court expanded the definition of the culpability sufficient to warrant the death penalty in a felony-murder case. Building upon the Enmund holding -- which required at least an "intent to kill" prior to finding culpability -- the Court in Tison held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement." *Id.* at 158.

In <u>Tison v. Arizona</u>, the Tison brothers actively assisted their father and his cellmate in an armed prison escape. The brothers provided weapons and a vehicle, as well as participated in the escape by holding shotguns on the guards. Following the escape, the brothers and the two escapees fled toward the desert where they experienced car trouble. One of the brothers hailed down a family traveling down the highway. The group then proceeded to steal the family's vehicle. In preparing to flee, the two escapees killed the family. The brothers reported that they did not intend to kill the family and were surprised at the shootings. *See* 481 U.S. 137-41.

The Supreme Court relied upon the lower court finding that "neither petitioner specifically intended to kill the victims and neither inflicted the fatal gunshot wounds." <u>Tison</u>, 481 U.S. at 138. Nevertheless, the Court concluded that "reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state . . . ." *Id.* at 158.

The Court justified its holding because it determined that the "participation of each petitioner in the crimes . . . was very substantial." <u>Tison</u>, 481 U.S. at 142. This major involvement was combined with the determination that "each could reasonably have foreseen that his conduct . . . would cause or create a grave risk of . . . death." *Id.* The Court concluded that the brothers could foresee the likelihood that grave injury or death would result from their participation in the armed escape of two convicted murderers, as well as from the kidnaping and armed robbery of the victim family. Not only did the brothers procure the weapons used, they helped entice the family into the reach of the actual killers, they participated in the robbery, they made no efforts to assist the victims or prevent the killing, and they did nothing to dissociate themselves from the actual killers following the murders. *See id.* at 139-41. "Each petitioner was actively involved in every element of the kidnaping-robbery and was physically present during the entire sequence of criminal activity culminating in the murder of the Lyons family and the subsequent flight." *Id.* at 158.

Under these circumstances, the Supreme Court held that this degree of reckless indifference to human life combined with this substantial level of participation fulfills the Enmund requirement of culpability sufficiently to justify the death penalty.

### 3. The Enmund/Tison finding was unreasonable in light of the facts.

The Arizona Supreme Court's finding that Washington's participation in the Hill killing satisfied the Enmund/Tison requirement of culpability was an unreasonable application of the law as well as an unreasonable determination of the facts. The Arizona Supreme Court differentiated Enmund from Washington in that Enmund was a "minor actor in an armed robbery," while the court determined that Washington's participation was major. However, unlike Washington, Enmund actually "initiated and planned the armed robbery." Enmund, 458 U.S. at 804 (O'Connor, J., dissenting). No evidence was presented at trial that Washington even knew of the plan prior to its initiation, much less that he planned it. The Enmund Court relied upon the finding that there was no direct evidence at trial that Earl Enmund was present during the robbery but accepted the "inference that Enmund was the person in the car by the side of the road at the time of the killings, waiting to help the robbers escape." 458 U.S. at 784. Because of Enmund's minor participation and the lack of evidence of an intent to kill, the Supreme Court reversed his murder conviction and sentence.

The evidence placing Washington at the scene of the Hill robbery and killing is more tangential -- he was in Yuma, Arizona on the day of the crime. Washington's sentence relies upon even less participation as well as an undisputed lack of evidence of an intent to kill.

The standards of Tison do not apply to Washington's case. Washington's degree of participation did not meet Enmund's level much less that of the Tison brothers. Washington neither planned the crime nor procured the weapon. The evidence is disputable if he was even present at the home, much less "actively involved in every element of the [crime] and . . . physically present during the entire

sequence." The evidence in Washington's case further demonstrates that, even if he had been present, Washington immediately dissociated himself from the actual killer, thus further attenuating his involvement. The finding that Washington's participation was major is clearly erroneous and an unreasonable application of the facts. The state failed to meet either the "intent to kill" requirement of Enmund or the "major participation combined with a reckless indifference to human life" requirement of Tison.

■    ■    ■

Washington's rights as guaranteed by the Due Process Clause of the Fifth Amendment to the United States Constitution; the Right to Counsel Clause of the Sixth Amendment to the United States Constitution; the Eighth Amendment protections against cruel and unusual punishment; and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, were violated as a result of the imposition of the sentence of death when the element of intent to commit murder is absent.

### F.

In the eleventh claim for relief Washington alleges his rights guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated as a result of the ineffective assistance of counsel that he received at the sentencing phase of the capital proceedings. Through the thirteenth claim for relief, Washington alleges counsel was ineffective in his representation on direct appeal. This violated Washington's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### 1. The right to counsel.

Every defendant threatened with a loss of liberty in a criminal proceeding has a constitutional right to the assistance of counsel. Scott v. Illinois, 440 U.S. 367 (1979); Argersinger v. Hamlin, 407 U.S. 25 (1972); Kirby v. Illinois, 406 U.S. 682 (1972); United States v. Wade, 388 U.S. 218 (1967); Gideon v. Wainwright, 372 U.S.

335 (1963); <u>Powell v. Alabama</u>, 287 U.S. 45 (1932). Criminal defendants need the "guiding hand of counsel" to assist them in preparing and presenting their defenses. The Sixth Amendment right to counsel together with the due process protections of the Fourteenth Amendment establish a right to effective assistance of counsel. <u>Gideon</u>, 372 U.S. 335 (1963).

Inadequate assistance of counsel does not satisfy the protections. <u>Cuyler v. Sullivan</u>, 446 U.S. 335 (1980); <u>McMann v. Richardson</u>, 397 U.S. 759 (1970); <u>Reece v. Georgia</u>, 350 U.S. 85 (1955); <u>Johnson v. Zerbst</u>, 304 U.S. 458 (1938); <u>Powell</u>, 287 U.S. at 57, 71. The failure to provide effective assistance is a fundamental constitutional error which undermines the entire adversary process. <u>Strickland v. Washington</u>, 466 U.S. 668 (1984); <u>Johnson v. Zerbst</u>, 304 U.S. 458; <u>Gideon v. Wainwright</u>, 372 U.S. 335 (1963).

