```
X  ___ FILED      ___ LODGED
   ___ RECEIVED   ___ COPY

        APR 2 2 2005

   CLERK U S DISTRICT COURT
   DISTRICT OF ARIZONA
   BY_____ DEPUTY
```

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Theodore Washington,<br><br>              Petitioner,<br><br>v.<br><br>Dora B. Schriro, et al.,[1]<br><br>              Respondents. | No. CIV 95-2460-PHX-JAT<br><br>DEATH PENALTY CASE<br><br><br>**MEMORANDUM OF DECISION<br>AND ORDER** |

Petitioner Theodore Washington ("Petitioner") seeks federal habeas relief from his 1987 conviction and resulting death sentence.   Petitioner filed an initial habeas petition in this Court on November 9, 1995, before the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). (Dkt. 1.)[2] Accordingly, the provisions of the AEDPA do not apply to this case. Lindh v. Murphy, 521 U.S. 320, 336 (1997).

In an Amended Petition filed on May 27, 1997, Petitioner raised seventeen claims. (Dkt. 20.)  In an Order filed August 9, 1999, the Court determined that Claims 1, 2, 3 (in part), 6, 7, 8-A, 9, 11 (in part), 12, 14-A, 16 and 17 were procedurally barred. (Dkt. 64.) The Court determined that Petitioner was entitled to review on the merits of Claims 3 (in part),

---

[1]    Dora B. Schriro is substituted for her predecessor as Director, Arizona Department of Corrections, pursuant to Fed. R. Civ. P. 25(d)(1).

[2]    "Dkt." refers to documents in this Court's file.

115

4, 5, 8-B, 8-C, 10, 11 (in part), 13, 14-B, 14-C and 15.[3] (Id.; dkts. 72, 73.)  In this Order, the Court addresses the merits of those claims and finds that Petitioner is not entitled to federal habeas corpus relief.

## FACTUAL AND PROCEDURAL BACKGROUND

Sometime after 11:00 p.m. on June 8, 1987, there was a knock at the front door of Ralph and Sterleen Hills' Yuma home.  Through the door a man told the Hills' teenage son, Le Sean, that he had come by to pay money he owed Ralph.  When Le Sean opened the door, two men forced their way into the home and attempted to grab Le Sean.  Le Sean managed to evade the men and fled from the home to get help.  Le Sean's parents exited their bedroom to investigate.  (RT 12/10/87 at 123.)[4]  In the dining room, Ralph saw the shadows of two men holding something in their hands and heard one of the men yell, "We're narcotics agents.  We want the dope and the money."  (Id. at 123, 133-34.)  The Hills were ordered back into their bedroom, told to lie face down on the floor, and their hands and feet were bound.  (Id. at 124, 127, 134-36.)  One of the men ransacked the couple's bedroom while the second man stood over the couple, sometimes "screwing" a pistol in Ralph's ear.  (Id. at 125-26; RT 12/9/87 at 33.)  Ralph glimpsed a young black man with a mustache and long sideburns wearing a red bandana, whom he did not recognize, searching the couple's closet and dresser.  (RT 12/10/87 at 125, 136-37, 147-48.)  Ralph heard a man say "we better get the kid."  (Id. at 126-27.)  Both Hills were shot at close range with a .12 gauge shotgun, resulting in massive injuries to Ralph and killing Sterleen.  A cigarette lighter holder, a watch, and a locked box containing a gold watch and coins were taken from the home.

---

[3]     The Court granted Petitioner's motion to reconsider its determination that subclaim 8-C was procedurally defaulted (dkt. 73), and granted Petitioner's motion to amend to add subclaim 14-C (dkt. 64 at 25, n.9, 34).

[4]     "RT" refers to reporter's transcript.  "ROA" refers to eight volumes of instruments and minute entries from the trial, direct appeal and post-conviction proceedings, documents 1-263. (Arizona Supreme Court No. SC87C14064).  The original reporter's transcripts and certified copies of the trial and post-conviction records were provided to this Court by the Arizona Supreme Court. (See Dkts. 27, 28.)

Shortly after the shooting, Fred Robinson, the common-law husband of Susan Hill, Ralph Hill's daughter from a previous marriage, was apprehended by police fleeing the Hills' neighborhood in his tan Chevette. Robinson and Susan had been in a relationship together since 1972, parenting three children. (RT 12/8/87 at 70.) Their relationship was stormy, as Robinson verbally and physically abused Susan. (Id. at 71-72, 74, 83.) On at least three occasions, Susan had attempted to leave their Banning, California home. (Id. at 73-74, 76-82, 84-94.) Each time, however, Robinson found her and threatened her if she did not return to him. (Id.) In February 1987, Susan persuaded Robinson to take her to visit her father in Yuma. (Id. at 97.) While there, Susan informed Robinson by letter that Sterleen had obtained a peace bond against him and that he should not enter their property. (Id. at 101-02.) Thereafter, unbeknownst to Robinson, Susan left Yuma to stay with other relatives in California. (Id. at 102-03.)

In a search of Robinson's car, police found an empty .12 gauge shotgun shell box and a red bandana. During a pat search of Robinson, police found four .38 caliber cartridges. Robinson's shoes were confiscated and later matched to footprints outside the Hills' home, which evidenced a limp of the left leg, like the one Robinson had as the result of a motorcycle accident. However, neither Le Sean nor Ralph Hill, who had known Robinson for years, identified him as one of the men they saw that night. (RT 12/2/87 at 12; 12/10/87 at 148.) Le Sean believed that one of the men could have been white. (RT 12/2/87 at 55, 56.) Following the shootings, officers recovered a .12 gauge shotgun, rubber gloves, shotgun shells (expended and live) and a tan trench coat in a field near the Hills' home. (RT 12/9/87 at 166-79; 12/10/87 at 91-92.) Inside a pocket of the trench coat was a piece of paper with the name "Eric Robinson" written on it.[5]  (RT 12/9/87 at 175-76.)  The shotgun was subsequently determined to be the murder weapon, and had been reported missing by its owner, who lived in Banning, five months earlier. (RT 12/9/87 at 87-89.)

The day after the murder, Petitioner and Jimmie Lee Mathers, friends of Robinson,

---

[5]     Eric Robinson is one of Fred Robinson's sons.

1  were separately arrested in California.[6]  They were transferred to Yuma, where they and

2  Robinson were each charged with first degree murder, attempted first degree murder, two

3  counts of aggravated assault, burglary and armed robbery.  State v. Robinson, 165 Ariz. 51,

4  56, 796 P.2d 853, 858 (1990).  The three defendants were tried jointly in December 1987.

5  At trial, the prosecution theory of the crime was that Robinson had driven with

6  Petitioner and Mathers to the Hills' home and, while Robinson waited outside, Petitioner and

7  Mathers employed the ruse to gain entry into the house.  Once inside, they bound the Hills

8  and ransacked their bedroom for valuables.  Mathers shot Ralph after he glimpsed Petitioner,

9  and then Mathers shot Sterleen, before they both fled the residence.

10  At trial, Robinson's son Andre testified that on the day of the crime, he overheard his

11  father, Mathers and Petitioner discuss a trip to Yuma.  (RT 12/8/87 at 10-11.)  According to

12  Andre, Petitioner was wearing a red headband.  (Id. at 15-16.)  Mathers told Andre that they

13  were "going to Arizona to take care of some business" (RT 12/9/87 at 5), and Robinson told

14  Truman, another of his sons, that he was going to Arizona to look for Susan (RT12/4/87 at

15  95-96, 132, 158-59).  Both Andre and Truman observed their father and Mathers put some

16  guns, including a shotgun, in their father's tan Chevette and later drive toward Petitioner's

17  house, one block away.  (RT 12/4/87 at 97-98, 102-04, 108-09, 124-31, 135-38, 150, 154-58;

18  12/8/87 at 6-7.)  Shortly thereafter, Truman saw his father, Mathers, and Petitioner drive by

19  in the vehicle, apparently on their way to Arizona.  (RT 12/4/87 at 135-36.)  According to

20  Truman, Petitioner was wearing a red headband and a tan trench coat and identified the

21  trench coat recovered near the shotgun as the one he saw Petitioner wearing the day of the

22  murder.[7]  (RT 12/4/87 at 101-02, 136, 138-42, 144-45).

23

24  [6]    Petitioner and Robinson are both black; Mathers is white.

25  [7]    Truman's testimony regarding what he saw Petitioner wearing the day of the
   murder was inconsistent. (RT 12/4/87 at 101-02, 135-36, 144-45, 166-67, 169, 170-71.) He
26  testified that he saw Petitioner wearing a red headband and a tan coat, as well as jeans and
27  a sweater, but he also testified that the only time he saw Petitioner that day was from
   approximately half a block away, while Petitioner was sitting in the back of his father's car
28  as they drove by. (Id. at 135-36, 137-40, 145-46.) Petitioner's common-law wife, Barbara

On December 15, 1987, a jury convicted the three defendants of all charges. Prior to sentencing for the first degree murder, the trial court held a joint aggravation/mitigation hearing. (RT 1/8/88.) At that hearing, evidence was admitted over defense objection that, either in or on the way to Yuma, Robinson told Petitioner that the purpose for the trip was to "take out" a drug dealer who purportedly lived in the Hills' home and that Robinson told Petitioner that "if things get rough, shoot 'em." (RT 1/8/88 at 59-60.) Petitioner presented three mitigation witnesses and urged four mitigating circumstances: (1) intoxication at the time of the offense; (2) minor role; (3) his youthfulness; and (4) familial activities. (Id. at 174-76, 89-112, 117-43.)

The trial court found two aggravating factors against Petitioner: (1) that Petitioner committed the murder in consideration for or in the expectation of anything of pecuniary value under A.R.S. § 13-703(F)(5), and (2) that the murder was committed in an especially heinous, cruel or depraved manner under A.R.S. § 13-703(F)(6). (ROA 109.) The court found that Petitioner's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was not impaired in any degree; that Petitioner did not act under duress; that Petitioner was legally accountable for the conduct of others and that his participation was not relatively minor; that he could have reasonably foreseen that his conduct would cause or would create a grave risk of causing death to others; that Petitioner's age (27) was not a mitigating factor; and that "none of the other or additional factors offered" by Petitioner, including "his passive nature, [that he was a] loving father, good family man and child, friend, his desire to do things with his life or schooling, was sufficiently mitigating to overcome the aggravating factor[s] of the crime." (RT 1/13/88 at 29-30; see ROA 109 at 5.) The Court therefore sentenced Petitioner to death.

In a consolidated opinion addressing Petitioner's and Robinson's direct appeals, the Arizona Supreme Court found that the trial court had improperly considered Petitioner's

---

Bryant, testified that she had never seen the tan trench coat before and had never seen Petitioner wear such a coat. (RT 12/11/87 at 4-5.)

1  post-arrest statements in concluding that Robinson had procured the murder by payment or
2  promise of something of pecuniary value, but found that sufficient other admissible evidence
3  otherwise supported this aggravating circumstance. Robinson, 165 Ariz. at 59, 796 P.2d at
4  861. The supreme court also affirmed the trial court's finding that the murder was both
5  especially cruel and especially heinous or depraved. Id. at 61, 796 P.2d at 863. The supreme
6  court agreed there was "sparse" evidence that Petitioner had been intoxicated at the time of
7  the offense, that his role in the offense was not minor, and that his youthfulness was not
8  mitigating. Id. at 61, 796 P.2d at 863. It found that while Petitioner was a single parent
9  raising a young son, that fact, viewed in the context of the case, was not such a mitigating
10  circumstance as to outweigh the aggravating circumstances; the court therefore affirmed
11  Petitioner's death sentence. Id. It also affirmed Robinson's conviction and sentence. Id.
12  In a separate opinion, the supreme court reversed Mathers's conviction, finding insufficient
13  evidence established his participation in the crime. See State v. Mathers, 165 Ariz. 64, 796
14  P.2d 866 (1990).

15      Following the affirmance of his conviction and death sentence, Petitioner filed a
16  petition for post-conviction relief ("PCR") in the trial court. (ROA 126, 141.) The PCR
17  court held a joint evidentiary hearing on Petitioner's and Robinson's ineffective assistance
18  of counsel claims and claims based on Mathers's acquittal on September 8-9, 1993. On
19  August 12, 1994, following additional briefing, the PCR court denied relief on Petitioner's
20  claims. (ROA 214.) On April 25, 1995, the Arizona Supreme Court summarily denied
21  Petitioner's petition for review. (ROA 235.) Petitioner thereafter commenced this habeas
22  action.