When determining whether counsel was ineffective, the reviewing court must:

> First, the defendant must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

<u>Strickland</u>, 466 U.S. at 687. The defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694.

The ultimate focus of the ineffectiveness inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. The reviewing court should be concerned with whether the result of a particular proceedings is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results. Examination should be made as to the totality of the representation.

This case, because it is a capital proceeding, involved two trials and two

results. The penalty phase is subject to the same standards and principles concerning ineffectiveness claims as is the trial. Strickland, 466 U.S. at 686.

Resolution of the ineffectiveness issue requires application of the facts of this case to the legal principles enunciated in Strickland. In order to do so, this Court must decide whether defense counsel did in fact render a deficient performance. Thus, it must determine whether the acts of counsel were outside the range of competence and whether they had an adverse effect on the results of the proceedings. Id. at 689.

The due process clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on the first appeal of right. Evitts. v. Lucey, 469 U.S. 387 (1985). Certainly, appellate counsel's performance may be deficient and may prejudice the defendant if counsel fails to argue a "dead-bang winner." Moore v. Gibson, 195 F.3d 1152, 1180 (10th Cir. 1999). A "dead-bang winner" issue is "an issue which was obvious from the trial record, and one which would have resulted in a reversal on appeal." United States v. Cook, 45 F.3d 388, 395 (10th Cir.1995).

### 2. Trial counsel at sentencing.

Trial counsel was ineffective at the sentencing phase , *inter alia,* as he:

- failed to conduct an investigation of Washington's family and validate facts regarding same;

- failed to investigate and present available evidence in mitigation which would have affected the sentencing determination, especially considering that there was no tactical or strategic reason for counsel's failure to do so;

- failed to locate and interview witnesses who knew Washington's background and who could testify about his childhood and his mental and emotional problems;

- failed to present evidence that given the stable environment provided by prison, the therapeutic effect of the passage of time and Washington's resultant maturation, the prospects that Washington would resolve his significant psychological and emotional problems were high.

In light of the wealth of mitigating evidence sentencing counsel could have

uncovered but failed to present because of his insufficient investigation, it is clear that Washington was prejudiced.

### a. Evidence of mitigation.

Susan Hill was never interviewed by Washington's counsel for purposes of mitigation. She would have been willing to testify on Washington's behalf for sentencing. The daughter of the victims and former wife of Fred Robinson does not believe Washington was part of the plan or took part in the killing and assault.

> Although Teddy may have been with Fred and Mr. Mathers when they left Banning, California on June 8, 1987, and Teddy may have been in Yuma, Arizona on June 9, 1987, I do not believe that Teddy Washington was involved in the murder of my step-mother and the shooting of my father. I do not believe Teddy would hurt my family.
>
> . . . If Teddy would have been made aware that this was Fred's plan, or if he knew that Fred was traveling to my parents home on June 8, 1987, he would have left Fred and Mr. Mathers.[202]

In addition, Susan Hill, the victims' daughter, does not believe the death penalty is appropriate for Washington.[203]

In addition, had Washington's trial and sentencing attorney contacted and interviewed Washington's family, he would have learned of the abusive and terrifying environment in which Washington was raised. For a description of the evidence of mitigation that trial counsel did not discover due to his failure to investigate *see* Part II(A) through (I).

All of this information was available to Washington's attorney at the time of the penalty phase in this case. Each member of Washington's family would have testified as to the information known to him or her if asked to do so.[204] In fact, at

---

[202]Hill Declaration at ¶¶ 9, 10; *see also* Carson Declaration at ¶ 13.

[203]Hill Declaration at ¶ 12.

[204]Carson Declaration at ¶ 14; *see also* Littlejohn Declaration at ¶ 11; Simpson Declaration at ¶ 7.

least one member of Washington's family who traveled from the Sacramento, California area to Yuma, Arizona for the mitigation hearing was never interviewed by Washington's attorney or asked to take the stand on Washington's behalf.[205]

### b. Counsel had a duty to investigate.

Counsel had a duty to make a reasonable investigation such that he was able to make informed decisions about how best to represent his client. *See* Strickland, 466 U.S. at 691; Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994). The Constitution requires nothing less than a full investigation into the defendant's life history before an individualized sentencing may occur in a capital case. "[Washington's counsel's] representation at the sentencing hearing amounted in every respect to no representation at all . . . , and the total absence of advocacy falls outside Strickland's wide range of professionally competent assistance." Clabourne v. Lewis, 64 F.3d 1373, 1387 (9th Cir. 1995).

The duty to investigate is part of a reasonably competent lawyer's duty to his client. "The principle is so fundamental that the failure to conduct a reasonable pretrial investigation may itself amount to ineffective assistance of counsel." *See* United States v. Tucker, 716 F.2d 576, 583 n. 16 (9th Cir. 1983).

Failure to conduct a sentencing investigation constitutes ineffective assistance of counsel. *See, e.g.,* Caro v. Calderon, 165 F.3d 1223, 1226 (9th Cir. 1999); Hendricks v. Calderon, 70 F.3d 1032, 1043-44 (9th Cir. 1995); Evans v. Lewis, 855 F.2d 631, 637-38 (9th Cir. 1988); Bean v. Calderon, 163 F.3d 1073, 1079 (9th Cir. 1998). In addition, counsel has an obligation to conduct an investigation which will allow a determination of the type of experts to consult. Once that determination has been made, counsel must present those experts with sufficient relevant information relevant to allow the expert to make sound conclusions. Caro v. Calderon, 165 F.3d at 1226; Bean v. Calderon, 163 F.3d at 1080. Failure to investigate a client's mental

---

[205]Carson Declaration at ¶¶ 13, 14.

impairments may constitute ineffective assistance of counsel. *See, e.g.*, Hendricks v. Calderon, 70 F.3d at 1043-44; Evans v. Lewis, 855 F.2d at 637-38.[206]