23                                  **DISCUSSION**

24  **Claim 3:      Failure to Sever Trial**

25      In the exhausted portion of Claim 3, Petitioner alleges that the trial court's refusal to
26  sever his trial from that of Mathers and Robinson, and its subsequent admission of hearsay
27  evidence, violated his rights to due process, equal protection, and counsel under the Fifth,
28  Sixth, and Fourteenth Amendments, and protection against cruel and unusual punishment

                                        - 6 -

under the Eighth Amendment. (Dkt. 20 at 19-24.) Specifically, Petitioner alleges that the admission of evidence regarding two incidents in which Robinson coerced Susan Hill into returning to him, and evidence that the murder weapon, which had been in Robinson's possession prior to the murder, was reported missing (or stolen) by a Banning resident, posed an unconstitutional risk that Petitioner would be found guilty based solely on his association with Robinson.

The denial of a motion to sever trial of co-defendants rises to the level of a constitutional violation if it results in prejudice so great as to deny a defendant his right to a fair trial. See United States v. Lane, 474 U.S. 438, 446 n. 8 (1986); see also Zafiro v. United States, 506 U.S. 534, 539 (1993); United States v. Tootick, 952 F.2d 1078, 1082 (9th Cir. 1991). Generally, "[u]nfair prejudice is measured by the degree to which a jury responds negatively to some aspect of evidence unrelated to its tendency to make a fact in issue more or less probable." United States v. Johnson, 820 F.2d 1065, 1069 (9th Cir. 1987). Such prejudice may arise where co-defendants assert mutually exclusive or antagonistic defenses, or exculpatory evidence would be available to one defendant if he was tried separately but is unavailable if he is tried jointly. See Zafiro, 506 U.S. at 539. Such prejudice may also arise when evidence of one co-defendant's wrongdoing in other circumstances could lead a jury to conclude erroneously that a second defendant participated in the charged offense. See id. However, the denial of severance does not render a trial fundamentally unfair merely because a defendant otherwise would have had a better chance of acquittal, or when appropriate limiting instructions cure the risk of unfair prejudice. See id. at 540. The issue is "whether the state proceedings satisfied due process." Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997) (quoting Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991)). The habeas petitioner bears the burden of demonstrating that the state court's denial of severance rendered his trial "fundamentally unfair." Id. (quoting Hollins v. Dep't of Corr., State of Iowa, 969 F.2d 606, 608 (8th Cir. 1992)).

Evidence Regarding Robinson's Coercion of Susan Hill

At trial, over defense objections, evidence was admitted regarding two occasions prior

1  to the murder in which Robinson had forced Susan to return to their Banning home.  In June

2  1986, two of Robinson's friends, who were armed, forced their way into the North

3  Hollywood apartment of Susan's sister Darleen, where Susan was then staying, and tied up

4  Darleen and her daughter. (RT 12/8/87 at 78-80.)  Robinson, armed with a knife, then came

5  into the apartment looking for Susan and found her hiding in a bedroom closet. (Id.)  Susan

6  testified that Robinson told her that he had intended to cut her and Darleen's throats, but

7  changed his mind because Darleen's daughter was there. (Id. at 81.)  Susan testified that she

8  returned with Robinson to Banning the next day after he threatened to hurt Darleen and her

9  daughter if she refused.  (Id. at 82.)  In November 1986, Susan went to Philadelphia,

10  Pennsylvania, to live with an aunt and uncle without telling Robinson. (Id. at 84.)  In January

11  1987, Robinson went to Philadelphia with Mathers, among others, to retrieve her. (Id. at 89-

12  90.)  Using a ruse to contact her, Robinson and Mathers grabbed Susan, forced her into a car

13  and held her at a motel overnight, before returning with her to California.  (Id. at 90-91.)

14  Susan testified that Robinson threatened to hurt her aunt and uncle if she refused to return

15  to California with him.  (Id.)

16       At trial, Petitioner objected to testimony by Susan Hill regarding the North Hollywood

17  incident.  In response to that objection, the trial court instructed the jury as follows:

18       Ladies and gentleman, during the course of this trial you may find evidence
         that applies to one defendant or another defendant, but not as to all of the
19       defendants.  Since you are the triers of fact you will have to make that
         determination.

20  (RT 12/8/87 at 81.)  After the close of evidence, the trial court further instructed the jury:

21

22       Evidence has been introduced for the purpose of showing that one or
         more of the defendants committed acts other than those for which he or they
         are on trial.

23       Such evidence, if believed by you, was not received and may not be
         considered by you to prove that person is a person of bad character or that
24       person has a disposition to commit a crime.

25       Such evidence was received and may be considered by you only for the
         limited purpose of determining if it tends to show a characteristic method, plan
         or scheme in the commission of other acts similar to the method, plan or
26       scheme used in the commission of the offense in this case, which would
         further tend to show the identity of the person who committed the crime, if
27       any, of that which the person is accused, and which would further tend to show
         a clear connection between the other act and the one which that defendant is
28       accused so that it may be logically concluded that if that defendant committed

- 8 -

the other offense, he also committed the crime charged in this case.
    For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case.
    You are not permitted to consider such evidence for any other purpose.

(ROA 92 at 20.)

On direct appeal, the Arizona Supreme Court found that evidence regarding the North Hollywood and Philadelphia incidents was admissible "to prove Robinson's modus operandi and to prove that Robinson sent Washington to the Hill home as part of a scheme to retrieve Susan," and, "since the evidence was clearly admissible against Robinson, the absence of Washington diminishes the prejudicial impact of the North Hollywood episode [and presumably the Philadelphia incident] as to him." Robinson, 165 Ariz. at 57, 796 P.2d at 859. Thus, the supreme court concluded that evidence regarding the two incidents did not prejudice Petitioner because it did not connect him in any way to those incidents and the jury had been instructed to only consider that evidence against the defendant(s) involved in those incidents.

Petitioner argues the admission of that evidence was particularly prejudicial to him *because* he was not involved in those incidents and there was no evidence that he had knowledge of them before the murder. Petitioner asserts that the evidence showed that Robinson "had hunted Susan Hill on a number of occasions and was willing to use violence to force her to come back to him," and that persons who accompanied Robinson under similar circumstances would also appear to be willing to use violence to assist Robinson in achieving his ends. (Dkt. 85 at 31.) The Court disagrees. Jurors are presumed to follow instructions given by the court. See Weeks v. Angelone, 528 U.S. 225, 234 (2000); Belmontes v. Woodford, 359 F.3d 1079, 1082 (9th Cir. 2004), vacated on other grounds by Brown v. Belmontes, 2005 WL 694089, 73 U.S.L.W. 3564 (U.S. March 28, 2005). The trial court instructed the jury to consider evidence regarding other acts by one or more of the defendants, "only for the limited purpose of determining if [that evidence] tends to show a characteristic method, plan or scheme . . . similar to the method, plan or scheme used in the commission of the offense in this case" such that this evidence tended "to show the identity

1  of the person who committed" the charged offense by tending to show a "clear connection

2  between the other act and the one which that defendant is accused so that it may be logically

3  concluded that if that defendant committed the other offense, he also committed the crime

4  charged in this case."

5      There was no evidence that Petitioner was involved in either the North Hollywood

6  or Philadelphia incidents. The jury could not, consistent with their instructions, find that the

7  evidence regarding those incidents tended to show a characteristic method, plan or scheme

8  of *Petitioner* that was similar to the one used in the commission of the Yuma events.

9  Evidence of the North Hollywood and Philadelphia incidents tended to show that Robinson

10  involved others in his efforts to find Susan and coerce her return, but it did not tend to show

11  that Petitioner was one of the others who had been so involved.  The trial court's

12  instructions were adequate to offset any unfair prejudice resulting from the admission of

13  evidence regarding the North Hollywood and Philadelphia incidents.

14      Petitioner also asserts that the Arizona Supreme Court expressly refused to consider

15  evidence regarding Mathers's involvement in Susan Hill's "abduction" in Philadelphia

16  against Mathers, but did consider that evidence against him. The Arizona Supreme Court

17  did not consider the evidence against Petitioner; rather, it held that admission of that

18  evidence did not warrant severance because Petitioner was adequately protected by the

19  limiting instructions given to the jury. Robinson, 165 Ariz. at 57, 796 P.2d at 859.  As

20  addressed above, this Court has reached the same conclusion.  The Arizona Supreme

21  Court's treatment of this evidence as to Mathers is irrelevant to Petitioner's constitutional

22  claim; thus, the allegation is without merit. Because Petitioner was not unfairly prejudiced

23  by the admission of this evidence, in light of the trial court's instructions to the jury, the

24  denial of severance did not violate his constitutional rights.

25      Police Report Evidence

26      Petitioner argues that denial of severance unfairly prejudiced him based on the

27  admission of evidence that the shotgun used in the murder had been reported missing to

28  Banning police by its owner several months prior to the murder.  (RT 12/9/87 at 87-89.)

1   Petitioner contends the admission of this evidence unfairly prejudiced him because there
2   was no evidence that he had known that Robinson possessed the shotgun or had put it in his
3   car before picking up Petitioner. He argues this evidence was prejudicial because "the state
4   was unable to make any connection between [Petitioner] and the murder weapon. His
5   fingerprints were not on the weapon." (Dkt. 85 at 32.)

6       The trial court admitted over defense objection testimony from a law enforcement
7   officer relating the contents of a routine police report regarding the missing shotgun. (RT
8   12/9/87 at 87-89.) The supreme court held that testimony admissible because it was not
9   offered to prove the truth of the report, but to establish the geographical location of the
10  shotgun in Banning. Robinson, 165 Ariz. at 57, 796 P.2d at 859. It also found the
11  significance of the hearsay testimony, which placed the weapon in Banning five months
12  prior to the murder, was "vastly diminished by other evidence directly linking Robinson and
13  [Petitioner] to the shotgun." Id.

14      Petitioner's claim appears to be wholly unfounded. The admission of evidence
15  indicating the shotgun was stolen did not improperly link Petitioner to the gun, or implicate
16  him as the associate of a thief. In fact, this evidence was not necessarily contradictory to
17  Petitioner's assertion that no evidence demonstrated he knew Robinson possessed the gun
18  or that it was in the trunk of the car. Further, Petitioner's assertion that no evidence
19  otherwise connected him to the gun is erroneous. The shotgun was recovered from a field
20  near the Hills' home and within yards of a trench coat, identified as one worn by Petitioner
21  the day of the offense, in the pocket of which was a slip of paper with the name of one of
22  Robinson's sons. There was no evidence that Robinson passed that field, much less through
23  it, or that either Robinson or Mathers had worn a trench coat that day. Evidence that
24  Petitioner had worn the coat that day, which was subsequently found in close proximity to
25  the murder weapon, was sufficient to support the inference that Petitioner had either
26  abandoned the shotgun and coat as he fled the scene, or that he had abandoned the coat as
27  his accomplice abandoned the shotgun, as they both fled from the Hills' home. The Court
28  cannot identify any ground on which the report's admission would have unfairly prejudiced

1   Petitioner.

2       The Court concludes that the denial of severance, and the subsequent admission of

3   evidence regarding the North Hollywood and Philadelphia incidents and the police report

4   regarding the shotgun, did not unfairly prejudice Petitioner so as to violate his constitutional

5   rights. Accordingly, relief on this claim will be denied.

6       **Claim 4:**    **Restrictions on Cross-Examination**

7       In Claim 4, Petitioner alleges that the trial court's refusal to permit unlimited cross-

8   examination of witness Barbara Bryant violated his rights to due process and reliable

9   procedures under the Fifth, Eighth and Fourteenth Amendments, and his right to confront

10   witnesses under the Sixth Amendment. During direct examination, Bryant testified that at

11   approximately 2:00 a.m. on June 9, 1987, Petitioner called her collect and asked her to call

12   him back at an Arizona telephone number. (RT 12/2/87 at 110-11.) A few minutes later,

13   Bryant called Petitioner at that number. (RT 12/2/87 at 116.) The prosecution asked Bryant

14   the following:

15       Q.    When you got these calls in the middle of the night, did you
                  ever ask [Petitioner] where he was?

16       A.    I asked him once and he said, "Arizona".

17               *       *       *

18       Q.    Did you ask him what he was doing in Arizona?

19       A.    He said he was stranded.

20   (RT 12/2/87 at 122-23.)

21       On cross-examination, Bryant testified that Petitioner frequently went to gatherings

22   for two or three days with Robinson and/or other members of Robinson's motorcycle club

23   and would call for a ride if stranded. (RT 12/2/87 at 135-36.) When Petitioner's counsel

24   asked Bryant what Petitioner told her when he called her the morning of June 9, 1987, the

25   prosecution objected based on hearsay. (Id. at 137.) Defense counsel argued that he was

26   entitled to cross-examine Bryant regarding the conversation because the prosecution had

27   opened the door, but the trial court sustained the objection and found the question had been

28

asked and answered on direct. (RT 12/2/87 at 137-38.) The trial court precluded cross-examination of Bryant regarding what was said in the June 9, 1987 telephone calls. (RT 12/2/87 at 144-45.) The trial court determined that Bryant could not be cross-examined about what Petitioner had said under the prior inconsistent statement exception because potential unfair prejudice outweighed its relevance. (RT 12/2/87 at 145.)