Washington's counsel failed to exercise the skill, judgment, and diligence expected of reasonably competent criminal defense lawyers. Furthermore, there were no tactical or strategic reasons for counsel not to conduct an investigation and properly prepare for both the trial and sentencing phases of the capital proceedings. Specific prejudicial errors were committed by counsel who represented Washington. Decisions by counsel were not reasonable and were "outside the wide range of professionally competent assistance" that the Sixth Amendment demands. Consequently, many aspects of counsel's performance "so undermine the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

Washington was prejudiced by counsel's ineffectiveness because he received a death sentence when the abundance of mitigating evidence would have warranted

---

[206]*See also* Hall v. Washington, 106 F.3d 742 (7th Cir. 1997) (holding trial counsel ineffective (even under AEDPA standards) for failing to investigate and discover readily available mitigating evidence; investigation is required where it is apparent from evidence that the defendant has some mental or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance); Emerson v. Gramley, 91 F.3d 898 (7th Cir. 1996) (holding trial counsel ineffective for failing to prepare and present mitigation evidence and making no sentencing argument); Glenn v. Tate, 71 F.3d 1204 (6th Cir. 1995) (holding trial counsel ineffective for failing to adequately prepare and present mitigation evidence; neurological examination showed global brain damage); Antwine v. Delo, 54 F.3d 1357 (8th Cir. 1995) (holding counsel ineffective for failing to investigate and present available evidence of bipolar disorder; counsel failed to follow up on inconsistencies between medical report and client's self-reporting); Baxter v. Thomas, 45 F.3d 1501 (11th Cir. 1995) (holding trial counsel ineffective during penalty phase of capital trial for failing to adequately investigate and present mitigation evidence; counsel did not interview defendant's sister, neighbor, or social worker, even though counsel was aware of defendant's odd behavior and even requested a mental health evaluation).

a life sentence. Had counsel not committed the errors as described above, the results of the sentencing hearing would have been different.

### 3. Appellate counsel.

Appellate counsel was ineffective at the sentencing phase as he failed to raise and argue the insufficiency of the evidence to sustain the conviction.

Robert Clarke, Washington's trial attorney, also represented Washington on direct appeal. At the trial and at its conclusion, Clarke forcefully argued that the state's evidence against Washington was insufficient to sustain a conviction, and moved for an acquittal and a new trial.[207] However, Clarke began the sentencing hearing by again moving for an acquittal and a new trial.[208] Clarke did not raise this issue on appeal.[209] Counsel for co-appellant James Mathers did.

Mathers argued Rule 20 on direct appal. Washington did not. Although the state courts made a finding as to Washington, albeit erroneous, as to the sufficiency of the evidence, see State v. Mathers, 165 Ariz. at 71, 796 P.2d at 873; Td. 244, 245 at 4, that does not necessarily resolve the issue.

The United State Supreme Court in Strickland v. Washington, 466 U.S. at 688, set forth the test for ineffective assistance of counsel. The inquiry must focus on (1) whether Washington received reasonably effective assistance and, (2) if not, whether counsel's errors resulted in a reasonable probability that the outcome would have been

---

[207]TR Dec. 23, 1987 at 5-7.

[208]TR Jan. 8, 1988 at 32.

[209]Clarke's reason for not raising this issue was that he believed that he did not have to present it to the Arizona Supreme Court. "I do recall the provision that -- the statutory provision which required the supreme court to research the entire record for error. So I do believe that I was under the impression that the supreme court would -- was not necessarily limited to only those issues raised in the brief in determining whether or not error had occurred. I believed -- I think I believed that, then, and I still believe that today." TR Sept. 9, 1993 at 9-10.

Page 72

different. *Id.*

The role of the attorney on direct appeal is clear. The Sixth Amendment right to counsel applies not only at trial, but also during the course of the direct appeal, and therefore, there are certain obligations that the attorney has to his client that must be fulfilled during this appeal. Douglas v. People of the State of California, 372 U.S. 353, 355 (1963). Counsel is not required to advance every possible argument, but the attorney must be able to assist in preparing and submitting a brief to the appellate court. *See* Swenson v. Bosler, 386 U.S. 258, 259 (1967). Appellate counsel is required to include any issue which has a reasonable probability of success on appeal. "The constitutional requirement of substantial equality and fair process can only be attained where counsel acts in the role of an active advocate on behalf of his client," as opposed to a friend of the court making a detached evaluation of the appellant's claim. *See* Anders v. California, 386 U.S. 738, 744 (1967); *see also* Entsminger v. Iowa, 386 U.S. 748, 751 (1967).

This right is fundamental, and therefore, the state supreme court's decision to address an issue that was not specifically raised by Washington does not negate the counsel's duty to raise this claim in the first place. Although the issue was addressed, it was reviewed without a zealous advocate presenting and arguing the facts and merits of the insufficiency of the evidence and the acquittal issue. "Lawyers are "necessities, not luxuries" in our adversarial system of criminal justice. Gideon v. Wainwright, 372 U.S. 335, 344 (1963).

Appellate counsel's failure to raise the issue of insufficient evidence and the failure of the trial court to enter a judgment of acquittal was not harmless. Here, there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," thus establishing ineffective assistance of counsel. *See* Strickland v. Washington, 466 U.S. at 694. The issue in Washington's case was a "dead-bang winner." *See* Banks v. Reynolds, 54 F.3d 1508, 1515 (10th Cir. 1995). A "dead-bang winner" is "an issue which was obvious from

the trial record,[210] and one which would have resulted in a reversal on appeal." United States v. Cook, 45 F.3d at 395. How does Washington know that the issue was a "dead-bang winner?" He read State v. Mathers, 165 Ariz. 64, 796 P.2d 866. So did the judge in the state collateral proceedings and he reached the same conclusion.

Appellate counsel failed to exercise the skill, judgment and diligence expected of reasonably competent appellate lawyers. There was no tactical or strategic reason for counsel's failure to review and prepare adequately for the appellate phase of the capital proceedings. Had counsel not committed the error as described above, the results of the appeal would have been different. See State v. Mathers, 165 Ariz. 64, 796 P.2d 866.