The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him." Claims raised pursuant to the Confrontation Clause generally fall into two broad categories: cases involving the admission of out-of-court statements and cases involving restrictions on the scope of cross-examination. See Delaware v. Fensterer, 474 U.S. 15, 18 (1985). The instant claim falls into the second category, which involves limitations that prevent defense counsel from exposing facts to the jury from which the jury could draw inferences regarding the reliability of a witness. Id. at 19.

"'The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'" Davis v. Alaska, 415 U.S. 308, 315-316 (1974) (quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940)). Impeachment of a witness's credibility and exposure of witness bias and possible motive in testifying are two purposes served by the constitutionally protected right of cross-examination. See id. at 316. However, a trial court has broad discretion in determining the scope and extent of cross-examination. See Alford v. United States, 282 U.S. 687, 694 (1931); Carriger v. Lewis, 971 F.2d 329, 332-33 (9th Cir. 1992). A trial court may impose reasonable limits on cross-examination to prevent harassment, prejudice, confusion of the issues or repetitive questioning, and to protect a witness's safety. See Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). Such limitations on cross-examination do not deny the constitutionally protected right of confrontation, but constitute legitimate evidentiary rulings entrusted to the discretion of the trial judge. See id.; Perry v. Rushen, 713 F.2d 1447, 1450 (9th Cir. 1983).

Petitioner argues that the trial court's limitation of cross-examination of Bryant regarding what he said during the telephone calls violated his constitutional right to confront

1  an adverse witness with prior inconsistent statements. The questioning at issue called for

2  inadmissible hearsay. Petitioner fails to identify a basis under which such testimony would

3  have been admissible. The prosecution did not "open the door" to such testimony; instead,

4  Bryant volunteered information in response to a question from the prosecution requiring

5  only a "yes" or "no" response.[8]  Petitioner has not identified any inconsistency between

6  Bryant's trial testimony and any statement previously made by her.

7      In sum, the trial court did not err in sustaining the objection. Even if the trial court

8  erred, the court's ruling on this single question did not render Petitioner's entire trial

9  fundamentally unfair. Any error by the trial court in sustaining the objection did not have

10  a substantial and injurious effect on the verdict. See Brecht v. Abrahamson, 507 U.S. 619,

11  629 (1993). Federal habeas relief on this claim will be denied.

12      **Claim 5:      Sufficiency of the Evidence**

13      In Claim 5, Petitioner challenges the sufficiency of the evidence supporting his

14  conviction and sentences under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Dkt.

15  20 at 26-31.) Petitioner primarily argues that there is no greater evidence to support his

16  conviction than there was to support Mathers's conviction, which the Arizona Supreme

17  Court found insufficient on direct appeal; therefore, he argues that he is entitled to habeas

18  relief. However, the standard to assess the sufficiency of the evidence to support a

19  conviction is "whether, after viewing the evidence in the light most favorable to the

20  prosecution, *any* rational trier of fact" could have made the finding beyond a reasonable

21  doubt.[9]  Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis added). A habeas court

22  faced with a record of historical facts which supports conflicting inferences must presume,

23

24      [8]      Notably, Petitioner did not object to Bryant's volunteered information,
       presumably because it tended to support his defense theory that he was abandoned by
25  Robinson and Mathers in Yuma prior to the murder.

26      [9]      The standard requires a review of the evidence relevant to *Petitioner* and an
       assessment of whether that evidence is sufficient to sustain the conviction of *Petitioner*.
27  Thus, how the Arizona Supreme Court resolved such a claim as to Mathers is irrelevant to
28  the analysis.

1   even if it does not appear in the record, that the trier of fact resolved any such conflicts in

2   favor of the prosecution. See id. at 326.

3       Applying a presumption that the jury resolved conflicting inferences in favor of the

4   prosecution, the Court concludes that Petitioner's conviction is supported by sufficient

5   evidence.  Prior to the murder, Robinson and Mathers told witnesses they were going to

6   Arizona, and Robinson's son heard Robinson, Mathers and Petitioner discuss going to

7   Yuma.  Both Mathers and Petitioner were seen in Robinson's car leaving Banning the

8   evening of the murder.  During the intrusion, Ralph Hill glimpsed a young black man

9   wearing a red bandana, who was not Robinson.  Immediately following the shooting,

10  Robinson was stopped as he fled from the Hills' street.  In his car, police recovered a red

11  bandana, like one Petitioner had been seen wearing earlier in the day, and like the one Ralph

12  Hill observed one of his assailants wearing.[10]  The shotgun used against the Hills and a tan

13  trench coat, identified as one worn by Petitioner the day of the shooting and containing a slip

14  of paper with Eric Robinson's name on it, were found within yards of each other in a field

15  near the Hills' home. There was no evidence that Robinson passed the field or that he could

16  have abandoned the coat or the shotgun in the field as he fled from the Hills' street.  A

17  couple of hours after the murder, Petitioner called his common-law wife from Yuma, telling

18  her that he was stranded, and later bought a bus ticket at the Yuma terminal to return to

19  Banning.  From this evidence, a rational trier of fact, construing all inferences in favor of

20  the prosecution, could have found beyond a reasonable doubt that Petitioner was both

21  present in Yuma the night of the crime and that he participated in the crime.  Accordingly,

22  habeas relief will be denied as to this claim.

23  _____

24      [10]    The relevance of the bandana found in Robinson's car is attenuated; evidence was admitted that hairs found adhering to it were microscopically consistent with Mathers's

25  hair and were inconsistent with either Robinson's or Petitioner's hair. (RT 12/9/87 at 112-13, 114-16, 118-19.) In addition, there was no evidence that either Petitioner or Mathers was in

26  Robinson's car after the Hills were attacked.  However, viewing the evidence in a light favorable to the prosecution, this circumstantial evidence could support the theory that both

27  Petitioner and Mathers had red bandanas, but that Mathers removed his and left it in

28  Robinson's car before entering the Hills' home.

### Claims 8-B & 8-C: The (F)(6) and (F)(5) Aggravating Circumstances were Unconstitutionally Applied to Petitioner

In Claim 8-B, Petitioner alleges that in applying the (F)(6) aggravating circumstance to him, i.e., that the murder was committed in an especially heinous, cruel or depraved manner, the Arizona courts expanded the narrowing construction given to that circumstance so as to violate his Eighth Amendment rights. In Claim 8-C, Petitioner alleges that in applying the (F)(5) aggravating circumstance to him, i.e., that the murder was committed in the expectation of something of pecuniary value, the state courts similarly expanded the narrowing construction given to that circumstance in violation of his constitutional rights.

> When a federal court is asked to review a state's court's application of an individual statutory aggravating . . . circumstance in a particular case, it must first determine whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer. If so, then the federal court must attempt to determine whether the state courts have further defined the vague terms, and if they have done so, whether those definitions are constitutionally sufficient, i.e., whether they provide *some* guidance to the sentence.

Walton v. Arizona, 497 U.S. 639, 654 (1990), overruled in part on other grounds by Ring v. Arizona, 536 U.S. 584 (2002); Lewis v. Jeffers, 497 U.S. 764, 777-81 (1990). If a state court has defined an unconstitutionally vague statutory factor, a federal court's role is to determine "whether those definitions are constitutionally sufficient, i.e., whether they provide some guidance to the sentencer." Walton, 497 U.S. at 654. Federal habeas review of the application of an aggravating circumstance to the facts by a state court then is limited to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation. See Jeffers, 497 U.S. at 780.

#### Especially Heinous, Cruel or Depraved Circumstance

In Walton, the United States Supreme Court found Arizona's especially heinous, cruel or depraved aggravating circumstance to be facially vague, but held that Arizona courts had sufficiently narrowed application of the circumstance so as to constitutionally channel a sentencer's discretion. 497 U.S. at 654 (cruelty); see also Jeffers, 497 U.S. at 777-81 (depravity). The Supreme Court in Walton expressly held that both the cruelty and

1   depravity prongs of (F)(6) have been construed by the Arizona courts in a manner that

2   furnishes sufficient guidance to the sentence. Walton, 497 U.S. at 655.   Therefore, this

3   Court's review of the state courts' application of the (F)(6) circumstance to the facts is

4   limited to determining whether the state court's finding was so arbitrary or capricious as to

5   constitute an independent due process or Eighth Amendment violation. See Jeffers, 497

6   U.S. at 780.

7   　　　Because phrased in the disjunctive, the (F)(6) factor can be established by showing

8   especial cruelty, heinousness or depravity, alone. See, e.g., State v. Roscoe, 184 Ariz. 484,

9   500, 910 P.2d 635, 651 (1996); State v. Smith, 193 Ariz. 452, 461, 974 P.2d 431, 440

10   (1999).   In this case, the trial court found, and the supreme court affirmed, that as to

11   Petitioner the murder was both especially cruel ("cruelty prong") and especially heinous or

12   depraved ("depravity prong").

13   　　　*Cruelty Prong*

14   　　　Petitioner alleges that the cruelty prong was unconstitutionally applied to him

15   because Arizona courts have narrowed application of that prong such that it can only be

16   found against the actual killer of a victim, and not an accomplice who was merely present.

17   (Dkt. 85 at 60.) He argues that because there was no evidence that he was the actual killer,

18   or even that he was present in the home, the cruelty finding as to him unconstitutionally

19   expanded Arizona's construction of that prong.  (Id.)

20   　　　To support a finding of cruelty, the prosecution must establish beyond a reasonable

21   doubt that the victim consciously suffered physical pain or mental anguish and that the

22   defendant knew or should have known that the victim would suffer. See State v. Moody,

23   208 Ariz. 424, 471, 94 P.3d 1119, 1166 (2004); State v. Trostle, 191 Ariz. 4, 18, 951 P.2d

24   869, 883 (1997); State v. Amaya-Ruiz, 166 Ariz. 152, 177, 800 P.2d 1260, 1285 (1990).

25   Arizona courts have upheld application of the cruelty prong to accomplices who did not

26   actually kill the victim, but who were present and extensively participated in the underlying

27   felonies when it was reasonably foreseeable that the victim would suffer. See State v.

28   Miles, 186 Ariz. 10, 17, 918 P.2d 1028, 1035 (1996); State v. Dickens, 187 Ariz. 1, 24-25,

926 P.2d 468, 491-92 (1996); State v. Lacy, 187 Ariz. 340, 354, 929 P.2d 1288, 1302 (1996) (upholding cruelty finding against unarmed accomplice, but reducing sentence on other grounds). In State v. Carlson, the Arizona Supreme Court held there is "no vicarious liability for cruelty in capital cases absent a plan intended or reasonably certain to cause suffering. The plan must be such that suffering before death must be inherently and reasonably certain to occur, not just an untoward event." 202 Ariz. 570, 583, 48 P.3d 1180, 1193 (2002). Thus, under Arizona law, cruelty may be found as to a non-triggerman accomplice if "the defendant intended that the murder be committed in such a manner as to cause the victim to suffer or, absent intent, knew it would be so." Id. Evidence that an accomplice was present during the crime, involved in planning the details or method of the murder, or supplied the weapon used may support such finding of intent. See id.

The trial court found that Sterleen's murder was especially cruel because she experienced mental anguish as a result of the late night intrusion of armed men into her home, was bound and forced to lie face down on her bedroom floor while the room was ransacked, and then endured the terror of hearing her husband shot, followed by the pumping of the shotgun with the knowledge that she was next. (ROA 109 at 3, ¶ 5.) The trial court specifically found there was no evidence that Sterleen had been rendered unconscious prior to being shot, citing testimony of the medical examiner. (Id. at ¶ 5(e).) Further, it found that Petitioner was advised prior to the invasion that "the real purpose of the trip to Yuma was to 'take out' a drug dealer and get his dope and his money," and that he nevertheless participated in the armed invasion. (Id. at ¶ 4(a), (b).) Finally, it found that Petitioner was present and failed to act to avert the murder. (Id. at ¶ 5(b).) The Arizona Supreme Court affirmed the cruelty finding, noting that Sterleen would have experienced great distress at being bound and at the uncertainty regarding her ultimate fate. Robinson, 165 Ariz. at 60-61, 796 P.2d at 862-63.

At a minimum, the evidence demonstrates that Petitioner forcibly intruded into the Hills' home late at night, brandished weapons, and demanded non-existent dope and money from the Hills. Certainly the intrusion and the binding were planned, and Petitioner

1    participated in those acts. That Sterleen Hill would suffer mental anguish as a result of these
2    acts, and that she might subsequently be killed, was entirely foreseeable. This is sufficient
3    to establish that Petitioner knew, or should have known, that the victim would suffer.
4    Moreover, there was evidence that Petitioner had been informed by Robinson prior to the
5    intrusion that the purported plan was to "take out" the drug dealer that purportedly lived in
6    the home, and that if "things got rough, [to] shoot 'em." Finding that Petitioner knew or
7    should have known that one of the victims would suffer physical pain and mental anguish
8    based on these facts was not so arbitrary and capricious as to violate Petitioner's
9    constitutional rights.