■   ■   ■

Washington's rights as guaranteed by the Due Process Clause of the Fifth Amendment to the United States Constitution; the Right to Counsel Clause of the Sixth Amendment to the United States Constitution; the Eighth Amendment protections against cruel and unusual punishment; and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, were violated as a result of the actions of counsel at sentencing and appeal.

### G.

The Court divided claims fourteen and fifteen into two parts. See Memorandum and Order, Aug. 9, 1999, at 25-29. It characterized claim 14-B as follows, "[i]n Claim 14-B, Petitioner contends the Arizona Supreme Court failed to consider and separately weigh all of the mitigating evidence supported by the record in its independent review of his sentence." Id. at 27. The Court construed claim 15-B as,

---

[210]At trial, Robert Clarke aggressively argued that the evidence was not sufficient to sustain a conviction and that a judgment of acquittal should have been entered. TR Dec. 23, 1987 at 5-7; TR Jan. 8, 1988 at 32.

Page 74

"the Arizona Supreme Court should have considered Mathers' acquittal as a mitigating circumstance when it independently reviewed Petitioner's sentence on direct appeal." *Id.* at 29. Both claims asserted violations of Washington's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The Court, based upon arguments advanced by respondents, *see* Reply Memorandum at 14-15 [Doc. No. 35], expressed concerns whether claims 14-B and 15-B were properly exhausted by explaining that Washington failed to specifically present both claims to the Arizona Supreme Court. *See* Memorandum and Order, Aug. 9, 1999, at 27-29. The Court related that its determination of whether claims 14-B and 15-B were exhausted hinged upon whether the independent review by the state supreme court -- which included an independent reweighing of the evidence -- was sufficient itself to preserve the two claims for federal review. Alternatively, the Court queried whether Washington was required to present these claims in a motion for reconsideration to the Arizona Supreme Court. *Id.* at 27-29. Before addressing the merits of claims 14-B and 15-B, Washington will address the concerns regarding exhaustion.

### 1. Exhaustion.

A state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus. *See* <u>Duncan v. Henry</u>, 513 U.S. 364, 365-66 (1995) (*per curiam*); <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971). For Arizona prisoners, exhaustion is usually satisfied by raising a claim to the state supreme court on direct appeal or in a Rule 32 motion. <u>Roettgen v. Copeland</u>, 33 F.3d 36, 38 (9th Cir.1994). The exhaustion doctrine requires only that the state courts be given a fair opportunity to address the claim. That doctrine does not require that the state courts actually rule on the claim. <u>Castille v. Peoples</u>, 489

U.S. 346, 350-51 (1989).[211] Here, the state supreme court had a fair opportunity to review the claims through the independent review process.

## 2. Independent review.

### a.

In 1976, the Arizona Supreme Court recognized that the " . . .gravity of the death penalty requires that we painstakingly examine the record to determine whether it has been erroneously imposed." State v. Richmond, 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976) (citing State v. Maloney, 105 Ariz. 348, 358, 464 P.2d 793, 803 (1970) ("The judgment of death by legal gas has called upon us to carefully and painstakingly search the record to determine whether there is serious error")).[212] The

---

[211]See also Jeffers v. Lewis, 38 F.3d 411, 418 (9th Cir. 1994). "While 'it is important that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence,' Gardner v. Florida, 430 U.S. 349, 361 (1977) (plurality opinion), 'due process does not require that the sentencer exhaustively document its analysis of each factor . . . ' " Jeffers v. Lewis, 38 F.3d at 418 (citing Jeffries v. Blodgett, 5 F.3d 1180, 1197 (9th Cir. 1993)).

[212]See also State v. Brewer, 170 Ariz. 486, 500, 826 P.2d 783, 797, (1992) ("The severity of the death penalty requires that we undertake an extensive, independent review of each death sentence handed down under Arizona law"); State v. Walton, 159 Ariz. 571, 586, 769 P.2d 1017, 1032 (1989) ("We independently review the record to determine whether the facts establish the presence or absence of the aggravating factors to sustain the imposition of a death sentence"), aff'd sub nom. Walton v. Arizona, 497 U.S. 639 (1990); State v. Rumsey, 136 Ariz. 166, 172-173, 665 P.2d 48, 54-55 (1983) ("It is true that we have held in all cases where the death penalty has been imposed we will conduct an independent review of aggravating and mitigating evidence and will decide independently whether the death sentence should be imposed in each case"), aff'd sub nom. Arizona v. Rumsey, 467 U.S. 203 (1984); State v. McMurtrey (McMurtrey I), 136 Ariz. 93, 101, 664 P.2d 637, 645 (1983) ("In reviewing imposition of the death penalty it is our duty to review the record and make a separate independent determination as to whether the death penalty is appropriate"); State v. Jeffers, 135 Ariz. 404, 428, 661 P.2d 1105, 1129 (1983) ("This court will search the record and make an independent determination whether the death penalty should be imposed"); State v. Gretzler, 135 Ariz. 42, 54, 659 P.2d 1, 13 (1983) ("In

Page 76

Arizona Supreme Court has made it abundantly clear that its duty to independently reweigh sentencing factors and determine whether the death penalty should be imposed derives from federal constitutional concerns that the death penalty not be inflicted in an arbitrary and capricious manner. State v. Watson, 129 Ariz. 60, 63, 628 P.2d 943, 946 (1981) (*citing* Gregg v. Georgia, 428 U.S. 153, 189 (1976) ("[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action"); Godfrey v. Georgia, 446 U.S. 420, 428 (1980) ("This means that if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty")).