10         *Depravity Prong*

11         Petitioner alleges that the Arizona courts unconstitutionally found depravity as to him
12    because there was no evidence that he was the actual shooter or that he "was even in or
13    near" the Hills' home the night of the crime. (Dkt. 85 at 57.) Petitioner argues that the
14    statute "explicitly refers to the state of mind of the killer, not to that of a co-defendant," and
15    that "the Supreme Court" has held that this prong "may only be applied to the 'perpetrator'
16    of the killing." (Id. at 60.)

17         A finding that a murder was especially "heinous" or "depraved" focuses on the
18    defendant's state of mind at the time of the offense. See State v. Fulminante, 161 Ariz. 237,
19    255, 778 P.2d 602, 620 (1988); accord State v. Jimenez, 165 Ariz. 444, 455, 799 P.2d 785,
20    796 (1990); Amaya-Ruiz, 166 Ariz. at 178, 800 P.2d at 1286; State v. Ross, 180 Ariz. 598,
21    605, 886 P.2d 1354, 1361 (1994) ("heinousness and depravity refer to a defendant's vile
22    state of mind and attitude at the time of the murder, as evidenced by his conduct"); State v.
23    Smith, 146 Ariz. 491, 504, 707 P.2d 289, 302 (1985). A defendant's state of mind is
24    determined by his behavior at or near the time of the offense. State v. Lujan, 124 Ariz. 365,
25    372, 604 P.2d 629, 636 (1979); accord State v. Poland, 132 Ariz. 269, 285, 645 P.2d 784,
26    800 (1982); State v. Jeffers, 135 Ariz. 404, 429, 661 P.2d 1105, 1130 (1983); State v.
27    Martinez-Villareal, 145 Ariz. 441, 451, 702 P.2d 670, 680 (1985); State v. Greene, 192 Ariz.
28    431, 440, 967 P.2d 106, 115 (1998). In State v. Gretzler, the supreme court listed five non-

exclusive factors to be considered in determining whether a murder was especially heinous or depraved and evidenced a defendant's "vile" state of mind: (1) the apparent relishing of the murder, (2) the infliction of gratuitous violence on the victim beyond the murder itself, (3) needless mutilation, (4) the senselessness of the murder, and (5) the helplessness of the victim.  135 Ariz. 42, 51-52, 659 P.2d 1, 10-11, 12 (1983); accord State v. Wallace, 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989).  The Arizona Supreme Court has upheld application of the depravity prong to a non-triggerman accomplice.  See State v. Tison, 129 Ariz. 526, 545, 633 P.2d 335, 354 (1981); State v. Scott, 177 Ariz. 131, 143-44, 865 P.2d 792, 804-05 (1993).

In this case, the trial court appeared to base its depravity finding on the senselessness of the murder and the helplessness of the victim.  (RT 1/13/88 at 28) ("There is no reasonable doubt that the murder was a senseless crime.  There was no way the victim could have identified anyone.  She was utterly helpless and was in no manner any threat to the defendant.")  The Arizona Supreme Court affirmed the depravity finding, again, apparently based upon the senselessness of the crime and the helplessness of the victim.  It stated that "[a]s difficult as it may be to define depravity, the gangland-style action of forcing two elderly persons to lay face down on the floor, tying them up, then senselessly shooting them amounts to depraved conduct."  Robinson, 165 Ariz. at 61, 796 P.2d at 863.

Evidence reflected that Petitioner left Banning with Robinson and Mathers and traveled to Yuma, Arizona, the evening of the crime.  Petitioner was observed wearing a red bandana and a tan trench coat.  Two men invaded the Hills' home late at night, forced the elderly couple to lie face down on their bedroom floor and tied them up, while demanding drugs and money and ransacking their bedroom.  After Ralph Hill glimpsed one of the assailants, a young black man wearing a red bandana, he and Sterleen were shot.  Robinson was apprehended as he fled from the Hills' street.  Two hours later, Petitioner called his common-law wife from Yuma, telling her that he was stranded, and later bought a ticket at the Yuma bus terminal to return home to Banning.  Pursuant to a search of the Hills' neighborhood following the crime, the murder weapon, a pair of rubber gloves and a tan

1  trench coat, identified as the one worn earlier by Petitioner, were found abandoned in a field

2  near the Hills' home.

3      This evidence was sufficient to support a finding that Petitioner was present in the

4  Hills' home and that he was involved in the crime, even if he was not the triggerman.

5  Further, it supports a finding of a vile state of mind due to the senselessness of the murder

6  and helplessness of the victim.  The Court concludes that the Arizona courts' finding of

7  depravity was not so arbitrary and capricious as to violate Petitioner's constitutional rights.

8  Accordingly, Petitioner is not entitled to relief based on the (F)(6) circumstance, and habeas

9  relief on Claim 8-B will be denied.

10      Pecuniary Gain Circumstance

11      The Ninth Circuit has upheld the Arizona courts' narrowing of the (F)(5)

12  circumstance.  See Woratzeck v. Stewart, 97 F.3d 329, 335 (9th Cir. 1996); see also Poland

13  v. Stewart, 117 F.3d 1094, 1099-1100 (9th Cir. 1997).  Therefore, this Court's review of the

14  state courts' application of the (F)(5) circumstance to the facts is limited to determining

15  whether the state court's finding was so arbitrary or capricious as to constitute an

16  independent due process or Eighth Amendment violation.  See Jeffers, 497 U.S. at 780.

17      Under Arizona law, the prosecution must show that the expectation of pecuniary gain

18  was "a motive, cause, or impetus for the murder and not merely the result of the murder."

19  State v. Hyde, 186 Ariz. 252, 280, 921 P.2d 655, 683 (1996).  The trial court found that

20  Petitioner was motivated to participate in the crime by the promise that the Hills had drugs

21  and money in their home.  (ROA 109 at 2, ¶ 4.)  It further found that Petitioner searched for

22  items of value in the Hills' bedroom and that items of value were taken from the residence,

23  although some were later recovered a distance from the home.  (Id.)  The Arizona Supreme

24  Court affirmed, noting that the armed assailants had repeatedly demanded drugs and money

25  from the Hills, Petitioner had searched their bedroom for valuables, and valuables were in

26  fact taken from the home.  Robinson, 165 Ariz. at 60, 796 P.2d at 862.  These findings

27  demonstrate that the application of the (F)(5) factor was not so arbitrary and capricious as

28  to violate Petitioner's constitutional rights.  Accordingly, habeas relief on Claim 8-C will

1   be denied.

2   **Claim 10:**     **Insufficient Enmund/Tison Findings**

3       In Claim 10, Petitioner alleges that his death sentence violates his Fifth, Sixth, Eighth

4   and Fourteenth Amendment rights because the prosecution failed to prove his intent to

5   commit murder in violation of the holdings in Enmund v. Florida, 458 U.S. 782, 787-88

6   (1982), and Tison v. Arizona, 481 U.S. 137 (1987). (Dkts. 20 at 42-43; 85 at 61.)   In

7   Enmund, the Supreme Court held that a felony-murder defendant could only be sentenced

8   to the death penalty if he actually killed, attempted to kill, or intended to kill. 458 U.S. at

9   797. In Tison, the Court expanded Enmund's rule so that a felony-murder defendant could

10   be sentenced to death if the defendant was a major participant in the underlying felony and

11   the defendant acted with reckless indifference to human life. 481 U.S. at 157-58; see also

12   Greenawalt v. Ricketts, 943 F.2d 1020, 1028 (9th Cir. 1991) (finding Enmund satisfied

13   when defendant knowingly created a grave risk of death and was an active participant in the

14   felonies).   Findings pursuant to Enmund may be made by the trial or appellate court.

15   Cabana v. Bullock, 474 U.S. 376, 387 (1986).  A state court's finding that Enmund/Tison

16   is satisfied is sufficient if "after viewing the evidence in the light most favorable to the

17   prosecution, *any* rational trier of fact" could have made the finding beyond a reasonable

18   doubt. Jackson, 443 U.S. at 319 (emphasis added).

19       At sentencing, the trial court found that Petitioner was a "major factor in bringing

20   about the crime," that he "evinced a total and reckless disregard for human life" and that he

21   "planned to execute the victim during the armed robbery."  (ROA 109 at 3, ¶ 5(c), (f).) On

22   direct appeal, the supreme court found the requisite culpability was established because

23   there was evidence that Petitioner "was at least present when the hands and feet of Ralph

24   and Sterleen Hill were bound, that the Hills were terrorized with firearms, . . . [and that

25   Petitioner] was at least present in the Hills' home when Ralph Hill was wounded and

26   Sterleen Hill was murdered." Robinson, 165 Ariz. at 62, 796 P.2d at 864.

27       Petitioner argues there was no evidence he was present when the Hills were tied up

28   or when Sterleen Hill was murdered. (Dkt. 85 at 61-62.)  He further argues that even if

there were evidence that he was in the Hills' home, there was no evidence that he intended

Sterleen Hill's death or that he was a major participant in the underlying felonies and

showed reckless indifference to human life. (Id. at 62.) The Court disagrees.

Although neither Le Sean nor Ralph Hill identified Petitioner as one of the men who

forced their way into the Hills' home, there was substantial circumstantial evidence

connecting Petitioner to the armed intrusion. First, Petitioner was seen in Robinson's car

as Robinson left Banning for Yuma, Arizona, the evening of the murder. Petitioner was

observed wearing a tan trench coat and a red bandana. There was evidence that Robinson

told Petitioner, either in Yuma or on the way to Yuma, that the purpose of the trip was to

rob a drug dealer and to "shoot 'em" if things got "rough." Two men forced their way into

the Hills home and bound the Hills. (Id. at 124, 127, 134-36.) Ralph Hill testified that one

of the intruders kept poking a gun into his ear. (Id. at 124-25, 126, 134.) He also testified

that he glimpsed one of the armed intruders – a young black man wearing a red bandana

who was not Robinson – as the man searched the Hills' bedroom, while the other man stood

over the couple. (RT 12/10/87 at 125, 126.) Robinson was apprehended as he fled from the

Hills' street immediately after the shooting. A trench coat identified as the one Petitioner

had been observed wearing earlier in the evening, was found abandoned a few yards from

the shotgun used in the attack. There was no evidence that Robinson could have or did pass

the field where these items were found following the shooting. Viewing the evidence in the

light most favorable to the prosecution, a rational factfinder could find beyond a reasonable

doubt that Petitioner was a major participant in the underlying felonies and that he acted

with reckless indifference to human life under Enmund/Tison. Relief on this claim will be

denied.

**Claim 11:     Ineffective Assistance of Counsel at Sentencing**

In Claim 11, Petitioner alleges that counsel was ineffective at sentencing in violation

of his rights to due process, equal protection, protection against cruel and unusual

punishment, and counsel under the Fifth, Sixth, Eighth and Fourteenth Amendments. To

establish IAC, a petitioner must show that counsel's performance was deficient and that the

deficiency prejudiced his defense. <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

**A.      Failure to Investigate and Present Evidence from Susan Hill at Sentencing**

Petitioner initially alleges that trial counsel, Robert Clarke, rendered ineffective assistance by failing to interview and present testimony from Susan Hill at sentencing. In support, Petitioner attached a declaration from Susan Hill. (Dkt. 84, Ex. K)  In the declaration, Hill stated that she did not believe Petitioner was involved in the murder of her stepmother and that she would have so testified at sentencing if Clarke had asked her. (Dkt. 84, ex. K at ¶¶ 9-10, 12.) Additionally, she declared that Petitioner had intervened on her behalf prior to the murder when Robinson became violent towards her and that she did not believe that Petitioner would have participated in a plan to kidnap her and return her to Robinson. (<u>Id.</u>, at ¶¶ 8, 10, 12.) Petitioner did not present this declaration to the PCR court, nor did he call Hill as a witness during the state evidentiary hearing.

In a previous order, the Court denied Petitioner's motion to expand the record to include Hill's declaration. (Dkt. 96 at 4.) Petitioner had sought expansion in support of his <u>Jackson</u> insufficient evidence claim, and the Court denied the request because review of that claim was limited to the record before the state court. (<u>Id.</u>) In the same order, the Court also denied expansion in support of the instant claim of ineffectiveness because the exhibits Petitioner sought to expand into the record constituted new evidence that had never been presented to the state courts. (<u>Id.</u>) The Court concluded that Petitioner had been afforded a full and fair opportunity to develop the facts in support of Claim 11 during the state evidentiary hearing and that he had demonstrated neither cause and prejudice nor a fundamental miscarriage of justice to excuse his failure to present the new evidence in state courts. (<u>See id.</u> at 3, citing <u>Keeney v. Tamayo-Reyes</u>, 504 U.S. 1 (1992).)