In order to conduct an adequate independent review of a death sentence, the Arizona Supreme Court stated it must necessarily examine the following factors

---

view of the gravity of the death penalty, we have also held that in all capital cases, automatically appealed to this court under Rule 31.2(b) Arizona Rules of Criminal Procedure, 17 Ariz. Rev. Stat. §, we will conduct an independent review of all matters of aggravation and mitigation, and will decide independently whether the death sentence should be imposed in each case"); State v. Ceja, 115 Ariz. 413, 415, 565 P.2d 1274, 1276 (1977) ("Due to the gravity of the penalty involved, it is the duty of the reviewing court to make an independent examination of the record to determine whether the death penalty was properly imposed"); State v. Fierro, 166 Ariz. 539, 548, 804 P.2d 72, 81 (1990) ("Whenever the trial court imposes the death penalty, we must conduct an independent review of the record and make a separate determination of the propriety of the sentence"); State v. Gerlaugh, 135 Ariz. 89, 659 P.2d 642 (1983) ("None of the issues raised by counsel on appeal concerned the penalty imposed but we, nevertheless, have an obligation to examine the aggravating and mitigating circumstances to determine if the evidence supports the imposition of the death penalty"); State v. Woratzeck, 134 Ariz. 452, 456, 657 P.2d 865, 869 (1982) ("The gravity of the death penalty requires us to make an independent review of its imposition to determine its appropriateness").

Page 77

which include, but are not limited to:

> [w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factors; whether the evidence supports the sentencing court's finding the existence of a statutory aggravating circumstance(s); whether the evidence supports the sentencing court's finding the absence of statutory mitigating circumstance(s); whether mitigating circumstances found to be present are sufficiently substantial to call for leniency; and whether the sentences of death are excessive, or disproportionate to the penalty imposed in similar cases, *considering both the crime and the defendant.*

State v. Richmond, 114 Ariz. at 196, 560 P.2d at 52 (emphasis supplied) (*referencing* Gregg v. State, 233 Ga. 117, 210 S.E.2d 659 (1974), *aff'd*, Gregg v. Georgia, 428 U.S. 153.)

The Arizona Supreme Court has gone so far as to say that when conducting its independent review of a death sentence it will look beyond the claims raised in the four corners of the pleading. *See* State v. Ceja,115 Ariz. at 415, 565 P.2d at 1276 (holding that the Arizona Supreme Court independently reviewed the record to ensure that the lower courts accorded defendant a fair trial even though the defendant did not allege any error in the trial); State v. Jordan, 114 Ariz. 452, 454, 561 P.2d 1224, 1226 (1976) (holding that the Arizona Supreme Court will review issues not raised in the appellants brief), *vacated on other grounds sub. nom.* Jordan v. Arizona , 438 U.S. 911 (1978); State v. Gerlaugh, 135 Ariz. at 89, 659 P.2d at 642 ("None of the issues raised by counsel on appeal concerned the penalty imposed but we, nevertheless, have an obligation to examine the aggravating and mitigating circumstances to determine if the evidence supports the imposition of the death penalty"). Furthermore, the Ninth Circuit has held that appellate counsel in an Arizona death penalty case was not ineffective for failing to raise claims relating to the defendant's death sentence because appellate counsel did so with the understanding that the state supreme court was required to make an independent examination of the legality and propriety of the death penalty. Gerlaugh v. Stewart, 129 F.3d 1027, 1045 (9th Cir. 1997).

**b.**

This Court cites to O'Sullivan v. Boerckel, 526 U.S. 838, 119 S.Ct. 1728 (1999) in order to determine whether Washington has properly exhausted his claims. In O'Sullivan the United States Supreme Court held:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, we conclude that state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

O'Sullivan v. Boerckel, 119 S.Ct. at 1732.

When the supreme court decided Washington's case, it stated, "We must independently review the existence of aggravating and mitigating circumstances to determine if the death penalty was properly imposed." State v. Robinson, 165 Ariz. at 59, 796 P.2d at 861. It is of no consequence that Washington did not specifically raise claims 14-B and 15-B because those claims relate to Washington's sentence and were exhausted by virtue of the Arizona Supreme Court's independent review of Washington's sentence of death.[213]

_____

[213]For the respondents to now say that Washington should have filed a motion for reconsideration not only ignores the decision by the state supreme court and the findings by the court in collateral review, but the argument overlooks the rules that were in place at the time of Washington's direct appeal.

In 1990, Ariz. R. Crim. P. 31.18(c) stated that, "[a] motion for reconsideration shall be directed solely to discussion of those specific points or matters in which it is claimed the appellate court has erred in determination of facts or law." Ariz. R. Crim. Pro. 31.18(c) (1990). The comment to the 1983 amendment to Rule 31.18 states, "[p]arties filing motions for reconsideration should be able to point to specific misstatements of fact or statutory or decisional law." Ariz. R. Crim. Pro. 31.18(c) (Comment to 1983 amendment) (1990).

Washington has never argued that the Arizona Supreme Court has misstated facts. Washington maintains the way the state supreme court applied the facts when reviewing Washington's conviction and sentence was wholly unreasonable. Washington has always maintained that the facts were insufficient to support a

Page 79

When the state supreme court conducted its independent review of Washington's death sentence, the court had before it the record and full slate of insufficient evidence from the consolidated trial of all three defendants charged in the crime -- Theodore Washington, Fred Robinson and Jimmy Lee Mathers. The supreme court chose to consolidate all three cases on appeal for purposes of oral argument and judicial economy. However, when the Arizona Supreme Court reached its decision it issued two separate opinions on the same day -- one opinion for Robinson and Washington, State v. Robinson, 165 Ariz. 51, 796 P.2d 853, and a separate opinion for Mathers. State v. Mathers, 165 Ariz. 64, 796 P.2d 866.

The supreme court considered the issues described in claim 14-B and 15-B in its independent review. The state supreme court resolved constitutional issues during the appellate review process. The court engaged in a lengthy discussion of the facts of the crime and the alleged roles that each defendant played in the commission of the crime. The Arizona Supreme Court specifically discussed the sufficiency of the evidence against the three defendants as it related to each defendant's guilt.

> While we agree that the evidence is ample to support the convictions of Robinson and Washington, *see* State v. Robinson, 165 Ariz. 51, 796 P.2d 853 (1990), we find it insufficient to support Mathers' convictions. Our exhaustive review of the evidence does not permit us to join in the dissenters' view that the evidence is sufficient to support Mathers' convictions.

conviction and death sentence. The rationale and analysis in Mathers applies with equal force and logic in Washington. The facts in both Washington and Mathers were exactly the same and were before the Arizona Supreme Court at the same time.