The Court reaffirms this conclusion and again finds that expansion of the record to consider Hill's declaration in support of Claim 11 is not warranted. Petitioner was afforded a full and fair opportunity to develop his IAC claims during the PCR evidentiary hearing, including relevant testimony from Susan Hill. Petitioner's failure to develop, or to establish

1   cause and prejudice or a fundamental miscarriage of justice, precludes consideration of

2   Hill's declaration.  Absent evidence in support of deficient performance and prejudice,

3   Petitioner has failed to establish that Clarke was ineffective in violation of the Sixth

4   Amendment.  Therefore, the Court finds that Clarke's alleged failure to interview and

5   present testimony at sentencing from Susan Hill does not afford a basis for habeas relief.

6   **B.    Failure to Investigate and Present Other Mitigating Evidence**

7   Petitioner alleges that counsel failed to investigate and present available mitigation

8   regarding his family background, history of childhood abuse, learning disabilities, head

9   injuries, delinquency, substance abuse, fatherhood and move to Banning. (Dkts. 20 at 44-

10  47; 85 at 5-17.)  As discussed above, this Court's consideration of these allegations is

11  limited to the evidence in the state court record.    That evidence relates to Petitioner's

12  dysfunctional family background and the negative effects on his development, ingestion of

13  alcohol from early childhood and use of illicit drugs beginning in his early teens, history of

14  head injuries, suspected diffuse brain damage, and intoxication the night of the crime.

15  <u>Relevant State Court Proceedings</u>

16  At the aggravation/mitigation hearing, Petitioner's counsel presented three witnesses

17  on Petitioner's behalf – a friend, Steve Thomas; Petitioner's mother, Willie Mae Skinner;

18  and a half-brother, John Mondy.[11] (RT 1/8/88.) All three witnesses testified that Petitioner

19  was a friendly and upbeat person, that he was not violent or aggressive, and that he was a

20  caring father of his five-year old son for whom he had sought and obtained legal custody

21  from his ex-wife. (RT 1/8/88 at 89, 92, 94-95, 120-21, 124-26, 127-28, 135, 136, 139-40.)

22  Thomas testified that he had known Petitioner for two or three years and that he had

23  both worked with Petitioner and had hired Petitioner to work for him. (<u>Id.</u> at 90-92, 93, 103-

24  104.) Thomas testified that Petitioner was somewhat easily influenced and gullible. (<u>Id.</u> at

25  92.) He also testified that he had never seen Petitioner drunk or high. (<u>Id.</u> at 107-108.)

26

27
         [11]     The Court adopts the spelling used by Skinner in a letter submitted to the PCR
28  court dated August 24, 1993, rather than the one in the trial transcript. (ROA 193.)

1    Petitioner's mother testified that Petitioner was the youngest of her nine children, that

2    his father died when he was a child, and that he had dropped out of high school in the tenth

3    or eleventh grade. (<u>Id.</u> at 118-20.) She acknowledged that Petitioner had served some time

4    in prison, but also that he had worked to support himself and his son, and that he took good

5    care of his son. (<u>Id.</u> at 121-22, 126-27.)

6    John Mondy was thirteen years older than Petitioner and was a "peace officer," who

7    worked as a group counselor for the California Youth Authority. (<u>Id.</u> at 133.) Mondy

8    testified that Petitioner was good with his hands, such as drawing, electronics and carpentry,

9    but that he had difficulties in school. (<u>Id.</u> at 133-34.) Mondy testified that Petitioner could

10   be gullible or manipulated by others. (<u>Id.</u> at 135-36, 140.) Mondy acknowledged that

11   Petitioner had gotten into a few fights as a teenager and that he had served a couple of years

12   in prison for burglary, but that Petitioner had sought and obtained custody of his son and had

13   tried to mend his ways after leaving prison. (<u>Id.</u> at 137-38.)

14   The trial court found the mitigation insufficient to outweigh the two aggravating

15   factors; it expressly found that Petitioner's capacity to appreciate the wrongfulness of his

16   conduct or to conform his conduct to the requirements of the law was not impaired, that his

17   age (27) was not mitigating, and that none of the other factors offered by Petitioner,

18   including his passive nature, fatherhood, family relationships, and desire to do things with

19   his life were sufficiently mitigating to overcome the aggravation. (RT 1/13/88 at 29-30.)

20   On direct appeal, the state supreme court affirmed, finding "sparse" evidence that Petitioner

21   had been intoxicated at the time of the crime, that his age was not mitigating, and that being

22   a single parent was not sufficient to outweigh the aggravating circumstances. <u>Robinson</u>, 165

23   Ariz. at 61, 796 P.2d at 864.

24   In his PCR proceedings, Petitioner alleged that Clarke rendered ineffective assistance

25   by failing to interview him regarding potential mitigation and by failing to present evidence

26   of good behavior during incarceration, his unstable family background, and the absence of

27   a violent history or propensity. (ROA 141 at 25-26.) Petitioner sought and was granted the

28   assistance of psychologist Todd Roy, as well as authorization for a neurological assessment

- 26 -

(specifically, an EEG and MRI) and a neuropsychological examination to evaluate the existence of potential organic brain damage. (ROA 154, 160, 169, 172, 178-79, 184, 187-89.) Dr. Roy's report and an addendum were subsequently filed with the court. (ROA 173, 192.) Petitioner was also evaluated by psychiatrist Eva B. McCullars for the State, and a copy of her report was filed with the court. (ROA 185.)

The PCR court held a joint evidentiary hearing on Petitioner's and Robinson's IAC claims. (RT 9/8-9/93.) At the hearing, Petitioner's sentencing counsel, Robert Clarke, testified regarding his investigation and presentation of mitigating evidence. Petitioner's prison counselor, Juan Gonzales, testified about Petitioner's classification and good behavior during his confinement by the Arizona Department of Corrections ("ADOC"). In addition, Drs. Roy and McCullars testified about their respective evaluations of Petitioner. Dr. Roy cited several factors as mitigating. These included Petitioner's dysfunctional family background and its effects on his development, ingestion of alcohol beginning in early childhood and the use of illicit drugs beginning in his teens, and Petitioner's history of head injuries. Dr. Roy concluded that there were indications Petitioner had diffuse brain damage, likely resulting from head injuries and substance abuse, which would have impaired Petitioner's ability to make rational decisions, to plan and understand consequences of his behavior, and to mediate impulsivity. Based on the diffuse brain damage, Dr. Roy ruled out a diagnosis of antisocial personality disorder. Further, based on his interviews of Petitioner, Dr. Roy concluded that Petitioner had been under the influence of alcohol and cocaine the night of the crime. (RT 9/8/93 at 51, 72-73.)

Dr. McCullars agreed that Petitioner had a significantly dysfunctional family background (RT 9/9/93 at 138), but her opinion otherwise differed in most respects from that of Dr. Roy. She concluded that Petitioner had an antisocial personality disorder and testified that this diagnosis was not precluded by diffuse brain damage. (Id. at 125-27.) She explained that diffuse brain damage was present in approximately ten to fifteen percent of the population and that it did not necessarily impair an individual's functioning, noting that several prominent individuals, including presidents, have had such damage but not been

1   impaired by it. (Id. at 140-42.) Further, while she acknowledged that diffuse brain damage

2   could lead to learning disabilities and, in the worst cases, to "many other problems," she

3   testified that such individuals were "still able to think and follow their thought processes in

4   a relatively normal way." (Id. at 141.) Moreover, she found "no evidence on gross mental

5   status" that Petitioner was "either mentally retarded or organically disabled." (Id.)  With

6   respect to head injuries, Dr. McCullars found that Petitioner's historical reporting varied

7   from one interviewer to another in that he did not report the same instances of head injuries

8   to her that he had reported to Dr. Roy, and she did not appear to find the reported injuries

9   significant. (Id. at 133.) Dr. McCullars concluded that Petitioner's "addictive potential to

10  substances as are self-reported by him indicate a trait of a Dependent Personality Disorder."

11  (ROA 185 at 7.) She noted that while Petitioner indicated to her that he had been under the

12  influence of drugs the night of the crime, he had refused to discuss the details of the crime

13  with her. (Id.) Absent corroboration and based on Petitioner's admitted history of lying,

14  she lacked confidence in Petitioner's self-reports of drug use the night of the crime. (Id.)

15      Citing Strickland, among other cases, the PCR court denied relief on Petitioner's IAC

16  sentencing claim, crediting Dr. McCullars's conclusion that Petitioner had an antisocial

17  personality disorder and that he was poorly adjusted to living in society. (ROA 214 at 3.)

18  It found "nothing in [Petitioner's] makeup now, nor in the opinion of the experts was there

19  anything at the time of the offenses, which lessened his ability to differentiate right from

20  wrong or to conform his actions to the law." (Id.) It indicated that trial counsel acted

21  reasonably in not seeking a mental health evaluation where counsel observed nothing in

22  Petitioner's personality or actions to cause him to suspect that a mental examination would

23  be fruitful and that Petitioner was not prejudiced by the lack of a mental health evaluation

24  at the time of sentencing. (Id.) The court further noted that it had been aware that Petitioner

25  was a good or even model prisoner while jailed in Yuma and that he had minimal problems

26  at ADOC. (Id. at 4.) It found that there were nothing but "indications" from Petitioner that

27  he had been "drug or alcohol dependent; that he was so dependent at the time of the crimes,

28  or that either of those dependencies affected his ability to conform his actions to the

1   demands of society" and that "[n]either of these, taken separately or with any other

2   mitigating circumstance or circumstances would have mitigated against" a death sentence.

3   (Id.) The Arizona Supreme Court subsequently denied review.  (ROA 235.)

4           Performance Analysis

5           A petitioner claiming ineffective assistance "must identify the acts or omissions of

6   counsel that are alleged not to have been the result of reasonable professional judgment."

7   Strickland, 466 U.S. at 690.  Further, the petitioner must show that "counsel made errors so

8   serious that counsel was not functioning as the counsel guaranteed the defendant by the

9   Sixth Amendment."  Id. at 687.  The performance inquiry assesses whether counsel's

10  assistance was reasonable considering all the circumstances.  Id. at 688-89.  "A fair

11  assessment of attorney performance requires that every effort be made to eliminate the

12  distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged

13  conduct, and to evaluate the conduct from counsel's perspective at the time."  Id. at 689.

14  For instance, counsel's performance is evaluated by what reasonable counsel would have

15  done at that time, including an evaluation of state law sentencing strategies.  See Siripongs

16  v. Calderon, 35 F.3d 1308, 1315 (9th Cir. 1994).  A petitioner must overcome the

17  presumption that under the circumstances, the challenged action might be considered sound

18  trial strategy.  Id.  "A court deciding an actual ineffectiveness claim must judge the

19  reasonableness of counsel's challenged conduct on the facts of the particular case, viewed

20  as of the time of counsel's conduct."  Strickland, 466 U.S. at 690.

21          Petitioner alleges that Clarke performed deficiently because he conducted an

22  inadequate investigation and failed to present available mitigation.  Counsel has a duty to

23  conduct a reasonable investigation or to make a reasonable decision that makes particular

24  investigation unnecessary.  Strickland, 466 U.S. at 690.  The failure to adequately

25  investigate and present mitigating evidence can constitute deficient performance.  See

26  Wiggins v. Smith, 539 U.S. 510 (2003). A reasonable mitigation investigation involves not

27  only the search for good character evidence but also evidence that may demonstrate that the

28  criminal act was attributable to a disadvantaged background or to emotional and mental

problems.  See Boyde v. California, 494 U.S. 370, 382 (1990).  Thus, deficient performance has been found where trial counsel failed to investigate and present substantial mitigating evidence regarding family background, borderline mental retardation and exemplary behavior in prison when potential rebuttal evidence was minimal.  See Williams (Terry) v. Taylor, 529 U.S. 362 (2000).  In addition, counsel who is on notice of a serious mental health issue and does not complete a reasonable mitigation investigation or provide a reasonable tactical justification performs deficiently.  See Caro v. Woodford, 280 F.3d 1247, 1254 (9th Cir. 2002); Evans v. Lewis, 855 F.2d 631, 637 (9th Cir. 1988).  When counsel's investigation is being assessed for reasonableness, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."  Strickland, 466 U.S. at 691.