The motion to reconsider under the Arizona Rules of Criminal Procedure was never designed for an appellant in a criminal case to put the Arizona Supreme Court on notice that he or she disagreed with the supreme court's decision. If such were the case, then every defendant in a criminal case who had claims rejected by the Arizona Supreme Court would be required to request reconsideration before being allowed to proceed in federal court. Certainly that was not the designed purpose of the law, nor has it ever been held by any court to be a requirement in Arizona for purposes of exhaustion. Such a requirement would tax and further burden the state court system.

State v. Mathers, 165 Ariz. at 71, 796 P.2d at 873.

The state court in collateral proceedings determined that the supreme court accepted as true certain facts regarding the sufficiency of the evidence against Washington. "This court must accept that as true and does."[214] The post-conviction court went on to say that the "acquittal" issue was "passed upon when the Supreme Court affirmed the conviction. It is not for this court to attempt reexamination."[215] Later, the court specifically stated:

> Whether petitioner now argues he received a fundamentally unfair and excessive penalty because Mathers was the actual killer and was set free. Or whether he argues that considering Mathers' acquittal his punishment violates constitutional protections concerning punishment. Or whether he argues the penalty for murder is cruel or unusual. Or that no greater evidence was available to support his conviction than that of Mathers, the highest court in the state has spoken to those exact issues and they are resolved for all time and purposes as to this court.[216]

In other words, the court determined in collateral proceedings that issues related to sufficiency of the evidence, the acquittal of Mathers and the failure to acquit Washington -- as related to the conviction and sentence of Washington -- were "resolved for all time and purposes" and "included in the decision of the supreme court."

Because Washington gave "the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," O'Sullivan, 119 S.Ct. at 1732 and that process took into consideration whether the sentence of death was excessive, or disproportionate considering both the culpability of the two other defendants Washington has exhausted claims 14-B and 15-B in the Arizona courts.

---

[214]Td. at 192, p. 5.

[215]Td. at 192, p. 7.

[216]Td. at 244, 245, p. 2, 4.

### 3. Mitigating evidence.

During its independent review, the supreme court had before it the following evidence of mitigation: Robinson exerted influence over Washington;[217] Washington was a follower and easily manipulated;[218] Washington was fairly young and could be rehabilitated;[219] there was nothing in Washington's background but one burglary conviction; he was a loving and caring father and individual;[220] he had a nonviolent character;[221] and his role in the crime was minor.[222]

The Arizona Supreme Court failed to adequately consider aggravating and mitigating evidence and independently reweigh the evidence offered at trial. The Arizona Supreme Court did not conduct, or purport to conduct, an adequate review of Washington's sentence. It did not fully review the record to determine the presence of mitigating circumstances.

The Arizona Supreme Court's failure to fully consider and separately assess mitigating circumstances supported by the record and weigh them cumulatively against the aggravating factors violated Washington's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

### 4. A co-defendant was acquitted.

The state court failed to fully and adequately consider evidence of the acquittal

[217]TR Jan 8, 1988 at 170.

[218]TR Jan 8, 1988 at 172, 174.

[219]TR Jan 8, 1988 at 174.

[220]TR Jan 8, 1988 at 175.

[221]TR Jan 8, 1988 at 175.

[222]TR Jan 8, 1988 at 175-76. Despite the statement by the prosecutor, Washington's role in the crime was no where close to the participation by the Tison boys. *See* Tison v. Arizona.

of Mathers in its independent review of Washington's sentence.

Washington has previously outlined the evidence the state presented against him and has argued that it was not sufficient to sustain the conviction. *See* Part III(C)(1), *supra.* Washington also outlined the evidence the state presented against co-defendant James Mathers and pointed to the state court finding that the evidence was not sufficient to uphold Mathers' conviction. *See* Part III(C)(2), *supra.* Washington placed the state supreme court decision on direct appeal in his case beside the supreme court decision in Mathers. *See* Part III(C)(3), *supra.* Finally, he pointed out that the judge who presided over the trial and collateral proceedings was troubled by the fact that the defendant who was most culpable and was the actual shooter was acquitted by the state supreme court and Washington's conviction and sentence were upheld. *See* Part III(C)(4), *supra.*

> Quite truthfully, this court has a great deal of difficulty finding a basis to hold this defendant culpable which does not apply, at least equally or in a greater manner, to James Mathers. If Mathers, who was present at all times before the entry into the Hill residence, was not guilty of conspiring to rob and kill, no greater evidence seems to place this defendant at the scene.[223]

At bottom, the evidence against Washington places him in Yuma, Arizona on the day of the crime. James Mathers was in Yuma, Arizona on the day of the crime as well. This evidence, considered by the state supreme court in its independent review was enough to uphold the death penalty for Washington. This same evidence considered by the supreme court in its review of Mathers' conviction, was enough to overturn it and set Mathers free. These findings cannot be squared.

The fact that the Arizona Supreme Court entered a judgment of acquittal in favor of Mathers has to mean something  This disparate treatment constitutes a mitigating circumstance which must be considered in a constitutional context in upholding Washington's death sentence. The fact that Washington cannot be placed

---

[223]Td. at 192, p. 3.

at or near the scene of the crime by eyewitnesses or physical evidence, and the fact that a co-defendant of equal or greater culpability was released from prison, is a mitigating circumstance and was surely a factor that did not receive adequate consideration during the independent review process.

## H.

Washington alleged in part C of the fourteenth claim for relief[224] that the trial court failed to find that specific evidence of mitigation offered by Washington was sufficient to prevent the imposition of the death penalty. This violated Washington's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### 1. Relevant facts.

Washington presented evidence of four mitigating factors at his sentencing hearing. He argued that his minor participation in the offense, his intoxication, his youthfulness, and his positive role within his family prior to the offense constitute mitigating factors. Washington offered the evidence at trial as well as through the testimony of his friend Steve Thomas, his mother Mrs. Skinner, and his half-brother John Mondy, to support these mitigating factors.