Although Clarke could have conducted additional investigation of Petitioner's background for potential mitigation, the Court cannot conclude that Clarke performed deficiently by failing to do so.  At the state evidentiary hearing, Clarke testified that he had been in practice as an attorney since 1969 (RT 9/8/93 at 149), and that he had worked for two years as a prosecutor in the early 70s (RT 9/9/93 at 5).  He had tried thirty to fifty jury trials and approximately half of his practice was in criminal defense.  (RT 9/9/93 at 6-7.) Additionally, Clarke had tried three or four capital cases prior to being appointed to represent Petitioner and had pleaded out ten to twelve other capital cases.  (RT 9/8/93 at 149.)

In Petitioner's case, Clarke began investigating possible mitigation as he investigated the facts of the case.  (Id. at 150-51.)  Clarke testified that he had "very extensive discussions" with Petitioner regarding what his life was like from when he was a young man to the present.  (Id. at 151.)  He also testified that he had "rather extensive discussions" with Petitioner's common-law wife, Barbara Bryant, regarding Petitioner's life following his release from prison in California.  (Id.)  He testified that he had "rather extensive discussions" with Petitioner's brother regarding Petitioner while he was growing up, as well as with Petitioner's mother.  (Id.)  Clarke testified that he questioned Petitioner "very

closely" about his drug use and alcohol intake. (Id. at 153-54.) He also testified that he
asked Petitioner about whether he had ever been abused and about how he was disciplined,
and that he also reviewed those issues with family members of Petitioner. (Id.)

Clarke acknowledged that he did not seek Petitioner's California incarceration
records, but explained that he had concluded that the California Department of Corrections
was unlikely to have records relevant to potential mitigation, such as psychological records,
because Petitioner had only been incarcerated for two years for burglary and was not "a
hardened criminal." (Id. at 151-52.) Clarke also acknowledged that he did not seek
Petitioner's school records, instead relying on family members to provide information
regarding Petitioner's education. (Id. at 153.) He also acknowledged that he did not seek
a mental health evaluation of Petitioner, explaining that he had not observed anything from
his many lengthy meetings with Petitioner, or interviews of Petitioner's family, that
suggested that such an evaluation was warranted. (Id. at 154-55.) Clarke acknowledged
that he did not request Petitioner's medical history, but he questioned family members
regarding any "medical problems" or "anything out of the ordinary" in Petitioner's
background. (Id. at 155.) Finally, while acknowledging that Bryant told him that Petitioner
had a "cocaine problem" (RT 9/9/93 at 7), Clarke testified that Petitioner had never told him
that he was addicted to cocaine or that he had used cocaine the day of the crime; he had only
told Clarke that he had been intoxicated the day of the crime (id. at 4-5).

Petitioner presented no evidence at the state PCR evidentiary hearing to contradict
Clarke's testimony. In an affidavit submitted in support of his amended PCR petition,
Petitioner averred that Clarke "never discussed the penalty phase of my trial with me until
about twenty (20) minutes before the mitigation/aggravation hearing." (ROA 141, ex. C at
¶ 2.) He also averred that Clarke "never" asked him "any questions whatsoever" regarding
his personal background and that because of Clarke's alleged "lack of interest," Petitioner
never discussed several factors that might have been offered in mitigation. (Id. at ¶ 5.)
Clarke's presentation of three witnesses at sentencing, each of whom had traveled to Yuma
from at least as far away as Banning is alone sufficient to discredit the implication that

1    Clarke failed to prepare for the sentencing until minutes before the aggravation/mitigation
2    hearing. More critically, Petitioner did not testify nor otherwise present evidence from any
3    family member or Bryant to contradict Clarke's testimony at the evidentiary hearing. The
4    PCR court clearly found Clarke more credible than Petitioner's affidavit on these points.

5         Further, Petitioner presented no evidence that either his school records or his
6    California incarceration records would have revealed potential mitigation. Rather, as noted
7    by Dr. Roy in his report and in his testimony, a single reference to Petitioner in his school
8    records as "educable mentally retarded" was contradicted by Dr. Roy's own testing of
9    Petitioner, which reflected that Petitioner had average or low-average intelligence and
10   abilities and was not retarded. (RT 9/8/93 at 35.)

11        Nor did Petitioner establish that Clarke acted unreasonably in not seeking a mental
12   health evaluation. Counsel performs deficiently when he is on notice of a client's serious
13   mental health problems but fails to complete a reasonable mitigation investigation or to
14   provide a reasonable tactical justification for not conducting such an investigation.
15   See Caro, 280 F.3d at 1254. There was scant evidence that Petitioner had been treated for
16   any prior mental illness or had any mental health history. In an affidavit appended to his
17   amended PCR petition, Petitioner averred that after getting into trouble when he was fifteen,
18   he received psychiatric counseling as part of his rehabilitation. (ROA 141, ex. C.)
19   Petitioner reported this episode to Dr. Roy, telling him that the psychologist "concluded that
20   the death of [Petitioner's] father left him without a male figure in his life and was
21   responsible for the difficulties he experienced." (ROA 173 at 21.) There is no evidence
22   regarding the nature or extent of such counseling. Petitioner also reported to Dr. Roy that
23   in 1981 he had been taken to the Sacramento County Hospital after overdosing on LSD and
24   passing out, and was admitted to the psychiatric unit. (ROA 173 at 16.) There is no
25   evidence regarding the length of Petitioner's stay, treatment or diagnosis.[12]   Most

26

27
     _____
28        [12]    Dr. Roy noted that there were no confirming hospital records of that admission
     at the time of his report. (ROA 173 at 17.)

- 32 -

1   significantly, there is no evidence that either Petitioner, a family member or a friend ever

2   disclosed these occurrences to Clarke or that either of these occurrences would have led to

3   relevant mitigation. See Miniel v. Cockrell, 339 F.3d 331, 345 (5th Cir. 2003) (counsel not

4   deficient where there was nothing in the record or counsel's interactions with client to alert

5   counsel to potential mental problems); cf. Turner v. Calderon, 281 F.3d 851, 892 (9th Cir.

6   2002) (where counsel on notice that client might be mentally impaired, the failure to

7   investigate mental condition as mitigating factor without strategic reason is deficient);

8   Evans, 855 F.2d at 636-37 (counsel deficient where he failed to investigate client's

9   documented history of mental problems).   There was also no evidence that Petitioner, any

10   family member or friend alerted Clarke that Petitioner had suffered several head injuries

11   during his childhood and adolescence.[13]

12        Finally, it appears that Petitioner told Clarke only that he was intoxicated the night

13   of the crime; he did not say that he had also used cocaine and that he was an alcoholic and

14   drug addict. Absent evidence that Petitioner, or others, provided such information to Clarke,

15   Clarke had little reason to further investigate the issue.  On this record, the Court does not

16   find that Clarke conducted an unreasonable investigation.  See Wiley v. Puckett, 969 F.2d

17   86, 100 (5th Cir. 1992) (even if petitioner had told his counsel that he was under the

18   influence of drugs and alcohol, there was no reason for counsel to suspect existence of

19   mental impairment, and counsel's decision to limit investigation of potential mitigating

20   evidence to state's witnesses was reasonable).  Thus, the Court concludes that Clarke's

21   investigation and presentation of mitigation was reasonable and that he did not perform

22   deficiently.  However, even if Clarke performed deficiently in investigating and presenting

23   mitigation, the Court concludes that Petitioner was not prejudiced.

24        Prejudice Analysis

25        The prejudice component of the Strickland test focuses on whether counsel's

26   

27       [13]   It appears that medical treatment was only sought in one of those instances,
after Petitioner was involved in a car/bicycle accident when he was fifteen. (See ROA 173

28   at 13-14.)

1   deficient performance renders the result of the sentencing unreliable or the proceeding

2   fundamentally unfair. Lockhart v. Fretwell, 506 U.S. 364, 372 (1993). Thus, under this

3   prong, "an error by counsel, even if professionally unreasonable, does not warrant setting

4   aside the judgment of a criminal proceeding if the error had no effect on the judgment."

5   Strickland, 466 U.S. at 691. To demonstrate prejudice, the petitioner "must show that there

6   is a reasonable probability that, but for counsel's unprofessional errors, the result of the

7   proceeding would have been different." Id. at 694. A reasonable probability is a probability

8   sufficient to undermine confidence in the outcome. Id. Discussing the prejudice standard,

9   the Supreme Court stated in Strickland that:

10          The assessment of prejudice should proceed on the assumption that the
     decisionmaker is reasonably, conscientiously, and impartially applying the
11     standards that govern the decision. . . . When a defendant challenges a death
     sentence such as the one at issue in this case, the question is whether there is
12     a reasonable probability that, absent the errors, the sentencer–including an
     appellate court, to the extent it independently reweighs the evidence–would
13     have concluded that the balance of aggravating and mitigating circumstances
     did not warrant death.
14          In making this determination, a court hearing an ineffectiveness claim
     must consider the totality of the evidence before the judge . . . . Some of the
15     factual findings will have been unaffected by the errors, and factual findings
     that were affected will have been affected in different ways. Some errors will
16     have had a pervasive effect on the inferences to be drawn from the evidence,
     altering the entire evidentiary picture, and some will have had an isolated,
17     trivial effect. Moreover, a verdict or conclusion only weakly supported by the
     record is more likely to have been affected by errors than one with
18     overwhelming record support. Taking the unaffected findings as a given, and
     taking due account of the effect of the errors on the remaining findings, a
19     court making the prejudice inquiry must ask if the defendant has met the
     burden of showing that the decision reached would reasonably likely have
20     been different absent the errors.

21   Id. at 695-96. The additional mitigation evidence must do more than barely alter the

22   sentencing profile already presented to the sentencing judge. Id. at 699-700.

23          In evaluating prejudice, a court is "asked to imagine what the effect might have been

24   upon a sentencing judge, who was following the law, especially one who had heard the

25   testimony at trial. Mitigating evidence might well have one effect on the sentencing judge,

26   without having the same effect on a different judicial officer." Smith v. Lewis, 140 F.3d

27   1263, 1270 (9th Cir. 1998). Thus, this Court must consider Arizona law regarding the

28   weighing of aggravating and mitigating circumstances before it can determine whether there

- 34 -

1  is a probability the result of the sentencing proceeding would have been different if the

2  additional mitigation had been proffered. Id. at 1271. At the time Petitioner was sentenced,

3  Arizona's death penalty statute required a judge to impose a death sentence if one or more

4  aggravating circumstances were proven beyond a reasonable doubt and the mitigation

5  established by a preponderance of the evidence was not sufficiently substantial to call for

6  leniency. A.R.S. § 13-703(E) (superseded).[14]

7        The PCR court, before whom Petitioner was tried, heard all of the additional

8  mitigation evidence proffered by Petitioner.  It credited Dr. McCullars's finding of

9  antisocial personality disorder and concluded that Petitioner had not demonstrated a

10 reasonable probability that his sentence would have been different if that mitigation had

11 been presented at trial. A federal habeas court must defer to a state post-conviction court's

12 credibility determinations, following an evidentiary hearing, if they are fairly supported by

13 the record. See Sophanthavong v. Palmateer, 378 F.3d 859, 867 (2004) (citing Marshall v.

14 Lonberger, 459 U.S. 422, 434 (1983), for the holding that former § 2254(d) gave federal

15 habeas courts "no license to redetermine credibility of witnesses whose demeanor has been

16 observed by the state court, but not by them."); Carriger v. Stewart, 132 F.3d 463, 473 (9th

17 Cir. 1997).  This Court concludes that the PCR court's credibility determinations, and the

18 fact-finding based on those determinations, are fairly supported by the record in this case.

19 Moreover, the Court concludes that the additional mitigation proffered by Petitioner at the

20 state evidentiary hearing was insufficient to make a different sentence reasonably probable

21 had counsel presented it at sentencing.

22        *Intoxication the Night of the Crime*

23        Under Arizona law, intoxication at the time of a crime can constitute statutory

24

25        [14]    In Ring v. Arizona, 536 U.S. 584 (2002), the Supreme Court ruled that a
   sentencing judge, sitting without a jury, may not find an aggravating factor necessary for
26 imposition of the death penalty, invalidating this aspect of Arizona's capital sentencing
   scheme. In Schriro v. Summerlin, 124 S.Ct. 2519 (2004), the Court held that Ring does not
27 apply retroactively to cases, such as Petitioner's, that were already final on direct review at
28 the time Ring was decided.

mitigation if a defendant establishes that his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." A.R.S. § 13-703(G)(1). To establish this factor based on voluntary intoxication, a defendant must show either that his capacity to appreciate the wrongfulness of his conduct or that his capacity to conform his conduct to the requirements of the law was significantly impaired at the time of the offense. See, e.g., State v. Woratzeck, 134 Ariz. 452, 458, 657 P.2d 881, 871 (1982); State v. Lavers, 168 Ariz. 376, 395, 814 P.2d 333, 353 (1991). However, self-reports of voluntary intoxication at the time a crime was committed are subject to searching skepticism because of the obvious motive to fabricate. See, e.g., State v. Medrano, 185 Ariz. 192, 194, 914 P.2d 225, 227 (1996); State v. Murray, 184 Ariz. 9, 45, 906 P.2d 542, 578 (1995) (rejecting historical substance abuse as a mitigating factor where evidence of abuse was self-reported and uncorroborated). Further, a defendant's claim of alcohol or drug impairment may be rebutted by evidence that he took steps to avoid detection shortly after the murder or when it appears that intoxication did not overwhelm the defendant's ability to control his physical behavior. See State v. Rienhardt, 190 Ariz. 579, 591-92, 951 P.2d 454, 466-67 (1997); State v. Stanley, 167 Ariz. 519, 530-31, 809 P.2d 944, 955-56 (1991). In addition, a long history of drug dependence, absent evidence that a defendant was actually impaired at the time of the crime, does not constitute mitigation. See State v. Jones, 197 Ariz. 290, 312, 4 P.3d 345, 367 (2000).