The state offered no evidence to rebut the testimony and proof offered by Washington. The two co-defendants did not offer evidence of mitigation at the sentencing. Following the presentation of the evidence of Washington's mitigating factors, the state specifically stated, "The State has nothing to present in rebuttal."[225] In closing arguments, the state reasserted its position that Washington's role was that of a major participant; however, the state did not contest Washington's other three

---

[224]*See* Second Set of Amendments ("Amendment") to the First Amended Petition for Writ of Habeas Corpus Under 28 U.S.C. §2254 by a Person in State Custody. [Doc. No. 67].

[225]TR Jan. 8, 1988 at 143-44.

mitigating factors.

Despite the undisputed nature of three of Washington's mitigating factors and the strong evidence in support of all four mitigators, the trial court determined that no statutory mitigating circumstances existed and imposed a sentence of death.[226] The non-statutory mitigating factors offered by Washington were "sufficiently mitigating to overcome the aggravating factor of the crime."[227] The refusal to consider the mitigating factors is unwarranted based upon the evidence presented at trial and sentencing.[228]

### a. Minor participant.

The evidence presented at trial does not establish that Washington was even at the Hill home. The evidence showed that there were two armed individuals but no physical evidence placed Washington at or near the scene of the crime. Furthermore,

---

[226]TR Jan. 13, 1988 at 29.

[227]TR Jan. 13, 1988 at 29.

[228]It should be noted that two of the jurors did not believe that a sentence of death is appropriate in this case. Although the jurors found Washington guilty, two of the jurors believe Washington was guilty only by association.

> [T]he older colored defendant was a control freak. He was the instigator, the one who planned it. The white guy was the shooter. Teddy was a follower who was in the wrong place at the wrong time. Teddy was the least involved of the three men and he was the least guilty. Evans Affidavit at ¶¶ 4, 5.

> ■ ■ ■

> We all believed Jimmy Mathers was the shooter. Teddy was guilty by association and was the least guilty of the three. Martin Affidavit at ¶¶ 3, 5.

In addition, Susan Hill, the victims daughter, does not believe the death penalty is appropriate for Washington. Hill Declaration at ¶ 12.

neither eyewitness identified Washington as being one of the intruders at either the live line-up or in the photo line-up. All that the evidence at trial was able to establish is that Washington was in Yuma, Arizona on the day of the crime.

Even if evidence is taken in a light most favorable to the state, no evidence was presented that showed that Washington was a major participant in the murder. According to the testimony of Andre Robinson, Fred Robinson's son, Washington was not present when Mathers and Robinson loaded the weapons into the car nor when these two co-defendant's discussed the purpose of the trip to Yuma.[229] On the contrary, Steve Thomas testified at the sentencing hearing that Washington told him that he believed that they were going to Yuma for a party.[230] The testimony of Barbara Bryant, at trial, supported the routine nature of these pleasure trips.[231]

Even the state hesitates to suggest that Washington knew any different prior to their arrival in Yuma and only then he was led to believe, according to the state's theory, that they were going to rob a drug dealer.[232] However, there was no evidence to even support this theory.

Even accepting, *arguendo*, that Washington was the second intruder, his role in the murder was minor. There was no evidence that Washington tied up the Hills, held a weapon on them, struck either Mr. or Mrs. Hill, or shot either Mr. or Mrs. Hill. Washington did not commit the act of murder nor did he intend to kill. No evidence at trial even tied Washington to the property taken from the Hills.

The basis of the evidence of Washington's participation in the murder is by association. There is no physical or testimonial evidence to substantiate his

---

[229]TR Dec. 4 1987 at 123-129; Dec. 8, 1987 at 31.

[230]TR Jan. 8, 1988 at 97-98.

[231]TR Dec. 2, 1987 at 133-36.

[232]TR Jan. 8, 1988 at 148.

involvement as a participant, much less a major participant. The evidence presented at trial does nothing more than place Washington in Yuma, Arizona on the day of the crime. Despite the lack of evidence, the court concluded Washington was not a minor participant.[233]

### b. Intoxication.

Washington offered evidence of the statutory mitigator available under Ariz. Rev. Stat. § 13-703 (G)(1) that he was unable to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law due to his degree of intoxication. At trial, Barbara Bryant testified that she believed Washington to be drunk at the time of his call at 2:06 a.m. on June 9, 1987. She based her opinion on her long-term familiarity with Washington and his voice and speech patterns after drinking.[234] This evidence, presented at trial, was buttressed by the testimony of Major Ralph Ogden, one of the investigating officers, who reported that during his initial interview with Washington, the defendant also talked about his extreme intoxication while in Yuma.[235]

The state presented no evidence to contradict either testimony. The trial court gave no deference to this mitigating factor.[236]

### c. Youthfulness.

Washington also offered evidence of his age and youthfulness. Washington presented this mitigator not based so much on Washington's age, but that he is "much

---

[233]TR Jan. 13, 1988 at 29.

[234]TR Dec. 2, 1987 at 147.

[235]Of course, the testimony by Major Ogden as to statements made by Washington should not have been considered by the trial court at sentencing. *See* Part II (L) and (M).

[236]TR Jan. 13, 1988 at 29.

younger -- not only chronologically, but also in a lot of respects."[237]  To the extent that Washington was involved in the crimes, "it happened as a result of the influence of Mr. Robinson."[238]  The evidence  presented at trial and at sentencing clearly evidenced Washington's vulnerability.  "Teddy was manipulated."[239]

Numerous witnesses testified to the extent of Washington's naivete and youthful credulousness.  Steve Thomas, a long-time associate of Washington's, testified that Washington was "a jolly type.  But I noticed that he was sort of weak, whereas his heart was too good.  Like I told him, that he was always - he would be friends with a person too quick."[240]  Thomas further reported, "[Washington] was too friendly with too many people that I felt that he shouldn't have been friends with.  And on occasion I said, 'Hey, man what, you know - you can't be friends with everything you see'.  But he had that type of spirit, jolly type of person."[241]  As further proof of Washington's tendency to be overly trusting to his own detriment, Thomas recalled that Washington had married a woman who he later learned was a prostitute and then had to go to court to gain custody of their child when he learned of her nature and abusive behaviors toward the child.[242]  Washington's own family testified as to his vulnerability.  John Mondy, Washington's half-brother, reported that "Sometimes he could be gullible . . . Sometime being led a little."[243]  However, the witnesses at the mitigation hearing agreed, "He's not the type of person to hurt

[237]TR Jan. 8, 1988 at 170.