In this case, the only evidence, other than self-reports, that Petitioner was under the influence of alcohol and drugs the night of the crime was Bryant's testimony that Petitioner sounded intoxicated when he called her at least two hours *after* the offense. Although Petitioner ostensibly refused to discuss the details of the crime with either PCR expert, he nevertheless conveyed to each that he was intoxicated the night of the crime. However, neither expert opined that Petitioner's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law were impaired, much less significantly impaired. See A.R.S. § 13-703(G)(1). Indeed, the State's expert found

- 36 -

1   Petitioner's self-report untrustworthy, and the PCR court clearly agreed.   In addition,

2   evidence supports that Petitioner fled from the Hills' home immediately after they were shot,

3   that he called Bryant, and ultimately purchased a bus ticket to return to Banning.   These

4   facts rebut Petitioner's claimed impairment the night of the crime.   The Court therefore

5   concludes that the newly-proffered evidence of impairment would be accorded little weight.

6          *Mental Impairment*

7          Evidence was also proffered at the PCR hearing that Petitioner had diffuse brain

8   damage, and/or antisocial personality disorder.   Under Arizona law, evidence of head

9   injuries and resulting brain damage do not carry substantial mitigating weight absent a

10  causal connection to the crime.   Cf. State v. Stokley, 182 Ariz. 505, 898 P.2d 454 (1995)

11  (evidence of moderate to severe brain damage as a result of head injuries offset by above-

12  average intelligence and lack of impulsivity); State v. Stuard, 176 Ariz. 589, 863 P.2d 881

13  (1993) (reducing death sentence where evidence established tenuous impulse control due

14  to low IQ and substantial organic brain damage); State v. Chaney, 141 Ariz. 295, 686 P.2d

15  1265 (1984) (concluding that evidence of brain damage failed to establish inability to

16  control conduct).   However, major mental impairments, such as mental illness or brain

17  damage, carry far more mitigating weight than does a personality disorder *if* such

18  impairments demonstrate a defendant's inability to control his conduct or to appreciate the

19  difference between right and wrong.   See A.R.S. § 13-703(G)(1); State v. Doss, 116 Ariz.

20  156, 163, 568 P.2d 1054, 1061 (1977); State v. Richmond, 114 Ariz. 186, 197-98, 560 P.2d

21  41, 52-53 (1976). A personality disorder is only entitled to meaningful weight if it had some

22  effect on a defendant's capacity to conform his conduct to the law's requirements or

23  significantly influenced his behavior at the time of the crime.   See State v. Hoskins, 199

24  Ariz. 127, 152, 14 P.3d 997, 1022 (2000) (significant mitigation established if defendant

25  shows causal connection between personality disorder and commission of the crime); State

26  v. Vickers, 129 Ariz. 506, 515, 633 P.2d 315, 324 (1981).

27         Although Dr. Roy concluded that Petitioner had diffuse brain damage, he did not find

28  that such damage significantly impaired Petitioner's capacity to appreciate the wrongfulness

1   of his conduct or to conform his conduct to the requirements of law.  Dr. McCullars, whom

2   the PCR court found credible, found no indication that diffuse brain damage impaired

3   Petitioner's capacity in any regard.  Thus, any weight to be given to brain damage would be

4   minimal.  Further, although Dr. McCullars found that Petitioner had antisocial personality

5   disorder, there was no evidence that it impaired Petitioner's capacity to appreciate the

6   wrongfulness of his conduct or to conform his conduct with the law, or any causal

7   connection to Petitioner's involvement in the crime.  Thus, the weight given to that finding

8   would be minimal.

9   *Dysfunctional Family Background*

10  Both experts agreed that Petitioner had a significantly dysfunctional background.

11  Arizona courts have held that while a difficult family background, including childhood

12  abuse, may be relevant mitigation at the penalty phase, dysfunctional family history is

13  entitled to significant mitigating weight only if it had a causal connection to the offense-

14  related conduct.  See State v. Mann, 188 Ariz. 220, 231, 934 P.2d 784, 795 (1997); State v.

15  Towery, 186 Ariz. 168, 189, 920 P.2d 290, 311 (1996); Stuard, 176 Ariz. at 608 n. 12, 863

16  P.2d at 900 n. 12.  Further, the weight accorded a defendant's difficult family background

17  may be discounted for an adult offender because adults are considered to have greater

18  responsibility for their actions.  Gretzler, 135 Ariz. at 58, 659 P.2d at 16.

19  While both experts concluded that Petitioner had a dysfunctional family background,

20  neither identified any causal connection to Petitioner's participation in the offense.  The only

21  indication of any possible abuse was Dr. Roy's surmise that the discipline Petitioner

22  received might be considered abusive by later standards.  In any event, the possible effect

23  on Petitioner of his dysfunctional family background was mediated by his being 27 years

24  of age at the time of the crime.  Petitioner's evidence of a dysfunctional family background

25  would be entitled to little weight.

26  *Summary*

27  The Court concludes that it is not reasonably probable that the additional mitigation

28  proffered by Petitioner at his PCR hearing would have been sufficient to alter his sentence

- 38 -

and, thus, to establish prejudice.  There was evidence that Petitioner went into the Hills'

home seeking drugs and money and that he knew before entering the home that one or more

of its occupants might be shot, "if things [got] rough."  Petitioner participated in forcing

entry into the home, tying up the elderly occupants (face down on the floor) and ransacking

their bedroom for valuables.  Either Petitioner or his accomplice repeatedly stuck a gun into

Ralph Hill's ear.  Both Hills heard one intruder say that they should "get" the Hills' teenage

son.  Finally, after Ralph glimpsed one of his assailants, Sterleen witnessed the shooting of

her husband, followed by the pumping of the shotgun, and the undoubted realization that she

was next.  Robinson, 165 Ariz. at 61, 796 P.2d at 863.  Circumstantial evidence established

that Petitioner participated in these events, even if he was not the actual shooter.  These facts

support that Petitioner's participation was for pecuniary gain, and that the killing was

especially cruel, heinous and depraved.  In opposition to this evidence, Petitioner points to

claimed voluntary intoxication at the time of the crime and a chronic substance abuse

problem, diffuse brain damage and antisocial personality disorder, and a dysfunctional

family background.  He did not show that any of these, separately or combined, impaired

his capacity to control his conduct to the law's requirements or know the difference between

right and wrong.  Nor did he show any causal connection of these factors with the crime, to

help explain and therefore mitigate his role in the murder.  Thus, even if mitigating,

Petitioner failed to establish that they were entitled to more than minimal weight, as the PCR

court concluded.  The Court finds that, after considering the totality of the mitigation

evidence presented at sentencing and during the PCR, Petitioner has not demonstrated that

he was prejudiced by counsel's allegedly deficient performance.  Accordingly, Petitioner

is not entitled to relief on this claim.

### Claim 13:    Ineffective Assistance of Appellate Counsel

In Claim 13, Petitioner alleges that appellate counsel was ineffective for failing to

argue that there was insufficient evidence to sustain Petitioner's conviction in violation of

his rights to due process, equal protection, protection from cruel and unusual punishment,

and counsel under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Dkts. 20 at 51-52;

- 39 -

85 at 72-74.)  Petitioner's trial counsel, Robert Clarke, moved for acquittal and for a new trial based on insufficient evidence following the guilt phase and at the commencement of sentencing.  Clarke represented Petitioner on direct appeal, but did not raise a sufficiency of the evidence claim in his opening brief.

Petitioner's co-defendant Mathers raised a sufficiency of the evidence claim in his appeal.  In the course of granting relief on that claim, the Arizona Supreme Court noted that there was sufficient evidence to support Petitioner's conviction.  Mathers, 165 Ariz. at 71, 796 P.2d at 873.  Petitioner argues that the supreme court's decision to address an issue that was not specifically raised by him did not negate counsel's duty to raise and zealously argue the issue. (Dkt. 85 at 73.)  Petitioner's claim must fail on the prejudice prong because there is no probability that if appellate counsel had raised the claim the outcome of the proceeding would have been different.  See Strickland, 466 U.S. 694, 697 (finding that courts can analyze claim solely on prejudice prong, which requires a showing of a reasonable probability that absent counsel error the result would have been different).  The supreme court considered the issue *sua sponte* and determined that sufficient evidence supported Petitioner's conviction.  See Mathers, 165 Ariz. at 71, 796 P.2d at 873; see also discussion supra Claim 5.  There is no prejudice when appellate counsel does not raise a meritless claim.  See Featherstone v. Estelle, 948 F.2d 1497, 1507 (9th Cir. 1991).  Accordingly, relief on this claim will be denied.

**Claim 14-B:  The Arizona Supreme Court Failed to Consider Mitigation Evidence in Its Independent Review**

**Claim 15-B:  The Arizona Supreme Court Should Have Considered Mathers's Acquittal as a Mitigating Circumstance in Its Independent Sentencing Review**

In Claim 14-B, Petitioner alleges that the Arizona Supreme Court failed to consider and weigh all of the mitigating evidence supported by the record in its independent review of his sentence.  In Claim 15-B, Petitioner alleges that the Arizona Supreme Court should have considered Mathers's acquittal as a mitigating circumstance when it independently reviewed Petitioner's sentence on direct appeal.

1    The Court previously declined to determine whether Petitioner had properly

2    exhausted Claims 14-B and 15-B, subject to further briefing by the parties regarding the

3    issue. (Dkt. 64 at 27, 29.) The parties included additional briefing regarding the procedural

4    status of these claims in their merits briefs.  The Court has reviewed those briefs and

5    concludes that review on the merits of Claims 14-B and 15-B is procedurally barred.

6            Principles of Exhaustion and Procedural Default

7            To properly exhaust state remedies, a petitioner must "fairly present" his claims to

8    the state's highest court in a procedurally appropriate manner. O'Sullivan v. Boerckel, 526

9    U.S. 838, 848 (1999).  A claim is "fairly presented" if the petitioner has described the

10   operative facts and the federal legal theory on which his claim is based so that the state

11   courts have a fair opportunity to apply controlling legal principles to the facts bearing upon

12   his constitutional claim. Anderson v. Harless, 459 U.S. 4, 6 (1982); Picard v. Connor, 404

13   U.S. 270, 277-78 (1971).[15]  Explicit fair presentation must be made not only to the trial or

14   post-conviction court, but to the state's highest court. Baldwin v. Reese, 541 U.S. 27, 32

15   (2004).

16           A habeas claim may be precluded from federal review in either of two ways.  First,

17   a claim may be procedurally defaulted in federal court if it was actually raised in state court

18   but found by that court to be defaulted on state procedural grounds. Coleman v. Thompson,

19   501 U.S. 722, 729-30 (1991).  Second, a claim may be procedurally defaulted in federal

20   court if the petitioner failed to present the claim in any forum and "the court to which the

21   petitioner would be required to present his claim[] in order to meet the exhaustion

22   requirement would now find the claim[] procedurally barred." Coleman, 501 U.S. at 735

23   n.1. This is often referred to as "technical" exhaustion because although the claim was not

24   actually exhausted in state court, the petitioner no longer has an available state remedy. See

25   Gray v. Netherland, 518 U.S. 152, 161-62 (1996) ("A habeas petitioner who has defaulted

26   _____

27           [15]    Resolving whether a petitioner has fairly presented his claim to the state court
     is an intrinsically federal issue to be determined by the federal court. Wyldes v. Hundley, 69
28   F.3d 247, 251 (8th Cir. 1995); Harris v. Champion, 15 F.3d 1538, 1556 (10th Cir. 1994).

his federal claims in state court meets the technical requirements for exhaustion; there are no remedies any longer 'available' to him.").