[238]TR Jan. 8, 1988 at 171.

[239]TR Jan. 8, 1988 at 173.

[240]TR Jan. 8, 1988 at 92.

[241]TR Jan. 8, 1988 at 93.

[242]TR Jan. 8, 1988 at 94.

[243]TR Jan. 8, 1988 at 135.

anybody," as his mother put it.[244]  Throughout his childhood and adult life, Washington "wasn't violent, hostile, or arrogant or disruptive kid" was the manner in which his half-brother summarized Washington's nature.[245]

Again, the state did not dispute any of this testimony and presented no evidence of previous episodes of violence. Furthermore, the state did not contest the characterization of Washington as a naive follower. Despite the strong evidence of Washington's childlike capitulation to the leadership of others, the court dismissed this mitigator without any consideration of the character traits.[246]

### d. Good father and passive nature.

Washington also presented as mitigation evidence that he was a good father who supported his son as a single parent. Washington's mother described him as "a good father. He tried to take care of his child and worked . . . He still is concerned about his baby."[247]  Steve Thomas testified to the extremely close relationship between Washington and his young son, "The kid was always with him all the time and I never seen him - I don't have too many friends that take their kid around with them."[248]  Once again, the state presented no evidence or testimony to rebut the quality of the relationship between Washington and his son or to impugn the care with which Washington attended to his son. The court did not find the existence of this mitigating factor either.[249]

---

[244]TR Jan 8, 1988 at 128.

[245]TR Jan. 8, 1988 at 138.

[246]TR Jan. 13, 1988 at 29.

[247]TR Jan. 8, 1988 at 126-27.

[248]TR Jan. 8, 1988 at 95.

[249]TR Jan. 13, 1988 at 29.

## 2. Argument.

Under the Arizona sentencing scheme in Ariz. Rev. Stat. § 13-703 (E), the "mitigating and aggravating circumstances must be weighed against each other to determine whether the mitigating circumstances are sufficiently substantial to call for leniency." State v. Stevens, 158 Ariz. 595, 601, 764 P.2d 724, 730 (1988). However, prior to balancing the weight of the mitigating and aggravating circumstances, the court must first determine the existence of each factor. Clearly, the law holds that the state must prove beyond a reasonable doubt the presence of each aggravating circumstance to be considered by the court. The burden on showing the presence of each mitigating circumstance falls upon the defendant.[250] However, the burden of proof is lessened.

"[T]he Arizona statute . . . imposes on defendants the burden of establishing, by a preponderance of the evidence, the existence of mitigating circumstances. . . ." Walton v. Arizona, 497 U.S. 639, 649 (1990). Furthermore, the Supreme Court in Walton held that the state could not restrict the mitigating circumstances to be considered by the sentencing court. "[T]he Court has refused to countenance state-imposed restrictions on what mitigating circumstances may be considered in deciding whether to impose the death penalty." Id.

The trial court failed to abide by the Arizona sentencing statute and its holding in Washington's case is contrary to the Supreme Court holding in Walton. The court was required to determine the absence or presence of each of the mitigating factors by a preponderance of the evidence. Three of the mitigating factors asserted by Washington were not challenged by the state; nevertheless, the trial court failed to find their presence. As to Washington's assertion of intoxication, the court said he was not impaired.[251] However, when the burden is preponderance and the state offers

---

[250]See Ariz. Rev. Stat. § 13-703 (C).

[251]TR Jan. 13, 1988 at 29.

Page 90

no contradictory evidence, the defendant meets his burden.

As to Washington's assertion of youthfulness as a mitigating factor, the court failed to even consider or evaluate the presence of this circumstance.[252] The court limited its review to Washington's chronological age, despite the statements of Mr. Clarke that this mitigator referred to more than simply years. Once again, the state did not challenged this circumstance and the court should have found that Washington established the presence of this mitigator by a preponderance of the evidence.

Washington's evidence as to the quality of his relationship with his son and behavior as a father was also not properly considered. After the presentation of the evidence by Washington, the court dismissed it all in one sentence: "[h]is passive nature, loving father, good family man and child, friend, his desire to do things with his life or schooling," were not sufficiently mitigating to overcome the aggravating factor of the crime.[253]

The court gave the mitigating factors short shrift. The court misapplied the balancing test by requiring each mitigating circumstance to be sufficient to outweigh the aggravating circumstances. The sentencing court relied upon the wrong test to determine if a mitigating circumstance is to be considered further. Under Walton, the court must determine the presence or absence of each mitigating circumstance individually based upon the preponderance of the evidence and only then is the court to weigh the cumulative effect of the established mitigators against the cumulative effect of the aggravating factors. Under the proper standard of review, the finding by the sentencing court is clearly an unreasonable finding of the facts. Washington did meet his burden in establishing the presence of these mitigating factors, and these

---

[252]TR Jan. 13, 1988 at 29. The court simply said Washington's age does not present a mitigating factor.

[253]TR Jan. 13, 1988 at 29.

Page 91

mitigators clearly outweigh the aggravators. Consequently, Washington should have been sentenced to a life term rather than death.

### IV. Conclusion.

For these reasons, the Court should issue a writ of habeas corpus. In the alternative, the Court should issue an order permitting Washington to conduct discovery and schedule this matter for an evidentiary hearing[254], or consider argument from counsel on the issues presented.

Respectfully submitted this 18th day of January, 2000.

Fredric F. Kay
Federal Public Defender
Dale A. Baich

John Trebon
Trebon & Fine

By _Jason D. Hale, for_____
COUNSEL FOR PETITIONER

Copy of the foregoing mailed this 18th day of January, 2000 to:

J.D. Nielson
Assistant Attorney General
1275 W. Washington
Phoenix, AZ 85007-2997

_Jennifer Smith_____

o:\data\washingt\habeas\merit.hab

---

[254]Washington intends to seek discovery and an evidentiary hearing as to a number of claims presented to the Court.