Rule 32 of the Arizona Rules of Criminal Procedure governs when petitioners may seek relief in post-conviction proceedings and raise federal constitutional challenges to their convictions or sentences in state court. Rule 32.2 provides, in part:

> a. Preclusion. A defendant shall be precluded from relief under this rule based upon any ground:
> . . . .
>
> (2) Finally adjudicated on the merits on appeal or in any previous collateral proceeding;
>
> (3) *That has been waived at trial, on appeal, or in any previous collateral proceeding.*
>
> b. Exceptions. Rule 32.2(a) shall not apply to claims for relief based on Rules 32.1(d), (e), (f), (g) and (h). When a claim under [these subsections] is to be raised in a successive or untimely post-conviction relief proceeding, the notice of post-conviction relief must set forth the substance of the specific exception and the reasons for not raising the claim in the previous petition or in a timely manner. If the specific exception and meritorious reasons do not appear substantiating the claim and indicating why the claim was not stated in the previous petition or in a timely manner, the notice shall be summarily dismissed.

Ariz. R. Crim. P. 32.2 (West 2003) (emphasis added). Thus, pursuant to Rule 32.2, a petitioner may not be granted relief on any claim which could have been raised in a prior petition for post-conviction relief. Only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a prior petition will the preclusive effect of Rule 32.2 be avoided.

Therefore, if a claim was not raised previously in state court, this Court must determine whether Petitioner has state remedies currently available to him pursuant to Rule 32. If no remedies are currently available, then the claim is "technically" exhausted but procedurally defaulted. Coleman, 501 U.S. at 732, 735 n.1. Because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. Reed v. Ross, 468 U.S. 1, 9 (1984). However, as a general matter, the Court will not review the merits of a procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure to properly

1   exhaust in state court and prejudice from the alleged constitutional violation, or shows that

2   a fundamental miscarriage of justice would result if the claim were not heard on the merits

3   in federal court.  Coleman, 501 U.S. at 735 n.1.

4          Exhaustion Analysis

5          In light of the parties' supplemental briefing, the Court considers three ways in which

6   Petitioner may have fairly presented this claim to the state's highest court:  (1) by virtue of

7   the Arizona Supreme Court's sentencing review; (2) by way of a motion for reconsideration

8   to the Arizona Supreme Court; or (3) by including the claim in his petition for review from

9   denial of his PCR petition.

10          First, the Court rejects Petitioner's contention that the supreme court had a fair

11   opportunity to address these claims during its sentencing review.  These claims could not

12   have been exhausted as part of Petitioner's direct appeal when the supreme court conducted

13   a sentencing review, because it is during that review that the errors are alleged to have

14   occurred.  In order to give the state's highest court the opportunity to rule on his claim of

15   error arising during his direct appeal, the proper method was to file a motion for

16   reconsideration with the Arizona Supreme Court.  See Ariz. R. Crim. P. 31.18(b) ("Any

17   party desiring reconsideration of a decision of an appellate court may file a motion for

18   reconsideration in the appellate court within fifteen days after the filing of a decision by the

19   appellate court."); Correll v. Stewart, 137 F.3d 1404, 1418 (9th Cir. 1998) (finding

20   procedural default of claim based on error of the Arizona Supreme Court where petitioner

21   failed to file motion for reconsideration, which is "an avenue of relief that the Arizona Rules

22   of Criminal Procedure clearly outline.").  By not filing a motion for reconsideration,

23   Petitioner sidestepped the best method by which he could have raised these claims.

24          In the absence of filing a motion for reconsideration, Petitioner could have attempted

25   to fairly present these claims at each level of the state system through his PCR petition.

26   However, Petitioner did not present either Claim 14-B or 15-B in his first PCR petition or

27   subsequent petition for review.  Therefore, the Court finds that Petitioner did not fairly

28   present the substance of Claims 14-B and 15-B to the Arizona Supreme Court in his post-

- 43 -

1   conviction proceedings.

2   Petitioner was obligated to give the Arizona state courts at least one "*fair* opportunity

3   to act on [his] claim[]." O'Sullivan, 526 U.S. at 844. Because Claims 14-B and 15-B allege

4   error occurring during the Arizona Supreme Court's sentencing review, that review itself

5   did not provide the court notice of, or an opportunity to correct, the alleged error. Petitioner

6   subsequently neglected to make use of the available methods to fairly present his claims

7   regarding the supreme court's sentencing review, either by way of a motion for

8   reconsideration or by including it in his PCR proceeding. Thus, Petitioner failed to fairly

9   present these claims to the Arizona Supreme Court as required for proper exhaustion. See

10  Bell v. Cone, 125 S. Ct. 847, 851 n.3 (2005) (finding that a petitioner must present every

11  claim to the state's highest court if there is an available means). Petitioner is now

12  procedurally precluded from presenting these claims in state court by Rule 32.2(a)(3) of the

13  Arizona Rules of Criminal Procedure. This Court therefore finds that Claims 14-B and 15-B

14  are technically exhausted but procedurally defaulted, and review on the merits of these

15  claims is procedurally barred unless Petitioner demonstrates either cause and prejudice or

16  a fundamental miscarriage of justice to excuse the default. Petitioner has done neither.

17  (Dkts. 30 at 32; 85 at 74-81.) These claims are dismissed as procedurally defaulted.

18  **Claim 14-C: The Trial Court Failed to Find That Specific Mitigation Evidence
    Was Sufficient to Prevent a Death Sentence**

19
20  In Claim 14-C, Petitioner alleges that he proffered uncontested mitigation evidence

21  but the trial court found that no statutory mitigating circumstances existed and that non-

22  statutory mitigation was insufficient to overcome the aggravating factors. Petitioner argues

23  that the trial court's findings violated his rights under the Fifth, Sixth, Eighth and Fourteenth

24  Amendments. (Dkts. 67; 85 at 84-92.) As mitigation, Petitioner presented evidence of four

25  factors: intoxication, youthfulness/immaturity, his positive role within his family, and

26  evidence that his role in the offense was minor. Petitioner argues that the trial court's

27  "refusal to consider the mitigating factors [was] unwarranted based upon the evidence

28  presented at trial and sentencing" (dkt. 85 at 85), and the "trial court failed to abide by the

- 44 -

1   Arizona sentencing statute" because it was "required to determine the absence or presence

2   of each of the mitigating factors by a preponderance of the evidence . . . ." (Id. at 90.)

3   Further, he alleges that the trial court:

4            gave the mitigating factors short shrift.  The court misapplied the balancing
         test by requiring each mitigating circumstance to be sufficient to outweigh the
5            aggravating circumstances.  The sentencing court relied upon the wrong test
         to determine if a mitigating circumstance is to be considered further.  Under
6            Walton, the court must determine the presence or absence of each mitigating
         circumstance individually based upon the preponderance of the evidence and
7            only then is the court to weigh the cumulative effect of the established
         mitigators against the cumulative effect of the aggravating factors.  Under the
8            proper standard of review, the finding by the sentencing court is clearly an
         unreasonable finding of the facts.  [Petitioner] did meet his burden in
9            establishing the presence of these mitigating factors, and these mitigators
         clearly outweigh the aggravators.  Consequently, [Petitioner] should have
10           been sentenced to a life term rather than death.

11   (Id. at 91-92.)

12       The basis of Petitioner's claim is not entirely clear to the Court.  In part, Petitioner

13   appears to be arguing that the trial court failed to consider and determine the existence of

14   each mitigating circumstance presented.  However, a state court's errors in applying state

15   law do not give rise to federal habeas corpus relief.  See Ortiz v. Stewart, 149 F.3d 923, 941

16   (9th Cir. 1998).  In any event, Arizona law does not require the trial court to itemize and

17   discuss every piece of mitigation evidence.  See Jeffers v. Lewis, 38 F.3d 411, 418 (9th Cir.

18   1994).  In addressing the mitigating evidence, the trial court in this case listed and made a

19   finding as to each of the factors proffered by Petitioner.   The court determined that

20   Petitioner's capacity to control his conduct was not impaired by intoxication, that his role

21   in the offense was not minor, and that Petitioner had not established age as a mitigating

22   factor.  (RT 1/13/88 at 29-30; ROA 109 at 3-5, ¶¶ 5, 6.)  The court then listed and found as

23   mitigation Petitioner's evidence regarding his personality and commitment to his family.

24   (Id.)  Contrary to Petitioner's suggestion, the trial court did not refuse to consider the non-

25   statutory mitigation; rather, it found that mitigation insufficient to outweigh the aggravating

26   circumstances.

27       Petitioner also appears to argue that the trial court's assessment of the mitigation and

28   balancing of the mitigation and aggravation was erroneous.  The Constitution and federal

1   caselaw require only that the sentencer hear and consider all mitigating evidence; the *weight*

2   to be accorded such evidence is left to the discretion of the sentencer.   Eddings v.

3   Oklahoma, 455 U.S. 104, 114-15 (1982).  The record establishes that the trial court satisfied

4   its obligation to consider all mitigation, and Petitioner's disagreement regarding how that

5   evidence was weighted does not rise to a constitutional violation.  Further, the Arizona

6   Supreme Court conducted an independent sentencing review, during which it considered the

7   four mitigating factors urged by Petitioner.  See Robinson, 165 Ariz. at 61-62, 796 P.2d at

8   863-64.  Even if the trial court had committed constitutional error at sentencing, a proper

9   and independent review of the mitigation and aggravation by the Arizona Supreme Court

10   cured any such defect.  See Clemons v. Mississippi, 494 U.S. 738, 750, 754 (1990) (holding

11   that appellate courts are able to fully consider mitigating evidence and they are

12   constitutionally permitted to affirm a death sentence based on independent reweighing

13   despite error at sentencing).  Petitioner is not entitled to relief on this claim.

14   **Claim 15-A: The Trial Court Should Have Resentenced Petitioner in PCR**
       **Proceedings After Mathers Was Acquitted**

15

16        In Claim 15-A, Petitioner alleges that the PCR court should have resentenced

17   Petitioner during the PCR proceedings based on the acquittal of Mathers.  Although the

18   Court previously determined that this issue was exhausted and ordered briefing of the issue

19   on the merits, Petitioner did not address it in his merits brief.  The Court nevertheless

20   considers the claim.

21        Petitioner contended in his Amended Petition that the PCR court's refusal to consider

22   Mathers's disparate treatment on direct appeal, i.e., his acquittal based on insufficient

23   evidence, as a mitigating circumstance as to Petitioner's sentence violated Petitioner's

24   constitutional rights.  Petitioner argues that there was no more evidence against him than

25   there had been against Mathers, but his sentence was affirmed on direct appeal.  (Dkt. 20

26   at 55-56.)  "Unexplained disparity between sentences may constitute a mitigating factor."

27   State v. Henry, 189 Ariz. 542, 551, 944 P.2d 57, 66 (1997) (citing State v. Dickens, 187

28   Ariz. 1, 25-26, 926 P.2d 468, 492- 93 (1996); State v. Schurz, 176 Ariz. 46, 57, 859 P.2d

156, 167 (1993)). However, the Arizona Supreme Court's determination that insufficient evidence supported Mathers's conviction does not constitute "disparate treatment" of sentences because Mathers was acquitted of the crime and, therefore, received no sentence at all. Furthermore, both the state supreme court, see Robinson, 165 Ariz. at 62, 796 P.2d at 864; Mathers, 165 Ariz. at 71, 796 P.2d at 873, and this Court have concluded there was sufficient evidence to support Petitioner's conviction. See supra Claim 5. Moreover, Mathers's acquittal does not constitute a mitigating circumstance to be considered in connection with Petitioner's sentence because it does not relate to any aspect of *Petitioner's* character or record or to the circumstances of the crime. See Eddings, 455 U.S. at 111-12. To conclude otherwise would require an assumption that Mathers was guilty, despite the lack of sufficient evidence to establish his guilt. The PCR court did not violate Petitioner's constitutional rights by failing to consider Mathers's acquittal based on insufficient evidence as a mitigating circumstance as to Petitioner. Relief will be denied on this claim.

## CONCLUSION

As discussed herein, the Court concludes that Petitioner is not entitled to habeas relief on the merits of Claims 14-B and 15-B because they are procedurally barred. The Court further concludes, based on a review of the merits, that Petitioner is not entitled to habeas relief on Claims 3, 4, 5, 8-B, 8-C, 10, 11 (in part), 13, 14-C and 15-A. Accordingly, relief on these claims will be denied and this action dismissed.

Based on the foregoing,

**IT IS ORDERED** that habeas relief on Claims 3, 4, 5, 8-B, 8-C, 10, 11 (in part), 13, 14-B, 14-C, 15-A and 15-B is **DENIED** and that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 17) is **DENIED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment in accordance with this Order.

**IT IS FURTHER ORDERED** that the Clerk of Court shall forward a copy of this Order to all counsel of record, the Capital Case Staff Attorney, and Noel Dessaint, Clerk of

1   the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

2       DATED this 21 day of April, 2005.

3

4

5                                        JAMES A. TEILBORG
                                         United States District Judge
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28